IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN FLYNN, JAMES BOLAND, GERALD O'MALLEY, KEN LAMBERT, GERARD SCARANO, H. J. BRAMLETT, EUGENE GEORGE, PAUL SONGER, WILLIAM MCCONNELL, MATTHEW AQUILINE, GREGORY R. HESS, MICHAEL SCHMERBECK, VINCENT DELAZZERO, and BENJAMIN CAPP, as Trustees of, and on behalf of, the BRICKLAYERS & TROWEL TRADES INTERNATIONAL PENSION FUND 620 F Street, N.W. Washington, DC  20004 (202) 783-3788, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| and | ) ) |
| JIM ALLEN, MATTHEW AQUILINE, LON BEST, JAMES BOLAND, TED CHAMP, RAYMOND CHAPMAN, VINCENT DELAZZERO, BRUCE DEXTER, JOHN FLYNN, EUGENE GEORGE, GREGORY HESS, FRED KINATEDER, DAN KWIATKOWSKI, KEN LAMBERT, SANTO LANZAFAME, DICK LAUBER, WILLIAM MCCONNELL, EDWARD NAVARRO, GERALD O'MALLEY, JOHN PHILLIPS, CHARLES RASO, MARK ROSE, KEVIN RYAN, GERARD SCARANO, MICHAEL SCHMERBECK, PAUL SONGER, JOSEPH SPERANZA, and FRED VAUTOUR as Trustees of, and on behalf of, the INTERNATIONAL MASONRY INSTITUTE 620 F Street, N.W. Washington, DC  20004 (202) 783-3788, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ANGELO MONARCA, INC. d/b/a ANGELO MONARCA CONTRACTING LLC 51 Ferry Street Middletown, CT  06457, | ) ) ) ) ) ) |
| and | ) ) |

Civil Action No:

2327461.01

ANGELO MONARCA, Individually,                    )
  1111 Arbutus Street                              )
  Middletown, CT  06457,                          )
                                 )
                 Defendants.            )
_____ )

## COMPLAINT

Plaintiffs, by their attorneys, DICKSTEIN SHAPIRO LLP, complaining of the Defendants, allege as follows:

## CAUSE OF ACTION
### Jurisdiction and Venue

1.  This is an action brought by the fiduciaries of the Bricklayers & Trowel Trades International Pension Fund ("IPF" or "Fund") and the fiduciaries of the International Masonry Institute ("IMI") to enforce the terms of the Plan and Trust Agreements adopted by the IPF and IMI, and the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  This action arises under the laws of the United States, specifically Section 502(a)(3), 502(g)(2), and 515 of ERISA, 29 U.S.C. §§ 1132(a)(3), 1132(g)(2), 1145.  Pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), jurisdiction is therefore conferred on this Court as to the claims brought on behalf of the IPF and IMI.

2.  The IPF and IMI are administered in the District of Columbia.  Venue for the claims asserted by the IPF and IMI is conferred on this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), which provides:

> (2)  Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found.

2

### Parties

3.    Plaintiffs, John Flynn, James Boland, Gerald O'Malley, Ken Lambert, Gerard Scarano, H. J. Bramlett, Eugene George, Paul Songer, William McConnell, Matthew Aquiline, Gregory R. Hess, Michael Schmerbeck, Vincent DeLazzero and Benjamin Capp, are Trustees of, and sue on behalf of, the IPF. The IPF is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IPF trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IPF in their respective capacities as fiduciaries.

4.    The IPF also is authorized to effect collections on behalf of the IMI, pursuant to a written Assignment of Claims and the *Collection Procedures of the Central Collection Unit of the Bricklayers and Allied Craftworkers* ("Collection Procedures").

5.    Plaintiffs, Jim Allen, Matthew Aquiline, Lon Best, James Boland, Ted Champ, Raymond Chapman, Vincent Delazzero, Bruce Dexter, John Flynn, Eugene George, Gregory Hess, Fred Kinateder, Dan Kwiatkowski, Ken Lambert, Santo Lanzafame, Dick Lauber, William McConnell, Edward Navarro, Gerald O'Malley, John Phillips, Charles Raso, Mark Rose, Kevin Ryan, Gerard Scarano, Michael Schmerbeck, Paul Songer, Joseph Speranza and Fred Vautour, are Trustees of, and sue on behalf of the IMI. The IMI is an "employee benefit plan" within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3), and is a "multiemployer plan" within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37). The IMI trustees bring this action on behalf of, and for the benefit of, the beneficiaries of the IMI in their respective capacities as fiduciaries.

6.    Defendant, Angelo Monarca, Inc., upon information and belief d/b/a Angelo Monarca Contracting LLC (hereinafter collectively "Angelo Monarca, Inc."), is, and at all times

3

2327461.01

hereinafter mentioned was, a company maintaining offices and conducting business in the state of Connecticut.

7.    Defendant, Angelo Monarca, Individually, is, and at all times hereinafter mentioned was, the principal officer and controlling owner of Angelo Monarca, Inc., a company maintaining offices and conducting business in the state of Connecticut.

8.    Angelo Monarca, Inc. employs or has employed members of the International Union of Bricklayers and Allied Craftsmen and its affiliated local unions ("Union").

### Violation Charged

9.    Angelo Monarca executed collective bargaining agreements with the Union on behalf of Angelo Monarca, Inc.  The collective bargaining agreements are annexed hereto as Exhibits A and B and are hereinafter referred to as the "Agreements."

10.    Pursuant to the Agreements, Angelo Monarca, Inc. agreed to make certain payments to the IPF and IMI on behalf of its covered employees.

11.    Having submitted some contributions, Angelo Monarca, Inc. has demonstrated an awareness of the obligation to make those payments.

12.    An examination ("audit") of the books and records of Angelo Monarca, Inc. performed by the independent accounting firm of Buckley, Frame, Boudreau & Co., P.C. covering the time period October 2003 through June 2006 revealed that Angelo Monarca, Inc. failed to properly submit required reports and contributions for work performed during this time period.

13.    The total of contributions due the IPF and IMI by Angelo Monarca, Inc. for work performed during the months of October 2003 through June 2006, as determined by the audit, amounts to $22,250.62.

4

2327461.01

14.    Under the terms of the Plan and Trust Agreements adopted by the IPF and IMI, interest in the amount of $3,825.27, calculated at the rate of 15 percent per annum, and liquidated damages in the amount of $4,450.12 at the rate of 20 percent, have been assessed on such delinquent contributions determined due by the audit.

15.    Upon information and belief, the corporate status of Angelo Monarca, Inc., has been dissolved.

16.    Upon information and belief, Angelo Monarca has continued to carry on the business of Angelo Monarca, Inc. beyond that necessary to wind up its affairs.  Accordingly, Angelo Monarca is personally liable for the debts of Angelo Monarca, Inc.

17.    Plaintiffs have brought this action in faithful performance of the fiduciary duties imposed upon them under Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1).  Plaintiffs have been, and are, incurring additional attorney's fees as a direct result of Angelo Monarca Inc.'s failure to make contributions in accordance with the terms and conditions of the Agreements.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.  For the total amount of $31,305.71, which is constituted as follows:

a.  For unpaid contributions in the amount of $22,250.62 payable to the IPF and IMI for the time period October 2003 through June 2006, plus any and all additional amounts found to be due and owing through the date of judgment (ERISA  Section 502(g)(2)(A); Collection Procedures);

b.  For interest in the amount of $3,825.27 assessed on such unpaid contributions, calculated at 15 percent per annum from the Due Date (ERISA Section 502(g)(2)(B); Collection Procedures);

2327461.01

      c. For liquidated damages in the amount of $4,450.12 assessed on such unpaid contributions, calculated at 20 percent (ERISA Section 502(g)(2)(C)(ii); Collection Procedures);

      d. For the costs of filing this action in the amount of $350.00 (ERISA Section 502(g)(2)(D));

      e. For the costs of conducting the audit in the amount of $429.70 (ERISA Section 502(g)(2)(D)).

2. In the amount of Five Thousand Dollars ($5,000.00), and such additional amounts as may be incurred, representing attorney's fees and costs of this action (ERISA Section 502(g)(2)(D)).

3. That Defendants be directed to comply with their obligations to submit all required reports and to make all contributions due and owing to the IPF and IMI, and to pay the costs and disbursements of this action.

4. Such other relief as this Court deems appropriate, including judgment for any contributions and interest thereon that may accrue subsequent to the filing of this Complaint, as well as any resulting statutory damages thereon under ERISA.

Dated: February ___8___, 2008     By:_____

                        Ira R. Mitzner, DC Bar No. 184564
                        Charles V. Mehler III, DC Bar No. 475909
                        DICKSTEIN SHAPIRO LLP
                        1825 Eye Street, N.W.
                        Washington, DC 20006
                        (202) 420-2200

                        Attorneys for Plaintiffs

2327461.01

## I (a) PLAINTIFFS

JOHN FLYNN, et al.

## DEFENDANTS

ANGELO MONARCA, INC.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Ira R. Mitzner (202) 420-2200
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, DC 20006

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ○ E. General Civil (Other)     OR     ○ F. Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ⊙ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

ERISA - Complaint filed for recovery of delinquent contributions - 29 U.S.C. Sections 1002, 1132, 1145

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint    JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  2/8/08    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

    I.        COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

    III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

    IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

    VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

    VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

NCT 0218

# AGREEMENT

Between

## TILE CONTRACTORS ASSOCIATION
## OF
## CONNECTICUT

And

## INTERNATIONAL UNION OF BRICKLAYERS
## AND ALLIED CRAFTWORKERS LOCAL 1 CT

**April 1, 2002 through March 31, 2007**

This is a copy printed from the IUBAC Document Management System.

MCT 0218

# TABLE OF CONTENTS

| Article | | Page |
|---|---|---|
| Article I | Recognition | Page 1 |
| Article II | Equal Employment Opportunity | Page 1 |
| Article III | Union Membership | Page 2 |
| Article IV | Wages, Hours, & Working Conditions | Page 2 |
| Article V | Health and Safety Standards | Page 6 |
| Article VI | President and Field Representatives | Page 7 |
| Article VII | Stewards | Page 7 |
| Article VIII | Foreman | Page 8 |
| Article IX | Craft Jurisdiction | Page 8 |
| Article X | Contracting and Subcontracting | Page 10 |
| Article XI | IMI and Apprentice Trust | Page 10 |
| Article XII | Insurance | Page 12 |
| Article XIII | State and Federal Laws | Page 12 |
| Article XIV | Faulty Work | Page 12 |
| Article XV | Work Stoppage | Page 12 |
| Article XVI | Grievances Arbitration | Page 13 |
| Article XVII | Health, Pension and Annuity Funds | Page 13 |
| Article XVIII | Dues Check-Off | Page 15 |
| Article XIV | Preservation Work | Page 17 |
| Article XX | Traveling Contractors | Page 17 |
| Article XXI | Wage and Fringe Benefit Rates | Page 18 |
| Article XXII | Duration | Page 19 |

This is a copy printed from the IUBAC Document Management System.

0218

DCT 0218

# WITNESSETH

WHEREAS, the Employer recognizes the Union as the sole collective bargaining agent for all its Employees engaged as the Tile Layers and Finishers, Marble Masons and Finishers and Terrazzo Mosaic, Workers and Finishers.

WHEREAS, the Parties hereto desire to establish, maintain and regulate the standards of hours of labor, rates of pay and other terms and conditions of employment.

NOW THEREFORE, in consideration of the mutual promises, covenants and agreements unto each moving from the other, it is hereby mutually agreed by and between the parties hereto as follows:

## ARTICLE 1
### RECOGNITION

SECTION 1.  The Employer recognizes the Local #1 CT as the sole Bargaining Agent for its members, and the Local #1 CT recognizes the Tile Contractors Association of Connecticut as the sole Bargaining Agent for its members and as set forth in the Constitution and Bylaws of the International Union of Bricklayers and Allied Craftworkers and the Constitution for all such work to be performed within the State of Connecticut.

SECTION 2. The employer acknowledges that the Union has demonstrated that it represents a majority of its Employees in the bargaining unit described herein by providing or offering to provide executed union authorization cards.  Therefore, the Employer recognizes the Union as the exclusive bargaining representative of its employees in accordance with Section 9(a) of the National Labor Relations Act.

## ARTICLE II
### EQUAL EMPLOYMENT OPPORTUNITY

There shall be no discrimination in the referral, hiring, placement, classification, upgrading, layoff for termination of employment of any individual by reason of age, race, creed, color, sex, national origin, occupational irrelevant physical handicaps or membership or non-membership in the Union.  The Union agrees to support and actively participate in affirmative action programs to promote equal employment opportunity in the construction industry, and the parties hereto agree to the following system to referral of applicants for employment:

1.  The Union shall be the sole and exclusive source of referral of applicants for employment.
2.  The Employer shall have the right to reject any applicants for employment.
3.  The Union shall select and refer applicants without discrimination against such applicants by reason for membership or non-membership in the Union and such election and referral shall not be affected in any way by rules, regulations, by-laws, constitution divisions or any other aspect or obligation of referral as to the Union membership policies or requirements.  All such selections and referrals shall be in accordance with the following procedure;
4.  The Union shall maintain a register of applicants for employment at the office of its Business Manager.  If the register list is exhausted and the Union is unable to refer applicants for employment to the Employer within 24 hours from the time of receiving the Employer's request, the Employer shall be free to secure applicants without using the referral procedure.

1



5. Together with the aforementioned register of applicants, the Union shall also maintain an "Out of Work List" which shall list the applicant's chronological availability for employment. An applicant who is rejected by an Employer shall be returned to the position, which he held on the "Out of Work List" prior to his rejection.

## ARTICLE III
## UNION MEMBERSHIP

1. All Employees who are members of the Union at the time of the signing of this Agreement shall continue membership in the Union. All other employees must become members of the Union on or after the eighth (8) day following the beginning of employment, of the date of this agreement, whatever is later, and must maintain their membership in the union as a condition of employment to the extent of tendering the periodic dues and in the initiation fees uniformly required by the Union as a condition of acquiring or maintaining membership therein.

## ARTICLE IV
## WAGES, HOURS AND WORKING CONDITIONS

SECTION 1. See Article XX for the Wage and Fringe Benefit Rates.

SECTION 2. The Union shall have the option to divert monies from wages to any of the Funds upon thirty (30) days prior written notification to the Association signatory hereto.

SECTION 3. Money can be diverted back to wages from the Pension, Health and Annuity Funds subject to the approval of the Trustees, Trust Document, ERISA, Pension Benefits Guarantee Corporation and applicable laws.

SECTION 4. Should there be a need to increase the rates of contributions payable to the Health provided for in the Agreement, both parties agree to re-open the contract to discuss the increase.

SECTION 5. The regular workweek shall consist of five (5) eight (8) hour days, Monday through Friday, for a total of forty (40) hours. There shall be a one-half (½) hour unpaid lunch between 12:00 noon and 12:30 p.m. If unusual circumstances warrant, as shall be determined by the Employer, the one-half hour lunch period shall be allowed anytime between the hours of 11:30 a.m. and 1:30 p.m.

SECTION 6. The regular starting time shall be 7:00 a.m. or such other times as established by the Employer between 6:00 a.m. and 9:00 a.m. Any employee who is transferred to another job because of weather shall not displace any Employee working on that job to which he is transferred.

2

P C T   0218                                       CT   0218

SECTION 7.  Employees shall be paid the overtime rate of one and one-half times the regular straight time hourly rate of pay for all time worked in excess of eight hours per day, and for forty hours per week, and for Saturdays.  Employees shall be paid the overtime rate of two times the regular time hourly rate of pay for all time worked on Sundays and holidays.  There shall be no pyramiding of overtime.

SECTION 8.  On projects subject to limitations or restrictions by government agencies, railroads, utilities and private owners as to when work may be performed, the Employer may schedule work in accordance with these limitations or restrictions and all work will be paid at 15% above the regular straight time of pay. This applies to all time between 5:00 p.m. and 7:00 a.m. Sunday night through Friday.

SECTION 9.  The Employer shall establish one day each week, Monday through Thursday, as the Employer payday for its employees.  If a regular payday falls on a holiday, recognized in Section 11 hereof, employees shall be paid before quitting time on the regular work day immediately preceding the holiday, where practical.

The Employer shall pay employees by cash or check and shall accompany each payment with an itemized written statement setting forth the payroll period, the gross pay for said period, the hours worked and an itemized list of deductions from the employee's gross pay.  Failure of the Employer's bank to honor payroll checks because of insufficient funds may cause the Union to require the Employer to pay in cash on each regular payday.  Should an Employer's payroll check not be honored because of insufficient Funds, the Employer shall reimburse any such bank charges incurred by the employee.

SECTION 10.  There shall be only one scale of journeyman's wages and the highest scale shall prevail.  When the Employer violates this Agreement concerning the scale of wages by paying a higher rate of pay, he shall be obligated to pay the higher rate of pay to all journeyman and finishers employed on the job.  The higher wage rate shall continue in effect until the completion of the job and in no event shall a rate of wage so established be reduced on that job.

SECTION 11. (Holidays)  Recognized holidays, without pay, shall be New Years Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Under no circumstances shall work be scheduled for Labor Day, except in cases of extreme emergency involving life or property.  In the event any of the above holidays fall on a Sunday, it will be observed on the following Monday.

SECTION 12.  Any employee requested to report to work by an Employer or his Representative, who is not put to work after bringing his tools to work on the job, shall receive two (2) hours pay provided the employee is not prevented from working by conditions caused by adverse weather or other conditions beyond the control of the Employer, in which event the Employees shall be signed in and put to work on the next day when there is work available, weather permitting.

SECTION 13.  Any Employer, coming from outside of the Union's jurisdiction, shall notify the Union at least twenty-four (24) hours before he starts work, that he will engage employees, and pay said employee's wages, provided herein, in the full job at the rate provided for in whichever is higher.  The Employer can provide "One, Lead Mechanic and One, Lead Finisher," all other employees shall be members of Local 1 CT.

SECTION 14.  (Transportation) Employees shall provide transportation to and from the job in a property insured company vehicle.  Employees have the right to refuse transportation in a

3

CT 0218

company vehicle if the vehicle fails to meet safety requirements as set by the Connecticut Department of Motor Vehicle. If the Employer requests that the employees use their own vehicles to the job, they shall be paid travel time. Travel shall be paid by the rates listed by towns:

ZONE 1: " No Reimbursement"
Ansonia, Avon, Beacon Falls, Bethany, Bethel, Berlin, Bloomfield, Bolton, Branford, Bridgeport, Bristol, Cheshire, Chester, Clinton, Cromwell, Darien, Deep River, Derby, Durham, East Haddam, East Hampton, East Hartford, East Haven, East Lyme, East Windsor, Easton, Essex, Farmington, Fairfield, Glastonbury, Guilford, Haddam, Hamden, Hartford, Hebron, Killingworth, Lyme, Madison, Manchester, Marlborough,  Meriden, Middlebury, Middlefield, Middletown, Milford, Monroe, Naugatuck, New Britain, New Canaan, New Haven, Newington, Newtown, North Branford, North Haven, Norwalk,  Old Lyme, Old Saybrook, Orange, Oxford, Plainfield, Portand, Prospect, Redding, Rocky Hill, Salem, Seymour, Shelton, Southington, South Windsor, Southbury, Stamford, Stratford, Trumbull, Vernon, Wallingford, Waterbury, Westbrook, West Hartford, West Haven, Westport, Weston, Wethersfield, Wilton, Windsor, Windsor Locks, Wolcott and Woodbridge.

ZONE 2: "$5.00 per day"
Andover, Bozrah, Bridgewater, Brookfield, Burlington, Colchester, Columbia, Coventry, Danbury, East Granby, Ellington, Enfield, Greenwich, Groton, Lebanon, Ledyard, Montville, New Fairfield, New London, New Milford, Norwich, North Stonington, Plymouth, Preston, Ridgefield, Roxbury, Simsbury, Somers, Stonington, Suffield, Tolland, Waterford, Watertown and Woodbury.

ZONE 3: "$8.00 per day"
Ashford, Bethlehem, Canton, Chaplin, Franklin, Granby, Griswold, Harwinton, Lisbon, Mansfield, Morris, New Hartford, Sprague, Stafford, Thomaston, Voluntown, Washington, Willlington and Windham.

Zone 4: "$10.00 per day"
Barkhamsted, Brooklyn, Canaan, Canterbury, Colebrook, Cornwall, Eastford, Goshen, Hampton, Hartland, Kent, Killingly, Litchfield, Norfolk, North Canaan, Plainfield, Pomfret, Putnam, Salisbury, Scotland, Sharon,  Sherman, Sterling, Thompson, Torrington, Union, Warren, Winchester, and Woodstock,

SECTION 14 (a) Metropolitan Hartford Contractors shall use the attached zone schedule.

SECTION 14 (b) If an employee is requested to work outside the territorial jurisdiction of Local #1 CT, he/she receive travel compensation based on the follows:
| 0-10 Miles | $2.00/Day |
| 11-30 Miles | $7.00/Day |
| 31&Over Miles | $.30 Mile |

Mileage calculation to be based on distance calculated one-way to the work site from the closest point covered by Local #1 CT territory as defined in Article 1 Section 1.
Total compensation to be a combination of the above scale added to the zone rate (as defined in Article IV Section 14) utilized in calculating mileage.

If transportation is provided by the contractor, travel expenses will be limited to $10/day and will only be applied on dates travel is between Local #1 CT jurisdiction and the work place.

4

MCT 0218

SECTION 15. "SHIFT PROVISION" Shift work may be permitted under the following conditions:
(a) Where a job has more than one (1) eight (8) hour shift in any one (1) twenty-four (24) hour period. Employees will not be permitted to work more than one (1) shift in any one (1) work day.
(b) All employees on shift work shall receive a full normal workday's pay.
(c) Seven and one-half (7-1/2) hour's work shall constitute the shift during the second shift and seven- (7) hours work during the third shift.
(d) Where no third shift exists, time worked beyond the end of the second shift shall be paid at the overtime rate.
(e) No shift work will be permitted for less than five (5) consecutive workdays.
(f) Shift conditions and wages shall apply to alteration work in occupied areas without the requirement that work be performed during the regular work day, provided a written shift permit is issued by the Union.
(g) When an Employer wishes to work employees for the second or third shift periods, he shall notify the Union in writing within twenty-four (24) hours prior to the shift so that proper arrangements shall be made.

SECTION 16. (Grinding) Terrazzo Finishers engaged in the use of terrazzo grinding shall be paid $3.50 over the scale as of April 1, 2003; and $4.00 as of April 1, 2004; and $4.50 as of April 1, 2005; and $5.00 as of April 1, 2006. The rate shall be for the full working day.

SECTION 17. Employees shall receive four hours pay for the Christmas Eve Holiday provided the employee works the regularly scheduled day before and after the holiday. Employers may schedule work on Christmas Eve and Employees shall receive pay for actual hours worked on that day, in addition to their holiday pay. It shall be understood that the Employee must be on the Employer's payroll as of the 1st. of December.

SECTION 18. (Morning Break) A coffee/refreshment break of not to exceed ten (10) minutes shall be allowed every morning, with the understanding that either an apprentice or a finisher shall be allowed to get the refreshments and the other employees shall not leave their assigned work station. The break shall begin when the employees receive the refreshments.

SECTION 19. If an Employee is requested to work outside the territorial jurisdiction of Local #1 CT, *and required to stay overnight or the distance, as defined in Article IV Section 14b, is greater than 31 miles,* he/she shall receive one of the following compensation packages for living expenses at the contractors option:

1) Room and Board of $50/Day.
2) Room Supplied By the Contractor and Board of $20/Day.

SECTION 20. Absenteeism: If an Employee is going to be absent, he must notify his contractor and also call the union office. If no one is in the office, he must leave a message on the recorder. If he does not comply, the following will take place.

Journeypersons:    The first time; Employee will receive a verbal warning.
The second time; Employee will be brought before the joint arbitration board and fined $100.00.
The third time; Employee will be brought before the joint arbitration Board and find $150.00.
The fourth time; Employee will be brought before the joint arbitration board and fined $300.00.

5

ᴺCT 0218

The fifth time; Employee will be suspended for thirty (30) days.

| | |
|---|---|
| Apprentices: | The first time; Employee will receive a verbal warning.<br>The second time; $100.00 fine.<br>The third time; Employee will be dropped from the union. |

SECTION 21: Tile Layer Journeyman who has not previously worked under the terms of this Agreement when dispatched, shall be dispatched as Journeyman.  If the contractor objects within ten (10) working days, that said Employee is not a qualified journeyman, said Employee shall become an Improver Apprentice, who shall receive 85% of the Journeyman wage rate, plus the benefits specified in this agreement until such time as the Employee may be evaluated and/or reclassified.

Any worker may be re-evaluated on request if his or her production and quality is not consistent with current classification.

ARTICLE V
HEALTH AND SAFETY STANDARDS

SECTION 1.  The Employer, the Union and the Employees shall abide by the provisions contained in the Federal Williams-Steiger Occupational Safety and Health Act and the Connecticut Safety Construction Act.

SECTION 2. Employees shall abide by all safety regulations promulgated by the Employer, and an employee shall report to the Employer every injury which he incurs in the course of employment on the day such injury occurs.

SECTION 3.  When using machines in the performance of work, men and machines shall be properly guarded to prevent possible injuries, all safety devices to be supplied by the Contractor, and no safety devices be removed from such machine.

SECTION 4.  No employee shall be required to work where he is subject to excessive dust or grift caused by cutting or grinding.  This does not pertain to the operator who shall be adequately protected.

SECTION 5.  (Drug Testing)  In an effort to enhance the safety of the work place, testing of employees and applicants for drug, alcohol or other substance impairment may be required by the owner or Employer.  The testing program shall be performed by recognized physicians and/or laboratories and shall comply with any and all federal state and local standards.  The cost of such programs shall be born by the Employer.  When testing is required by the Employer, the employee shall be paid for the time necessary to take the test provided that the results of the employee's test are negative.  No time shall be paid to any employee whose test results are positive.

Nothing herein, shall be construed to impose any obligation, duty or responsibility upon the Union or its duly authorized representative to test employees for drug, alcohol or illegal substance.

The Employer shall indemnify and hold harmless the Union, its officers, Agents, Employees and Representatives from and against any and all loss, suits, actions or claims of any character by any employee or group of employees covered under this Agreement arising from the drug,

6

alcohol or substance impairment testing practices set forth in this Article.  Except that the Employer shall not be held responsible in any manner for loss, suits, actions or claims of any character in the event the Union, knowingly refers the employees to the Employer, who are under the influence of drugs, alcohol or other illegal substance.

Knowingly as used herein, shall not mean inferred knowledge, but shall rather mean that the referring Agent or Representative of the Union actually knew that the employee in question was under the influence of drugs, alcohol or other illegal substance at the time of the subjects referral.

SECTION 6.  With the understanding that safety is of utmost concern to both the Employee and Employer.   The following  requirements  of  union  members  are  mandatory  training  and administration to be furnished by the union.

| | |
|---|---|
| CPR/First Aid | Certification |
| Scaffolding Safety | Certification |
| 10 Hour OSHA Training | Certification |

If an Employee as of 10/4 does not meet these requirements, said Employee rate shall be reduced to 85% of scale until written notification of satisfactory completion is furnished.  Any member who is not at full scale shall have their rate reduced by 15% until satisfactory completion of these requirements.

## ARTICLE VI
### PRESIDENT AND FIELD REPRESENTATIVES

SECTION  1.    The  President  and/or  Field  Representatives  may  visit  any  building  on  the construction.   If the President and/or Field Representatives are barred from any job by the Employer while in the performance of their duties, the Union shall have the right not to permit its members not to work on the job.

If there is a location designated by the general contractor or construction manager for the visitors to sign in on the project, the President and/or Field Representatives must sign in prior to any work area.

SECTION 2.  The President or Field Representative may inspect any working member's pay stub or envelope during the job.

## ARTICLE VII
### STEWARDS

SECTION 1.  The first journeyman to start work on any job shall act as shop steward until he or some other member duly appointed by the President or Field Representative from among the Employer's employees working on that particular job.  There shall be no working shop steward.

SECTION 2.  Any employee appointed by the Union's President or Field Representative to serve as shop steward must be able to speak and read the English language, to perform the work available to the branch of the trade to which he is assigned.  His authority however, is recognized as subordinate to that of the President and/or Field Representative.

7

This is a copy printed from the IUBAC Document Management System.

NCT. 0218

SECTION 3.  The steward shall be allowed reasonable amount of time during normal working hours without loss of pay to perform the following functions:

a) Adjust all grievances and complaints in accordance with his role under the Grievance procedures and if he is unable to do so, he shall be permitted to call the President or Field Representative.
b) Examine the due's books of employees on the job.
c) See that the Employer furnishes drinking water in a covered vessel with individual drinking cups and that the proper toilet facilities are provided.

SECTION 4.  Any job lasting more than two weeks, the employer shall provide a job box or shanty to keep their tools

SECTION 5. The Employer shall be responsible for the loss of tools after working hours as a result of fire or breaking and entering of the building, up to one-hundred dollars ($100.00) per man, providing the employee, before starting work on the project, furnishes the Employer a written inventory of his tools and the replacement cost, thereof, verified by a Representative of the Employer.

SECTION 6. The steward shall remain at work so long as any employee in the branch of the trade in which the steward is working remains at work until the completion of work, provided he is qualified to perform the available work.  When workers are laid off before the job is complete, for reasons beyond the Contractor's control, the stewards shall have the first preference of being called back when the job starts up again.  "Punch list not included".

SECTION 7.  There shall be no interference with the steward in his reasonable performance of the duties set forth herein.  The steward shall not be discharged or discriminated against for his proper performance of his duty set forth herein.

SECTION 8.  All Employers shall call the Local Union when the job starts.

<u>ARTICLE VIII</u>
Foreman

SECTION 1.  When four (4) or more Employees (setters or helpers) are on one job, one tilesetter shall be designated as the foreman.

SECTION 2.  On any one job where there are ten (10) or more Employees (setters or helpers), the foreman shall receive a minimum of $2.00 per hour over the scale.  The job must be a job of five (5) or more working days.

SECTION 3.  The Employer may be exempt from foreman's pay if he employs a non-working job superintendent who is a member of Local #1CT.

<u>ARTICLE IX</u>
CRAFT JURISDICTION

SECTION 1.  The Employer acknowledges that the Union claims items of work listed in the Bricklayers and Allied Craftworkers International Union Constitution and Rules of Order as set forth below, to be within its work jurisdiction.  In making work assignments, the Employer shall

8

CT 0218 CT 0218

consider area and trade practice, work ordinarily and customarily performed by employees covered by this Agreement and Work Jurisdiction Agreements between International Unions.

a) Tile Layers Work – The laying or setting of all tile where used for floors, walls, ceilings, walks, promenade roofs, stair threads, stair risers, facings, fireplaces and decorative inset together with any marble plinths, thresholds or window stools used in connection with tile work, also to prepare and set all concrete, cement brick work or other foundations or setting or bedding of all tile, stone marble, composition, glass, mosaic or other materials forming the facing, hearth or fireplace of a mantle, or the mantle complete together with the setting of all cement, brickwork or other materials required in connection with the above work, also the slab and fabrication of tile mantels, counters and tile panels of every description and the erection and installation of the same. The building, shaping, forming construction or repairing of all fireplace work, whether in connection with a mantle, hearth facing or not, and the setting and preparing of all materials; such as cement, plaster mortar, brickwork, ironwork or other materials necessary for the proper and safe construction and completion of such work, except that a mantle made exclusively of brick, marble or stone shall be considered to be bricklayers, marble mason work respectively. It will be understood that the word "tile" refers to all burnt clay products, as used in the industry, either glazed or unglazed and to all composition matter made in single units up to 15" x 29" x 2" except quarry tile larger than 9" x 9" x 1-1/2", also the mixtures in tile form of cement, plastics and metals that are made for and intended for use as finished floor surface, whether upon interior floors or exterior floors, stair threads, promenade roofs, garden walls, interior or exterior floors, swimming pools and all places where tile may be used to form a finished surface for practical use, sanitary finishes or decorative purposes or inserts in other material.

b) Tile Finishers – shall mix all mortar, do all cleaning, washing and grouting of all tile installed by the tile layer or similar workmen, handle all sand, cement, tile and any and all material that may be used by the tile layer after being delivered on the job, and there shall be one (1) finisher to each tile layer on the job, as in the custom of the trade. Where conditions require a lesser ratio than one for one, the amount of finishers on the job shall be determined by the President and/or Business Representative of Local 1 and the Contractor involved. On all mortar jobs (walls and floors) there shall be at least one finisher for every tile layer and the finisher shall not be required to help more than one tile layer.

c) Marble Masonry – Marble Mason's jurisdiction claims consist of the carving, cutting and setting of all marble, slate (including slate backboards), stone, albereen carrara, sanioyx, vitrolite and similar opaque glass, scagliola, marleithic and all artificial imitation or cast of whatever thickness or dimension. This shall apply to all interior work, such as; sanitary, decorative and other purposes inside of buildings of every description wherever required, including all polished bone or sand finished also the cutting and fitting of above materials after same leave mills or shop and the laying of all marble tile, slate and terrazzo tile.

d) Marble Finishers – shall mix all mortar, do all cleaning, washing/grouting and point up of all marble installed by the marble mason. There shall be one (1) marble finisher to each marble mason on the job as the custom of the trade, or where conditions require a lesser ratio than one to one, the amount of finishers on the job shall be determined by the Business Representative of local 65 and/or the President and the Contractor involved.

e) Marble, Mosaic and Terrazzo Work – Marble Mosaic, Venetian Enamel and Terrazzo – Cutting and assembly of all Mosaic. The casting of all Terrazzo in shops and/or on the jobs. All scratch coat on walls and ceilings where Mosaic and Terrazzo is to be applied, shall be the work of the mosaic and Terrazzo workers. All bedding, laying or setting of metal composition or wooded strips and ground and the laying and cutting of metal, strips, lath or other reinforcement, where used in Mosaic and Terrazzo work shall be the work of the Mosaic and Terrazzo worker. All Cement Terrazzo, Magnetite Terrazzo, Dex-O-Tex, Rustic

This is a copy printed from the IUBAC Document Management System.

MCT 0218

or Rough Washed for interior or exterior of building and as other kinds of plastic mixtures composed of chips of marble granite, blue stone, enamel, mother of pearl and all other kind of chips when mixed with cement, rubber, magnesium, chloride or other binding materials when used on floors, ceilings, stairs, saddles or an part of interior or exterior of buildings and also other work not considered part of a building, such as fountains, swimming pools, etc... also other substitutes that may be applied under the same method as Mosaic and Terrazzo Cutting and assembling of art ceramic and glass mosaic comes under the jurisdiction of the Mosaic workers and the setting of same shall be done by the Tile Layers.

f) Terrazzo Finishers/Grinders – shall do all the handling of sand, cement, lyme, terrazzo chips and all other materials that may be used by the mosaic of Terrazzo Mechanic. Finishers shall do all the rubbing, grinding, cleaning by hand or machine or other work as is required in the handling of a Terrazzo Mechanic. There shall be one (1) Terrazzo Finisher to each Terrazzo Mechanic on the job as in the custom of the trade, or where conditions require a lesser ratio than one to one, the amount of Finishers on the job shall be determined by the President and/or Field Representative of Local 1 and the Contractor involved.

## ARTICLE X
## CONTRACTING AND SUBCONTRACTING

SECTION 1. It is agreed that if the work is sublet or subcontracted by the Employer, it shall be given to a Contractor who agrees to be bound by the terms of this Agreement. There shall be no lumping of work.

SECTION 2. No employees shall contract by the Unit, or lump work of any character, covered by our classification of work, or work for any person or persons contracting work by the unit, or lump work of any character, taken from general contractors without furnishing material and the permission from the President and/or Executive Board of the BAC Local 1 CT.

SECTION 3. The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project, to any person, firm or corporation, except where a subcontractor subscribes to and agrees in writing to be bound by the full term of this Agreement and complies with all the terms and conditions of this Agreement.

SECTION 4. All charges of violations of this Article shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

SECTION 5. The Employer agrees that he shall not subcontract work from any non-union Tile, Marble, Terrazzo or other type of flooring contractor, who is not signatory to this Agreement.

## ARTICLE XI
## INTERNATIONAL MASONRY INSTITUTE TRUST
## AND
## IMI APPRENTICESHIP TRUST

SECTION 1. Each Employer signatory hereto subscribes and agrees to be bound by the Agreement and Declaration of Trust of the International Masonry Institute (IMI) including the International Masonry Institute Apprenticeship Trust (IMI/AT).

SECTION 2. Each Employer agrees to pay said Funds the amount set forth in Article IV of this Agreement for each hour worked by each employee including apprentices, covered by this

This is a copy printed from the IUBAC Document Management System.

CT 0218

Agreement.  Payment shall be reported and paid not sooner than the twenty-fifth day of the month following the month in which the work was performed along with other contributions as provided in this Agreement.

SECTION 3.  Failure to contribute to the Fund shall be a violation of this Agreement.

SECTION 4.  Each employer shall be required to employ a ratio of one (1) to seven (7) Journeymen on a job when Apprentices are available.  When appropriate, a ratio of one (1) Apprentice to three (3) Journeymen may be employed.

a)  The following percentage of journeyman wage rates shall be paid to <u>Tile Setter Apprentices:</u>

For the first 1000 hours Employers shall contribute to the Funds for which contributions are required except the Pension and Annuity Fund:

| 0 – 500 Hours | 50% |
| 500 – 1000 Hours | 55% |

For the next 1000 hours Employers shall contribute to the Funds for which contributions are required except the Annuity Fund:

| 1000 – 1500 Hours | 60% |
| 1500 – 2000 Hours | 65% |

For the next 6000 hours Employers shall contribute to the Funds for which contributions are required for <u>all</u> Funds:

| 2000 – 3000 Hours | 70% |
| 3000 – 4000 Hours | 75% |
| 4000 – 5000 Hours | 80% |
| 5000 – 6000 Hours | 85% |
| 6000 – 7000 Hours | 90% |
| 7000 – 8000 Hours | 95% |

b)  The following percentage of Journeyman wage rates shall be paid to <u>Tile Finisher Apprentices:</u>

For the first 1000 hours Employers shall contribute to the Funds for which contributions are required except the Pension and Annuity Fund:

| 0 – 500 Hours | 60% |
| 500 – 1000 Hours | 65% |

For the next 1000 hours Employer shall contribute to the Funds for which contributions are required except the Annuity Fund:

| 1000 – 1500 Hours | 70% |
| 1500 – 2000 Hours | 75% |

For the remaining 1000 hours Employer shall contribute to <u>all</u> the Funds for which contributions are required:

| 2000 – 2500 Hours | 80% |

11

This is a copy printed from the IUBAC Document Management System.

MCT 0218

2500 – 3000 Hours                90%

SECTION 4. All parties of this Agreement shall adhere to the Apprenticeship rules and regulations and standards provided by IMI and the Connecticut State Apprenticeship Council. IMI shall register the training program and all Apprentices under the supervision of IMI with the Connecticut State Apprenticeship Council and secure certification of the apprenticeship program so that payment of Apprentice wage rate and fringe contribution rate will be permitted under state and federal prevailing rate laws. Contributions to the Apprenticeship Fund shall not be required during any period that payment of Apprentice wage rate and fringe contribution rate are not permitted under state and federal prevailing rate laws.

SECTION 5. The Committee shall cooperate with the Bureau of Apprenticeship, United States Department of Labor, Connecticut State Apprenticeship Council, Connecticut State Agencies and Trade Related industries in advancing the training skills of apprentices.

### ARTICLE XII
### INSURANCE

The Employer shall carry on behalf of all employees covered under this Agreement, Worker's Compensation Insurance through a carrier's licensed to do business in the State of Connecticut and shall make Unemployment Compensation payments as required by law. The Employer shall provide the President and/or Field Representative of the Union with evidence of such coverage upon request.

### ARTICLE XIII
### STATE AND FEDERAL LAWS

It is assumed by the parties hereto that each provision of this Agreement is in the conformity with all applicable laws of the United States and State of Connecticut. Should it later be determined that it would be a violation of any legal effective government or state order or statutes to comply with any provision or provisions of this Agreement, the parties hereto agree to negotiate such provision or provisions this agreement for the purpose of making them conform to such laws or statutes so long as they shall remain effective and the other provisions of this Agreement shall not be effected thereby.

### ARTICLE XIV
### FAULTY WORK

Whenever a Tile Layer or Tile Finisher shall do faulty work as certified by the Employer in writing, it shall be the duty of the Union's Principal Officer to investigate and, if the complaint is found to be justified, to order the Tile Layer or Tile Finisher to repair the work on his own time; provided the Employer furnishes the materials to make such repairs.

### ARTICLE XV
### WORK STOPPAGE

SECTION 1. It is agreed that there shall be no work stoppage during the term of this Agreement except for the following causes only and forty-eight (48) hours (weekends excluded) after notice from the Union has been received by the Employer and the Association which clearly states the union's intentions to strike for:

This is a copy printed from the IUBAC Document Management System.

MCT 0218

"Willful nonpayment of wages and/or fringe benefit contribution as required by
this agreement for time actually worked by employees under this "Agreement".
The notice required by this Section shall be by telegram, registered or certified mail and shall be
authorized and signed by the President of the Union.

SECTION 2.  Any employee(s) who lost wages when this Article XIV is implemented, due to the
Employer's failure to pay wages and/or fringe benefit contributions as provided in this
Agreement, shall be compensated for each hour lost up to two (2) work days, sixteen (16) hours.

SECTION 3.  Except as specifically provided in Section 1.  Above, there shall be no work
stoppage, strikes, slow-downs or other interference with the progress with the work during the
terms of this Agreement.

## ARTICLE XVI
### GRIEVANCES, ARBITRATION

SECTION 1.  Any disputes, which may arise with respect to the application and interpretation of
this Agreement, shall be taken up by the employee and the steward with the foreman.  If it is not
settled to the satisfaction of the employee and the steward, the President and/or Field
Representative shall be called immediately after the foreman gives his final decision.  All
disputes shall be handled on the day presented to the foreman or the next working day at the
latest.

SECTION 2.  If the dispute is not settled on the job, it shall be referred to a Standing Arbitration
Committee of four (4) members, two (2) of whom shall be Employers selected by Employers who
have signed Agreements with the Union, and two (2) of whom shall be selected by the Union.
Such Committee shall meet to consider to dispute within three (3) days after the notice at a time
and place designated in the notice, which shall be in writing.  No person interested in the
outcome of the dispute personally, shall be permitted to sit on the Committee.  Its decision shall
be final and binding.

SECTION 3.  If either party involved in the dispute shall fail to appear before the Committee after
receiving notice in writing of its meeting to consider the dispute, the Committee shall proceed to
hear that dispute and render its decision which shall be final and binding.  If the dispute is not
settled satisfactorily by the Standing Arbitration Committee, that is, if there is no majority vote on
the dispute within five days after the final hearing, the parties shall refer the matter to the Federal
Mediation and conciliation Service whose decision shall be final and binding.  The cost of
Arbitration meetings shall be paid by the party found in violation of this Agreement.

## ARTICLE XVII
### HEALTH, PENSION AND ANNUITY FUNDS

SECTION 1.  The parties hereto jointly agree to accept and be bound by the provisions of the
written Agreement and Declaration of Trust and any amendments thereto, provided it does not
conflict with the Collective Bargaining Agreement and/or provided the Collective Bargaining
Agreement does not conflict with any federal law or Department of Labor and IRS regulations
applicable to fringe benefit funds and provided written notification by certified mail has been
given, within sixty (60) days of such amendment becoming effective to the Local 1 CT and the
Associations having territorial jurisdiction, both of whom are parties to the Trust Agreement of the
various Health, Pension and Annuity Funds hereinafter covered by this Agreement, which are:
I.U.B.A.C. Local 1 Connecticut Health Fund

13

F CT 0218

Bricklayers and Trowel Trades International Pension Fund
Bricklayers and Trowel Trades International Retirement Savings Plan (Annuity)
International Masonry Institute
Tile Contractors Association of Connecticut

SECTION 2. Each Employer agrees to pay the Funds listed, the required contribution rates for all hours worked by employees and apprentices, except only as specifically agreed above with respect to the first 2000 hours of apprentice training. An hour of work for which overtime or any other premium wage must be paid, shall be considered a single hour for this purpose.

SECTION 3. Not later than the 20th day following the month in which the hours of work were performed, each Employer shall submit to the Funds reports containing a complete list of names of employees, social security numbers and the number of hours worked by each employee during the previous month. In the event no employee worked during the previous month, the Employer shall submit a report attesting that no employees worked and this will be the Employer's final report until the Employer has reportable hours in the future.

SECTION 4. If an Employer fails to make the required contributions to any Fund by the end of the month following the month in which the work was performed, the Employer shall be considered a delinquent Employer for that Fund.

If so determined by the Trustees of any Fund, Delinquent Employers shall pay to each Fund for which it is a delinquent Employer interest charges at the rate of one and one-half percent computed on the entire sum owed each Fund for each thirty (30) day period or fraction thereof that is a delinquent Employer.

If so determined by the Trustees of the Fund, an Employer whose check is returned for insufficient funds will be required to make payments by certified check for the next six (6) months.

SECTION 5. The failure of any Employer to make the required reports and contributions to each Fund shall make the Employer liable: 1) to each Employer damaged by such failure for whatever benefits the employee and his/her beneficiaries were denied because of the Employer's failure to make the required reports and contributions and 2) for court costs and attorney's fees reasonably necessary in collecting the contributions, provided however, that no Employer shall have any liability to any employee or beneficiary as set forth, if the failure to pay the required contribution or any part thereof was the result of honest mistake or inadvertence.

SECTION 6. No combination of Employer contributions to the pension and annuity funds shall exceed 25% of the hourly wage rate during the terms of this Agreement. However, if the present 25% restriction is ultimately adjusted or lifted by the IRS during the term of this Agreement, the negotiating parties will adjust or waive this clause accordingly.

SECTION 7. All fringe benefit funds to which Employer contributions are required by this Agreement shall be maintained at all times as jointly administered Taft-Hartley Trust Funds with an equal Employer with Employer Trustees and Labor Trustees, herein referred to as the "Trustees", with such powers and duties as may be provided for time to time by the applicable Trust Agreement. The Funds shall furnish to the Association and the union copies of their respective annual audit reports and annual actuarial or consulting reports and information concerning contributions received or due as might be requested from time to time.

14

PCT 0218

SECTION 8. The Funds shall at all times be operated in conformance with applicable Federal and State laws and regulations and shall be maintained as tax exempt trusts under provisions of International Revenue Code and Employer contributions to said Fund shall at all times be deductible by the Employer for Federal Income Tax purposes. In the event that a Fund fails to retain approval as a tax exempt Trust so that the Employer contributions shall not be deductible as a business expense, the Employer shall not be liable to contribute to such Fund for hours worked during the period that the contribution is not deductible.

SECTION 9. At the decision of the Fund's Trustees, an Employer determined to be delinquent in its payments as required herein may be held liable for all contributions due to the Fund and reasonable attorney's fees, court costs, audit fees and other expenses incurred incidental to collection of contributions due the Fund, including a reasonable rate of interest on contribution due. Appropriate payroll records of the Employer may be subject to audit by the Trustees of their authorized representative upon reasonable notice. The Trustees shall have all powers with respect to the audit of payroll records and the collection of delinquent contributions, interest, audit fees, attorney's fees and other expenses of collection as may be provided from time to time by the applicable Trust Agreement.

SECTION 10. Nothing in this Agreement, any Trust Agreement for a Fund to which contributions are required by this Agreement, a plan of benefits or any other documents shall be construed to impose upon the Employer or other contributor availability or obligation to contribute or make any other payments to any Fund toward the cost of benefits or the cost of administration or funding to the plan beyond the obligation of employer to make contributions, provide any required bonding and pay the expenses of collection specified in this Agreement. Except to the intent that the Association and the Union may participate in the selection of their respective Trustees, neither the Association nor the union nor any Employer shall be responsible for the operation or administration of the Funds. In no event shall the Association, the union or any Employer be liable for any action or failure to act of any Trustee. It is agreed and understood that this Section shall serve as a defense to any allegation or course of actin wrought by any individual or entity which might jeopardize the Employer's or other contributor's position that its liability is strictly limited as stated herein. In no event shall the Employer be liable to make duplicate contributions to more than one 1) Fund providing the same type of benefits.

## ARTICLE XVIII
### DUES CHECK-OFF

SECTION 1. Effective and continuing during the term of this Agreement and in accordance with the terms of an individual and voluntary written authorization for check-off of union membership dues to be furnished to the Employer in a form as specified in Section 3. Below, and permitted by law including the provisions of Section 302 © of the Labor Management Relations Act, as amended, the Employer agrees to deduct once each week from the net pay of each employee covered by this Agreement, who signs said authorization, the sum which the union has specified, or from time to time later specified, in writing to the Employer as the dues for the Union and its International Union for each payroll hour worked by said employee during the week as part of the employee's membership dues in the Union, provided however, that no change in the amount of hourly dues shall take effect until after the Union shall have given the Association thirty days (30) prior written notice thereof. Said deductions shall be made solely for each employee who is a member of the Local union and who is working in the geographical jurisdiction of the BAC Local 1 CT.

15

MCT  0218

SECTION 2.   The Union agrees to indemnify and safe the Employer and the Association harmless against any and all claims, suits or other forms of liability arising out of the Employers' participation in or performance of the provisions of this Article.   The Union assumes full responsibility.

SECTION 3.

## WORKING DUES CHECK-OFF AUTHORIZATION

☐   *I hereby authorize any of the various individual Employers who are signatory to a collective bargaining agreement with any Bricklayers & Allied Craftsmen Local Union, the International Union, or any other BAC affiliate, and by whom I may be employed during the term of such agreement, or any renewal or extension, or any subsequent agreement, to deduct from my wages and transmit monthly to said Union the sum which the Union has specified, or specifies from time to time, as the portion of my union dues to said Union, to the International Union, or to any other BAC affiliate, subject to check-off through procedures conforming to applicable law.   This authorization shall be irrevocable for a period of one (1) year following the date it was signed or until the current applicable collective bargaining agreement expires, whichever occurs sooner.   This authorization shall be automatically renewed from year to year, unless sixty (60) days prior to the termination or the annual renewal date I revoke the authorization by written notice to the Union and to the individual employer by whom I am employed.*

*DATE_____     Signature_____*

*Social Security No._____*

16

CT 0218

## ARTICLE XIX
## PRESERVATION OF WORK

**SECTION A.** In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership or any other business entity, including a joint venture, wherein the Employer (including its officers, director, owners, partners or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management or control, the terms and conditions of this Agreement shall be applicable to all such work.

**SECTION B.** All charges of violations of Section A of this Article shall be considered as a dispute under this Agreement and shall be processed in accordance with the procedures for the handling of grievances and final binding resolution of disputes, as provided in Article XV of the Agreement. As a remedy for violations of this Section, the arbitrator (or arbitration body) provided for in this Article XV is empowered, at the request of the Union, to require an Employer to 1) pay to affected employees covered by this Agreement including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations, and 2) pay into the affected Joint Trust Funds established under this Agreement any delinquent contributions to such Funds which have resulted from the violations, including such interest as may be prescribed by the Trustees or by law. Provision for this remedy herein, does not make such remedy the exclusive remedy available to the Union for violations of other Sections or Articles of this Agreement.

**SECTION C.** If, as a result of violation of this Article, it is necessary for the Union and/or the Trustees of the Joint Trust Funds to institute court action to enforce and award rendered in accordance with Section B above or defend an action which seeks to vacate such an award, the Employer shall pay any accountants' and attorneys' fees incurred by the Union and/or the Fund Trustees, plus costs of the litigation which have resulted from the bringing of such action.

## ARTICLE XX
## TRAVELING CONTRACTORS

When the Employer has any work specified in Article VII of the Agreement to be performed outside of the area covered by this Agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the Agreement in effect in the job site area. Employees covered by this Agreement shall be paid at least the established minimum wage scale specified in Article IV of this agreement but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the job site local Agreement. The Employer shall in all other matters be governed by the provisions established in the job site local Agreement. If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in Article VIII of this Agreement, the full terms and conditions of this Agreement shall apply.

17

WCT  0218

## ARTICLE XXI
### WAGE AND FRINGE BENEFIT RATES

Total Wage and Fringe Package —

| Effective Date | Tile Setters | Terrazzo Mechanics & Marble Setters | Tile Marble & Terrazzo Finishers |
|---|---|---|---|
| 10/1/02 – 4/2/03 | $37.70 | $37.90 | $31.38 |
| 4/3/03 – 9/30/03 | $38.45 | $38.90 | $31.98 |
| 10/1/03 – 4/2/04 | $39.20 | $39.90 | $32.58 |
| 4/3/04 – 9/30/04 | $40.00 | $40.55 | $33.22 |
| 10/1/04 – 4/2/05 | $40.75 | $41.20 | $33.82 |
| 4/3/05 – 9/30/05 | $41.50 | $42.45 | $34.42 |
| 10/1/05 – 4/2/06 | $42.55 | $43.70 | $35.26 |
| 4/3/06 – 9/30/06 | $43.77 | $45.70 | $36.23 |
| 10/1/06 – 3/31/07 | $44.92 | $46.85 | $37.15 |

18

This is a copy printed from the IUBAC Document Management System.

CT 0218

## ARTICLE XXII
## DURATION

This Agreement shall remain in full force and effective from April 1, 2002 or the day after expiration of the appropriate predecessor Agreement, whichever is later, through March 31, 2007 and shall renew itself annually thereafter unless either party shall have given written notice to the other party of its desire to terminate this Agreement and negotiate a successor Agreement at least sixty (60) days prior to March 31, 2007 or any March thereafter.

IN WITNESS WHEREOF, the parties hereto have set their hands and have caused this Agreement to be executed by their duly authorized Representative on this_____ day of _____

EMPLOYER:

INTERNATIONAL UNION OF
BRICKLAYERS AND ALLIED
CRAFTWORKERS LOCAL 1 CT

_____
Gerald A. Marotti, President

_____
Signature

_____
Vincent Convertito, Executive Vice-President,
Field Representative

_____
Company Name

_____
Street Address

_____
City                State       Zip

_____
Telephone

_____
Fax

19

Sep 19 02 07:57a                                                            p.2

WCT 0218

## ARTICLE XXII
## DURATION

This Agreement shall remain in full force and effective from April 1, 2002 or the day after expiration of the appropriate predecessor Agreement, whichever is later, through March 31, 2007 and shall renew itself annually thereafter unless either party shall have given written notice to the other party of its desire to terminate this Agreement and negotiate a successor Agreement at least sixty (60) days prior to March 31, 2007 or any March thereafter.

IN WITNESS WHEREOF, the parties hereto have set their hands and have caused this Agreement to be executed by their duly authorized Representative on this ___3rd___ day of ___Sep. 2002___

EMPLOYER:                                      INTERNATIONAL UNION OF
                                               BRICKLAYERS AND ALLIED
                                               CRAFTWORKERS LOCAL 1 CT

*Michael D. Corpain*
_____                    _____
Signature                                      Gerald A. Marotti, President

Tile Contractors Association                   *Vincent R. Convertito*
of Connecticut                                 _____
Company Name                                   Vincent Convertito, Executive Vice-President,
                                               Field Representative
67 Quinnipiac Avenue
_____
Street Address

North Haven, CT 06473
_____
City                State    Zip

(203) 773-9024
_____
Telephone

(203 773-1862
_____
Fax



RECEIVED
SEP 19 2002
COLLECTIVE BARGAINING SERVICES

(copy)

20

This is a copy printed from the IUBAC Document Management System.

## ARTICLE XXII
### DURATION

This Agreement shall remain in full force and effective from April 1, 2002 or the day after expiration of the appropriate predecessor Agreement, whichever is later, through March 31, 2007 and shall renew itself annually thereafter unless either party shall have given written notice to the other party of its desire to terminate this Agreement and negotiate a successor Agreement at least sixty (60) days prior to March 31, 2007 or any March thereafter.

IN WITNESS WHEREOF, the parties hereto have set their hands and have caused this Agreement to be executed by their duly authorized Representative on this_____ day of _____

EMPLOYER:

INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CT

_____
Signature

_____
Gerald A. Marotti, President

Angelo Marsrra Contracting LLC
Company Name

_____
Vincent Convertito, Executive Vice-President,
Field Representative

1111 Arbutus st.
Street Address

Middletown CT. 06457
City                    State    Zip

_____
Telephone

_____
Fax

Tile Finisher (Helper)

(copy)

20

# AGREEMENT

*between*

## AGC/CCIA Building Contractors
## Labor Division of Connecticut, Inc.

*and*

## Mason Contractors Association of Connecticut

*and*

## Local 1, Connecticut
## of the
## International Union of Bricklayers
## & Allied Craftworkers, AFL-CIO

## BUILDING



RECEIVED
NOV – 1 2002
COLLECTIVE BARGAINING SERVICES

April 1, 2002 through March 31, 2006



PCT 0496

## BUILDING TABLE OF CONTENTS

| Article | | PAGE |
|---|---|---|
| I | OBJECT | 1 |
| II | TERRITORIAL JURISDICTION | 1 |
| III | EQUAL EMPLOYMENT OPPORTUNITY | 1 |
| IV | UNION MEMBERSHIP | 2 |
| V | WAGES, HOURS, WORKING CONDITIONS AND HOLIDAYS | 3 |
| VI | HEALTH AND SAFETY STANDARDS | 7 |
| VII | PRESIDENT AND FIELD REPRESENTATIVES | 9 |
| VIII | FOREMAN | 9 |
| IX | STEWARDS | 10 |
| X | JURISDICTIONAL CLAIMS | 11 |
| XI | WORK RULES | 18 |
| XII | INTERNATIONAL MASONRY INSTITUTE TRUST AND IMI APPRENTICESHIP TRUST | 21 |
| XIII | INSURANCE | 22 |
| XIV | STATE AND FEDERAL LAWS | 22 |
| XV | WORK STOPPAGES | 22 |
| XVI | GRIEVANCE AND ARBITRATION PROCEDURE | 23 |
| XVII | FRINGE BENEFIT FUNDS | 24 |
| XVIII | DUES CHECK-OFF | 28 |
| XIX | BUILDING & CONSTRUCTION ADVANCEMENT PROGRAM | 29 |
| XX | MANAGEMENT PREROGATIVES | 30 |
| XXI | SEVERABILITY | 30 |
| XXII | TERM OF AGREEMENT | 31 |
| | SCHEDULE A | 32 |

PCT 0296

## BUILDING TABLE OF CONTENTS, continued

SCHEDULE B ................................................................................ 34

APPENDIX A ................................................................................ 35

AGC BRICKLAYER EMPLOYERS ...................................................... 36

MASON CONTRACTORS ASSOCIATION OF CT EMPLOYERS ........ 37

INDEX ........................................................................................... 38

SPECIAL AGREEMENT FOR TARGETED PROJECTS ....................... A1

LETTER AGREEMENT ...................................................................... A3

iii

PGT  0296

## Agreement

This Agreement is made and entered into on this 31st day of March, 2002, by and among the AGC/CCIA BUILDING CONTRACTORS LABOR DIVISION OF CONNECTICUT, INC., and the MASON CONTRACTORS ASSOCIATION OF CONNECTICUT, their successors or assigns, hereinafter referred to as the "Association", acting for and in behalf of those firms it is authorized and agrees to represent, each hereinafter referred to as the "Employer", and LOCAL ONE, CONNECTICUT, THE INTERNATIONAL UNION OF BRICKLAYERS & ALLIED CRAFTWORKERS, AFL-CIO, acting for and on behalf of all the Chapters listed on Schedule B hereto, hereinafter referred to as the "Union".

## ARTICLE I
## OBJECT

The Employer acknowledges that the Union has demonstrated that it represents a majority of its employees in the bargaining unit described herein by providing or offering to provide executed union authorization cards. Therefore, the Employer recognizes the Union as the exclusive bargaining representative of its employees in accordance with Section 9(a) of the National Labor Relations Act.

In order to carry out the bilateral spirit of this Agreement, in the event the Union grants more favorable terms to others or any signatory party to this Agreement, the Union will extend these more favorable terms to all the parties to this Agreement.

The Employer agrees not to sublet, assign or transfer any work covered by this Agreement to be performed at the site of a construction project to any person, firm or corporation, except where the subcontractor subscribes and agrees in writing to be bound by the full terms of this Agreement. All charges of violation of this paragraph shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedures for the handling of disputes and the final and binding arbitration of disputes.

## ARTICLE II
## TERRITORIAL JURISDICTION

This Agreement shall apply to all work performed in covered employment within the state of Connecticut.

The following are the geographical jurisdictions of each Local Union.

ZONE - A

All of Connecticut other than towns listed in Zone B.

ZONE - B

Norwalk, Westport, Weston, Wilton, Ridgefield, New Canaan, Stamford, Redding, Darien and Greenwich.

## ARTICLE III
## EQUAL EMPLOYMENT
## OPPORTUNITY

There shall be no discrimination in the referral, hiring, placement, classification,

1



upgrading, layoff or termination of employment of any individual by reason of age, race, creed, color, sex, national origin, disability or reasonable accommodation to a disability under the Americans with Disabilities Act or membership or non-membership in the Union. The Union agrees to support and actively participate in affirmative action programs to promote equal employment opportunity in the construction industry. The Employer may decline to arbitrate grievances dealing with the above matters, unless the parties and the employee(s) enter into an agreement which provides (1) that the Employer shall not discriminate, (2) that statutory issues are covered by this Agreement and will be arbitrated, and (3) that employee(s) are waiving their right to go to an administrative agency or court and further, this agreement results in the arbitration hearing being final and binding.

## ARTICLE IV
## UNION MEMBERSHIP

Section 1. All employees who are members of the Union at the time of the signing of this Agreement shall continue membership in the Union. All other employees must become members of the Union on or after the eighth (8) day following the beginning of employment or the date of this Agreement, whichever is later, and must maintain their membership in the Union as a condition of employment to the extent of tendering the periodic dues and the initiation fees uniformly required by the Union as a condition of acquiring or maintaining membership therein.

Section 2. On all work covered by this Agreement, the first man on the job shall be furnished by the Employer. Thereafter,

Local 1, Connecticut shall be given the first opportunity to refer applicants for employment for up to 50% of the jobs available during the entire course of the work, provided however, that contractors whose main place of business is located outside the state of Connecticut must maintain a ratio of three Local 1, Connecticut BAC Members to one BAC member from outside the state of Connecticut throughout the duration of the project. The Employer reserves the right to select the applicant to be hired and there shall be no discrimination in referrals or hiring by reason of membership or non-membership in the Union. The second opportunity for Employment, when the Local is unable to furnish qualified mechanics, provides the employer the opportunity to hire from any source available.

For purposes of lay off for lack of work only, the Employees shall be laid off according to the following groups, with Group IV being laid off first, Group III being laid off second, Group II being laid off third, and Group I being laid off last.

GROUP I. All applicants for employment as a journeyman who have four (4) or more years experience in the trade, who are residents of the geographical area constituting the normal construction labor market, who have been certified as a Journeyman by any Joint Apprenticeship and Training Committee and who have been employed for a period of at least one (1) year in the last four (4) years under a collective bargaining agreement between the parties to this Agreement.

GROUP II. All applicants for the employment who have to (2) or more years experience in the trade, are residents of the

2

geographical area constituting the normal construction labor market, have been certified as a Journeyman by any Joint Apprenticeship and Training Committee, and who have been employed for at least six (6) months in the last three (3) years in the trade under a collective bargaining agreement between the parties to this Agreement.

GROUP III. All applicants for employment who have four (4) or more years experience in the trade and who have been certified as a Journeyman by any Joint Apprenticeship and Training Committee affiliated with the International Union of Bricklayers and Allied Craftworkers.

GROUP IV. All applicants for employment who have worked at the trade for more than one (1) year.

### ARTICLE V
### WAGES, HOURS, WORKING CONDITIONS, AND HOLIDAYS

Section 1. Employees covered under this Agreement shall receive the following regular straight time hourly rate of pay for all time worked during the regular work day on and after the effective dates indicated:

*Zone A and *Zone B

| Effective Date | Hourly Rate |
| --- | --- |
| 3/31/02-10/5/02 | $25.00 |

*For exterior Pointing, Caulking and Cleaning, effective October 1, 1999, if going over ten (10) floors, a $1.00 per hour premium shall be paid for work at the tenth floor and above.

Effective April 1, 2002, Cement masons will receive one and one-half (1 ½) time fringe benefit contributions for all hours worked over eight (8) hours worked per day.

Section 2. The Union shall have the option to divert monies from wages to any of the fringe benefits funds to which contributions are required by this Agreement, upon thirty (30) days' prior written notice to the Associations signatory hereto. Monies can be diverted back to wages from the Pension, Health and Welfare and Annuity funds or reallocated among these funds, subject to the approval of the Trustees of any affected fund and the agreement in writing of the parties to this Agreement. If there is a required increase in the hourly rate of contributions to the Health Fund during the term of the Agreement, the increase shall be taken out of the wage rate and the Association shall be given 60 days' prior notice in writing.

Section 3. There shall be only one (1) hourly rate of wages paid to journeymen bricklayers and masons on the same job. Bricklayers or masons, other than foremen covered under this Agreement, shall not be required to check units or measure or count any amount of work performed during the day or any day of the work week.

Section 4. The regular work week shall consist of five eight (8) hour days, Mondays through Fridays, for a total of forty (40) hours. There shall be a one-half (1/2) hour unpaid lunch period between 12:00 noon and 12:30 p.m. If unusual circumstances warrant, as shall be determined by the Employer, the one-half (1/2) hour lunch period shall be allowed anytime between the hours of 11:30 a.m. and 1:30 p.m.

Section 5. The regular starting time shall be 8:00 a.m. or such other time as established by the Employer between 6 a.m. and 9 a.m. Any employee who is transferred to another job because of weather shall not displace any employee working on that job to which he is transferred.

When a job is unable to start before 10 a.m., no work is to be performed that day, unless the foreman shall specify a definite starting time. Employees ordered to stay on the job shall be paid from 10 a.m. This provision is based on a 8:00 a.m. to 4:30 p.m. workday. In the event the working hours become 7:00 to 3:30 p.m., substitute "9:00 a.m." for "10:00 a.m." in the preceding two sentences.

Section 6. Overtime - Employees shall be paid the overtime rate of one and one half times the regular straight time hourly rate of pay for all time worked in excess of eight hours per day and forty hours per week and all hours on Saturday. Employees shall be paid the overtime rate of two times the regular straight time hourly rate of pay for all time worked on Sundays and holidays. There shall be no pyramiding of overtime.

Section 7. On projects subject to limitations or restrictions by government agencies, railroads, utilities and private owners as to when work may be performed, the Employer may schedule work in accordance with these limitations or restrictions and all work will be paid for solely at the regular straight time rate of pay, regardless of the time of the day or the day of the week that the work is performed, except that time and one-half the regular rate of pay will be paid for all hours of work over forty (40) in a week.

Section 8. Saturday Make-Up Day. On any given project, Saturday may be worked at the straight time rate of pay if work is not performed on a day during that week because of inclement weather or other conditions beyond the control of the Employer, provided that an employee may not be discriminated against for not working on such a Saturday and that work on Saturday is scheduled for eight (8) hours. This provision will be limited to fifteen (15) Saturdays per Employer per year. After the fifteenth make-up Saturday, the Employer will have the option of either working seven (7) hours paying eight (8) hours or working eight (8) hours paying nine (9) hours. The Employer will notify the Union if it is working a Saturday make-up day. Failure to notify the Union will result in overtime rates having to be paid for work performed on any such Saturday.

Section 9. The Employer shall establish one day each week, Monday through Thursday, as the regular pay day for its employees. If a regular pay day falls on a holiday, recognized in Section 5 hereof, employees shall be paid before quitting time on the regular work day immediately preceding the holiday, where practical.

The Employer shall pay employees by cash, check, or by direct deposit with a stub upon agreement by the Employer and the employee and shall accompany each payment with an itemized written statement setting forth the payroll period, the gross pay for said period, the hours worked, and an itemized list of deductions from the employee's gross pay. Failure of the Employer's bank to honor payroll checks because of insufficient funds may cause the Union to require the Employer to pay in cash on each regular pay day.

Section 10. Holidays - Recognized holidays, without pay, shall be New Year's Day, Good Friday, Memorial Day, Independence Day,

4

PCT 0296

Labor Day, Thanksgiving Day and Christmas Day. Under no circumstances shall work be scheduled for Labor Day, except in cases of extreme emergency involving life or property. In the event any of the above holidays fall on a Sunday, it will be observed on the following Monday. Employees shall receive four hours pay for the Christmas Eve holiday provided the employee works the regularly scheduled day before and after the holiday. Employers may schedule work on Christmas Eve and employees shall receive pay for actual hours worked on that day, in addition to their holiday pay.

Section 11. Any employee requested to report for work by an Employer, or his representative, who is not put to work after bringing his tools on the job, shall receive two (2) hours' pay provided the employee is not prevented from working by conditions caused by adverse weather or other conditions beyond the control of the Employer, in which event the employee shall be signed in and put to work on the next day when there is work available, weather permitting.

Any employee or employees who commence working and are held up because of weather conditions during the first hour of work shall receive nothing less than one (1) hour of pay unless they voluntarily leave the job. If any employee is held up after the first hour of work has been completed, such employee shall receive his pay to the nearest hour following the cessation of work.

Section 12. An employee who has worked for at least two hours and subsequently laid off for lack of work during the regular working hours shall be paid for 8 hours, but shall not receive pay for that day beyond the hours already worked if the job is stopped by a governing authority or for unsafe

conditions or for a breakdown in the equipment or other conditions beyond the control of the Employer.

Section 13. Employees shall be paid for lost time due to the erection or stocking of scaffolds or waiting for materials that are already on the job, except in the event of a breakdown in equipment or other conditions beyond the control of the Employer or if the job is stopped by a governing authority or for unsafe conditions.

Section 14. Employees shall receive regular pay when being transferred from one job to another during regular working hours.

Section 15. There shall be only one scale of journeymen wages per Employer on one job and the highest scale shall prevail. When the Employer violates this agreement concerning the scale of wages by paying a higher rate of pay, he shall be obliged to pay the higher rate of pay to all bricklayers and masons employed on the job. The higher wage rate shall continue in effect until the completion of the job and in no event shall a rate of wage so established be reduced on that job.

Section 16. Should the Employer willfully work his employees beyond the established quitting time, the employees working on the job shall be paid to the next nearest one-half hour at the overtime rate.

Section 17. Wages shall be paid any time between 6:00 a.m. and the established quitting time on the job. No more than five (5) days pay shall be kept back on pay by any Employer after the close of its payroll week. There shall be no Friday pay day. In case of inclement weather on pay day, the pay shall be on the job by 10:30 a.m., where practical.

5

PCT 0296

Section 18. Any employee not receiving his money on the specified pay day shall receive waiting time at the regular rate of wages until paid. All employees entitled to receive waiting time and requesting it and not receiving it, shall report to a Field Representative of Local 1, Connecticut for settlement. No more than two (2) days' waiting time will be demanded or required on any job, unless the job is placed in the hands of a bonding company or receiver, for completion.

Section 19. No employee shall be laid off before the established starting time unless he was absent at the end of the preceding normal work day when work was available.

Section 20. The Employer shall see that a suitable shed or locker is available for the use of employees covered by this Agreement.

Section 21. In case of layoff of an employee, the employee will be paid whatever wages are due him. In the case of a layoff, the employee will be notified at least one-half hour before quitting time, during which time the employee shall pick up his tools and be paid whatever wages are due him. The Employer shall give the employee an unemployment compensation slip at the time of layoff or discharge.

Section 22. Any employee who willfully quits work or who is discharged for intoxication or other cause shall not be entitled to any of the layoff or discharge pay benefits provided for in this Article V.

Section 23. There shall be no lost time on the day of injury for any employee injured on the job and obliged to receive immediate medical attention or treatment.

Section 24. All employees who work on jobs where they are exposed to extreme man-made temperatures, uncleanliness, dust, mastics or in the laying of fire brick or acid brick or any other material that may be injurious to the health, shall be given ten (10) minutes to wash up before 12 noon and fifteen (15) minutes to wash and adjust proper clothing before quitting time. Any member who is operating a saw shall receive 15 minutes before quitting time to clean his station. No employee shall leave the premises before the established quitting time.

Section 25. Shift Provision - Shift work may be permitted under the following conditions:
(a) Where a job has more than one (1) eight (8) hour shift in any one ( 1) twenty-four (24) hour period, bricklayers shall be permitted to work more than one (1) shift in any one (1) work day provided they receive the applicable premium pay.

(b) All employees on shift work shall receive a full normal work day's pay.

(c) Seven and one-half (7-1/2) hours work shall constitute the shift period during the second shift and seven (7) hours work during the third shift. There shall be a one-half (1/2) hour lunch period at the midpoint of the second and of the third shift.

(d) Where no third shift exists, time worked beyond the end of the second shift shall be paid for at the overtime rate.

(e) No Shift work will be permitted for less than three (3) consecutive regular work days.

(f) Shift conditions and wages shall apply to alteration work in occupied areas without the requirement that work be performed

6

PCT 0296

during the regular work day, provided a written shift permit is issued by the Union.

(g) When an Employer wishes to work bricklayers for the second or third shift periods, he shall notify the Union in writing within twenty-four (24) hours prior to the shift so that proper arrangements shall be made.

Section 26. Carry Over Provision The parties will maintain the wage and benefit rates in effect on March 31, 2006 until October 1, 2006, notwithstanding the contract expiration date or any other provision of this Agreement.

Section 27. In order to maintain an accurate wage rate, each Employer agrees to supply the Union, upon request, with all the necessary pertinent information required for the completion of the United States Department of Labor Form WD10.

Section 28. When a job works overtime, preference shall be given to employees on that job. In the event additional craft workers are needed, they shall come from any other job with the company.

Section 29. In the even of inclement weather, employee(s) shall be paid wages for the first one (1) hour and each subsequent hour provided that the employee reports to work at the start of the shift and is required by the employer to stay at the job site.

## ARTICLE VI
## HEALTH AND SAFETY STANDARDS

Section 1. Any employee who willfully violates any safety regulation of the

Employer or of a governmental agency shall be subject to discharge without recourse.

Section 2. Employees shall abide by all safety regulations promulgated by the Employer. Employees shall report to the Employer every injury incurred in the course of employment on the day such injury occurs, on a form provided by the Employer, if it is physically possible for the employee to do so.

Section 3. Any masonry unit of concrete, cinder or like materials weighing 40 pounds or more shall be set by two masons.

Section 4. All walls built of the above designated weight shall only be raised seven (7) courses.

Section 5. All employees covered by this Agreement shall be fully protected from overhead work.

Section 6. Excessive dust, carborundum or other wheel or so-called saws for the use of cutting any brick, or block, shall have a blower or wet wheel to remove from the atmosphere any dust created by such process or the employee shall be provided with an OSHA approved mask. The Employer shall furnish all necessary tools for this operation, also glasses, nose protection, gloves, considered necessary for the health of the Operator. All table type masonry saws must use a blower or exhaust fan to disperse excess silica away from the operator. Dry cutting should be used only as a last resort if no reasonable alternative exists, except for restoration work, demolition, beam pockets, stonework, etc. If cutting dry, generally it should be done outside of buildings, enclosed scaffolding or places workers could be exposed to airborne silica.

7

CT 0298

Section 7. When using machines in the performance of work, the machine shall be properly guarded to prevent possible injury, all safety devices to be supplied by the contractor and no safety devices to be removed from such machines.

Section 8. No employee shall be required to work where he is subject to excessive dust or grit caused by masonry cutters or grinders. This does not pertain to the operator who shall be adequately protected.

Section 9. The Employer shall provide a place to operate the masonry saw which is protected from weather conditions (including providing heat when necessary) wherever possible and shall provide the BAC member operator with necessary safety equipment.

Section 10. Foot scaffolds shall not be permitted with the exception of topping of finished walls.

Section 11. Scaffolding used for washing down shall be no less than three (3) ten inch planks in width.

Section 12. Any safety or protective clothing and/or equipment furnished to employees by the Employer shall remain the property of the employer and shall be returned in good condition to the Employer when no longer in use on the project. Each employee, if required by the Employer, shall sign a receipt for said clothing and/or equipment at the time he receives it, and he shall be held responsible for the cost of replacement of any such clothing and/or equipment which is not returned in reasonably good condition, considering normal wear and tear, to the Employer.

Section 13. Drug Testing. In an effort to enhance the safety of the workplace, testing of employees and applicants for drug, alcohol or other substance impairment may be required by the owner or employer. The testing program shall be performed by recognized physicians and/or laboratories and shall comply with any and all federal state and local standards. The cost of such program shall be borne by the Employer. When testing is required by the Employer Employees shall be paid for the time necessary to take the test provided that the results of the employee's test are negative. No time shall be paid to an employee whose test results are positive.

Nothing herein shall be construed to impose any obligation, duty or responsibility upon the Union or its duly authorized representatives to test employees for drugs, alcohol or illegal substances.

The Employer shall indemnify and hold harmless the Union, its officers, agents, employees and representatives from and against any and all loss, suits, actions or claims of any character by any employee or group of employees covered under this Agreement arising from the drug, alcohol or substance impairment testing practices set forth in this Article, except that the Employer shall not be held responsible in any manner for loss, suits, actions or claims of any character in the event the Union knowingly refers employees to the Employer, who are under the influence of drugs, alcohol or other illegal substances.

"Knowingly" as used herein shall not mean inferred knowledge, but shall rather mean that the referring agent or representative of the union actually knew that the employee in question was under the influence of drugs,

8

alcohol or other illegal substances at the time of the subject referral.

Section 14. When using pump up, or commonly called "tower scaffolding", there must be at least sixteen (16) to twenty-four (24) inches of wall above the foot plank at all times, where practicable, whether the masons are tied off or not.

Section 15. The parties agree that a Committee with equal number of Union and Association members will be established to examine the issue of respiratory airborne dust.

Section 16. The Employer shall provide a chain hoist or similar device for use on any masonry units weighing over two (200) hundred pounds.

Section 17. Masons shall not be required to work through braces on staging.

### ARTICLE VII
### PRESIDENT AND FIELD
### REPRESENTATIVES

Section 1. All contractors starting work covered by this Agreement shall notify the President, Local 1, Connecticut, five (5) working days before the work is to commence.

Section 2. The Director and/or Field Representatives may visit any building under construction. If the President and/or Field Representatives are barred from any job by the Employer while in the performance or their duties, the Union shall have the right not to permit its members to work on the job.

If there is a location designated by the general contractor or construction manager for visitors to sign in on the project, the President and/or Field Representatives must sign in prior to entering any work area.

Section 3. The President or Field Representative may inspect any working member's pay stub or envelope during the job.

### ARTICLE VIII
### FOREMEN

Section 1. When four (4) or more bricklayers or masons are hired on a job, one (1) shall be designated as the foreman.

Section 2. The foreman shall be paid a minimum of $2.00 per hour above the journeymen's rate and shall be guaranteed forty (40) hours of work or pay per week. In addition, the guaranteed forty-hour requirement shall not apply when the job starts or finishes midweek, in those instances the foreman shall receive pay for actual hours worked. Further, the guarantee shall not apply when the employee makes himself unavailable for work.

Section 3. Foreman have the authority to hire, discharge and exercise supervisory functions and are recognized as the representatives of management. Foremen shall be practical mechanics in the branch of the trade over which they exercise supervision and members of the International Union of Bricklayers and Allied Craftworkers.

Section 4. Foremen shall be allowed to work with the tools of the trade.

9

## ARTICLE IX
## STEWARDS

Section 1. The first member to start to work on any job shall act as shop steward until he or another member is duly appointed by the Union from among the Employer's employees working on the particular job or a steward is furnished by the President or the Field Representative. There shall be no non-working stewards.

Section 2. Any employee appointed by the Union to serve as steward must be able to speak and read the English language and he must be competent to perform the work available in the branch of the trade to which he is assigned. His authority, however, is recognized as subordinate to that of the Field Representative.

Section 3. The steward shall be allowed a reasonable amount of time during normal working hours without loss of pay to perform the following duties of steward:

(a) the steward shall be permitted to call the Field Representative to report complaints;

(b) examine the dues books of employees on the job;

(c) see that the Employer supplies a suitable tool house heated in cold weather from October 1 to April 1, where employees may eat meals in comfort. It shall be separate from any material shed and shall be provided with a lock, with a key in the steward's possession;

(d) Either the foreman or the steward may open the aforesaid shed before starting and stopping of work;

(e) see that the Employer supplies all lines and furnishes drinking water in a covered vessel with individual drinking cups.

(f) see that proper toilet facilities are provided.

(g) when determined by the Employer to be required, the steward may accompany any injured or sick bricklayer, or mason and the steward shall be paid for any lost time in so doing on the day of the injury.

(h) check all scaffolds before being used by employees covered by this Agreement.

Section 4. The Employer shall be responsible for the loss of masonry tools after working hours as a result of fire or breaking and entering of the tool shanty, up to Two Hundred Dollars ($200.00) per man, providing the employee, before starting work on the project furnishes the Employer a written inventory of his tools and the replacement cost thereof, which is verified by a representative of the Employer.

Section 5. (a) The Steward shall remain at work so long as any employee in the branch of the trade in which the steward is working remains at work or until the completion of work, provided he is qualified to perform the available work.

(b) No steward shall be transferred to another job without prior notice to the Field Representative.

(c) When workers are all laid off before the job is completed, for reasons beyond the contractor's control, the steward shall have the first preference of being called back when the job starts up again. Punch list not included.

10

CT 0295

**Section 6.** If any work must be performed by a single employee after the regular working hours, the shop steward is not to replace that employee if such employee had the assignment during regular working hours.

**Section 7.** There shall be no interference with the Steward in his reasonable performance of the duties set forth herein. The Steward shall not be discharged or discriminated against for his proper performance of the duties set forth herein.

**Section 8.** Should an Employer determine to layoff or discharge a shop steward, it shall so notify the President, Local 1, Connecticut who shall immediately investigate the matter and notify the Employer of his decision at that time. If the parties are unable to reach agreement, the justifiability of the Employer's action shall be submitted within forty-eight hours to arbitration.

## ARTICLE X
## JURISDICTIONAL CLAIMS

**Section 1.** The Employer acknowledges that the Union claims items of work listed in the International Constitution and Rules of Order, Code 1 Branches of the Trade, as amended in 1992, and as set forth below, to be within its work jurisdiction. In making work assignments, the Employer shall consider area and trade practice, work ordinarily and customarily performed by employees covered by this Agreement and work Jurisdiction agreements between international unions.

A. <u>Brick Masonry</u> - Bricklaying masonry shall consist of the laying of bricks made from any material in, under or upon any structure or form of work where bricks are used, whether in the ground, or overrates

surface, or beneath water; in commercial buildings, rolling mills, ironworks, blast or smelter furnaces, lime or brick kilns; in mines or fortifications, and in all underground work, such as sewers, telegraph electric and telephone conduits. All cutting of joints, pointing, cleaning and cutting of brick walls, fireproofing, block-arching, terra-cotta cutting and setting, the laying and cutting of all tile, plaster, mineral wool, cork blocks and glass masonry, or any substitute for above material, the laying of all pipe sewers or water mains and the filling of all joints on the same when such sewers or conduits are of any vitreous material, burnt clay or cement, or any substitute material used for the above purpose, the cutting, rubbing, and grinding off of all kinds of brick and the setting of all cut stone trimmings on brick buildings, is bricklayers' work.

Cleaning, grouting, pointing and other work necessary to achieve and complete the work under the foregoing category shall be the work of the bricklayer.

All terra cotta called unit tile in sizes over 6" x 12" regardless of method of installation and all quarry tile over 9" x 9" x 1 1/4" size, split brick or quarry tile or similar material if bedded and jointed with one operation and the bedding, jointing and pointing of the above material shall be the work of the craft installing same.

All burnt clay extruded cellular products regardless of trade name or method of installation when used as a veneer on structures.

All clay products known as terra cotta tile, unit tile, ceramic veneer and machine made terra cotta and like materials in sizes larger

PCT 0296

than 6" x 12", regardless of the method of installation.

Where the preponderance of material to be installed is of the above sizes, and when material of lesser size is to be used in connection therewith, the bricklayers shall install such materials. Brick paving comes, under bricklayers' trade classification. In addition, such other construction work in this area that has been done, as the custom and practice by members of this Union.

The setting, grouting, and dry packing of all plates and machinery. The installation of all types of wall ties and anchors that support masonry walls.

Built-in corner guards, bearing plates and loose lintels.

The installation, assembly and erection of all masonry panels, whether brick, tile, natural stone, cement, utilizing a light frame, steel stud back-up system.

The cleaning, rubbing down, grinding, patching of masonry block walls.

The installation, pointing, cleaning and finishing of R-Brick, Pan-Brick or other thin brick systems.The fabrication and installation of brick panels or other prefabricated masonry panels, including the rigging, hooking on, signalling, bolting and/or welding, the installation of all anchors and supports and other miscellaneous hardware.

The laying, setting, bedding, pointing, grouting, steam cleaning, washing, spreading of asphalt and the sweeping of joints with sand, cement or stone dust of all paving units made of brick, stone, cement, precast or concrete, whether such units are interlocking, laid dry or in dry pack in mortar, sand, stonedust, asphalt, mastic, or substitutes.

The installation of Nailon brick or similar burnt clay units, including the cutting, fitting, nailing on, pointing, caulking and cleaning.

The application of all sand and cement coats, other substitute cement based materials, fireproofing materials, whether troweled or rolled on all masonry, cement, precast or concrete.

The water blasting machine or similar type of cleaning machines shall be the tool of the trade and operated by the members of the International Union of Bricklayers and Allied Craftworkers.

All exterior and interior cleaning of buildings, whether brick, stone, precast, cement or concrete, regardless of whether water, detergent, acid, restorer, or other substitute cleaning products are used.

The waterblasting, or other cleaning procedure used to expose aggregate or to prepare masonry to receive a new finish.

Waterblasting or other cleaning procedure which will be performed in connection with the pointing or caulking of a building.

The Bricklayer shall have the right to use all tools necessary to all of the above work operations, including but not limited to hand tools, power tools, electric and air hammers or chipping guns.

Cement or Concrete Block Laying - The laying of cement or concrete blocks or blocks of masonry material.

12

PCT 0296

B.  Stonemasonry - Stonemasonry shall consist of laying all rip rap, rubble work, with or without mortar, setting all cut stone, marble, slate or stone work (meaning as to stone, any work manufactured from such foreign or domestic products as are specified and used in the interior or the exterior of buildings by architects, and customarily called "stone" in the trade). Cutting all shoddies, broken ashlar or random ashlar that is roughly dressed upon the beds and joints, and range ashlar not over ten inches in height; the dressing of all jambs, corners and ringstones that are roughly dressed upon the beds, joints or reveals, and the cutting of a draft upon same for plumbing purposes only; and the cleaning, cutting of joints and pointing of stone work.

The erection, installation, plumbing, leveling, aligning, as well as, the installation of all parts and hardware, and the anchoring, bolting and welding of all natural stone when natural stone is installed in pre-cast, metal or glass curtain wall systems shall be the work of the Bricklayers and Allied Craftworkers.

The work of the stone masons on natural stone faced steel truss panels shall include but shall not be limited to the following:

1. All welding and/or bolting of the support steel to the building structure.

2. The unloading, rigging, hooking on, hoisting, signaling, tagging, setting and landing of the stone faced steel truss panels.

3. The final setting, including but not limited to plumbing, leveling and aligning.

4. All temporary and final welding and/or bolting of panel to panel connections, and panel to building structure connections.

5. The assembly, and setting up of all lifting mechanisms used to hoist or move such panels, including but not limited to hand derricks, electric and manual chain falls.

The work of the bricklayers and masons on natural stone uni-strut systems or similar type grid systems shall include but shall not be limited to the following:

1. The installation of the stone support system, including the erection , plumbing, leveling, aligning, bolting, welding and anchoring.

2. All welding of stud bolts whether by stud gun or arc welding.

3. The installation of tubular steel, clip angles and other parts and/or connections, whether bolted or welded.

4. The installation, setting, shimming, landing, and anchoring of natural stone to all metal grid backup systems.

5. All final setting of natural stone, including but not limited to plumbing, leveling and aligning.

6. The installation of all miscellaneous hardware necessary to complete the system, regardless of the method of installation.

The fabrication and installation of limestone, granite or other prefabricated natural stone panels, when mounted to steel or aluminum framing or set on steel struts shall be the work of the members of the International Union of Bricklayers and Allied Craftworkers.

This is to apply to all work on buildings, sewers, bridges, railroads, bulkheads,

breakwaters, jetties, or other public works, and to all kinds of stone, particularly to the product of the locality where the work is being done, and the same shall be considered stonemasonry.

Stonemasons shall have the right to use all tools which they consider necessary in the performance of their work.

C. Artificial Masonry - The cutting, setting and pointing of cement blocks and all artificial stone and marble, either interior or exterior, when set by the usual custom of the stonemasons and marble setter. All cement that is used for backing up external walls, the building of party walls, columns, girders, beams, floors, stairs and arches and all material substituted for the clay or natural stone products, and the cutting, setting and pointing of all precast concrete units regardless of size.

The erection and setting of fiberglass stone-faced wall panels, GFRC panels and units, and other lightweight artificial stone, when said operation is a direct set from the truck to the structure, including the installation of lugs and other supporting steel and hardware, the hooking on, signaling and securing, the plumbing and aligning, grouting, patching, caulking, anchoring, bolting, and welding.

D. Cement Masonry -

Laying out, screeding, operating of the power screed and finishing of all cement, concrete, aerated autoclaved concrete, brown stone composition, mastic and gypsum materials, also for fireproofing, waterproofing, cement and composition base and vault lights. The cutting of all cement and concrete for patching, cleaning and finishing. The bush hammering of all concrete and flash patching. The operation of the cement gun, the nozzle and the finishing of all material applied by the guns, also the operation and maintenance of the cement floor finishing machines and laser screed. The cement mason shall have the right to use all tools necessary to complete his work, including but not limited to hand tools, power tools, electric and air hammers or chipping guns.

Straight edging, floating, trowelling, edging, rubbing and brushing work.

The setting of lumber of other materials to determine the proper grade of concrete when used to serve as screeds, such as 2" x 4" or other plain pieces of material when held in place by stakes and/or spreaders. A screed is a strip of wood or metal used as a guide for leveling or grading a concrete floor, slab or sidewalk. Any bulkhead that is one single board in height (not to exceed twelve inches) shall be set and braced or staked by employees covered by this Agreement providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete.

The setting of all forms for sidewalks, curbs and gutters.

The installation and erection of all types of precast, prestressed concrete, stone or imitation stone or other fabricated masonry units when installed as wall panels by means of bolting and/or welding to structural steel or concrete frame construction.

The following units are to be recognized as coming within the meaning of "precast, prestressed concrete stone or imitation stone or other fabricated masonry units when

14

installed as wall panels by means of bolting and/or welding to structural steel or concrete frame construction."

Any fabricated masonry unit which may be included as a component of the exterior wall system such as fins, mullions, sunshades, sprandel units, window units and panels, the cutting, fitting, bedding, pointing, caulking, grouting and installation of gaskets. The plumbing, aligning, leveling and anchoring, including bolting and/or welding.

The setting and erection of fiberglass stone faced wall panels, and the drilling of holes and securing of the panels. The plumbing, aligning, leveling installation of gaskets, grouting, caulking, bracing and anchoring which includes metal clips, bolting and welding of all precast panels, columns, roofs and floor slabs.

The chipping, cutting, grinding, patching and rubbing of concrete surfaces necessary to correct imperfections caused by sagging, bulging or separation of concrete forms, or by the deterioration, scaling or cracking of concrete.

The application of a brush-coat cement base material as part of the operation of patching concrete when the color of the cement base is substantially the same as the surface to which it is applied. The filling of air holes that exceed 1/8" regardless of the color of the cement base material when patching concrete.

The removal and patching of snapties.

The setting of precast re-enforced concrete slabs for roof tiling or flooring when such are to be laid in or grouted with cement, lime or gypsum.

All chipping and cutting of concrete or other masonry units that is necessary to trace sources of leakage and to prepare surfaces of such units for installation of materials used in stopping leakage in such units.

The installation of materials used in the stoppage of leaks in concrete or other masonry units.

The application of non-decorative materials for waterproofing or damp proofing on new or used concrete.

For the purpose of defining non-decorative it shall mean: (a) sand and cement coats, with or without damp-proofing additive substantially where no color is added; (b) sand and cement coats, with or without damp or waterproofing additive substantially the same color as the surface to which it is applied; (c) damp and waterproofing materials, identified as such by the manufacturer, which is substantially the same color as the surface to which it is applied. ("Substantially the same" shall be white or gray cement or clear silicone, and shall apply under the "non-decorative" as well as "decorative" paragraphs of this section.)

The application of the following materials including the cleaning, priming and preparation of concrete floor surfaces to receive concrete stains, sealers, chemical curers, hardeners and waxes; the aforementioned materials included in concrete prior to pouring or in the finishing process performed during the curing period (not to exceed one week).

The sandblasting and etching of concrete to expose aggregate.

15

(d) Recommended but not mandatory footage per cement pours are as follows:

1,000-5,000 sq. ft. approximately 1,000 sq. ft. per employee recommended.

5,000-6,000 sq. ft.: 4-6 masons
7,000-8,000 sq. ft.: 5-7 masons
8,000-9,000 sq. ft.: 6-7 masons
9,000-11,000 sq. ft.: 7-8 masons
12,000-13,000 sq. ft.: 8-10 masons
14,000-15,000 sq. ft.: 10-12 masons
16,000-17,000 sq. ft.: 13-14 masons
17,000-18,000 sq. ft.: 13-14 masons
18,000-19,000 sq. ft.: 14-15 masons
19,000-20,000 sq. ft.: 15-16 masons

*5,000- 20,000 not more than 1,200 sq. ft. per employee recommended.

Whenever concrete is being poured in bulk and is brought to a definite grade, a cement mason must be hired to finish or level off such bulk concrete no matter what tool is used to do (Bulk concrete shall be classified as walls, footings, footers, parapets, or any formed concrete where grade nails, chalk lines, screed backs or any other grades are used). This shall apply only when twenty (20) cubic yards or more of concrete are poured in a 7-hour period.

There will be no large hand held grinders, bush/chipping hammers over 45 pounds on a vertical wall.

F. Plastering - All exterior plastering, plain and ornamental when done with stucco, cement and lime mortars or patent materials, artificial marble work, when applied in plastic form, composition work in all its branches, the covering of all walls, ceilings, soffits, piers, columns, or any part of a construction of any sort when covered with any plastic material in the usual methods of plastering, is the work of the plasterer. The casting and sticking of all ornaments of plaster or plastic compositions, the cutting and filling of cracks. All cornices, molding, coves and bull noses shall be run in place on rods and white mortar screeds and with a regular mold and all substitutes of any kind, when applied in plastic form with a trowel, or substitute for same, is the work of the plasterer.

The plasterer shall have the right to use all tools necessary to complete his work, including, but not limited to hand tools, electric and air hammers or chipping guns.

Dryvit System - All work pertaining to the Dryvit and similar systems, including insulation board, primus adhesive, reinforcing fabric and all other materials, also whatever preparations it takes to perform said Dryvit system, shall be the work of plaster men or members of the I.U.B.A.C. having the skill to perform said work.

1. Pointing, Caulking, and Cleaning - Pointing, caulking and cleaning shall consist of the pointing, caulking, and cleaning of all types of masonry, caulking of all window frames encased in masonry on brick, stone or cement structures, including all grinding and cutting cut on such work and all sandblasting, steam cleaning and gunnite work. The caulking of all window frames or door frames encased on masonry or brick, stone, precast or cement structures shall be the work of the members of the International Union of Bricklayers and Allied Craftworkers.

The pointing, cleaning and weatherproofing of all buildings, grain elevators and chimneys built of stone, brick and concrete. It shall include all grinding and cutting out.

16

PCT 0296

The preparation and mixing of all caulking shall be the work of the members of the International Union of Bricklayers and Allied Craftworkers.

The water blasting, or other type of cleaning and the application of all fireproofing materials in the interior of water tanks or chests, stacks, silos chimneys and turbines.

The application of all sand and cement coats, other substitute cement based materials, fireproofing materials whether troweled or rolled on all masonry, cement, precast, or concrete.

All epoxy injection work, whether poured by hand, pointed or injected by machine under pressure, on brick, stone, precast, cement and concrete.

The application of all chemicals and epoxy coatings, including plastic coatings that combine in a matrix material and artificial aggregates of all types, which form interior-exterior decorative non-structural finishes of wide imitative and artistic effect.

All exterior and interior cleaning of buildings, whether brick, stone, precast, cement or concrete, regardless of whether water, detergent, acid, restorer, or other substitute cleaning products are used.

The waterblasting or other cleaning procedure used to expose aggregate or to prepare masonry to receive a new finish, or to be performed in connection with the pointing or caulking of a building.

The tuckpointing of oakum and polyurethane rope or other backing material into joints and into expansion joints between the top of all cement block walls and steel ceiling decks or steel beams or concrete

beams or around the perimeters of windows, doors or other areas to be caulked, and; the cleaning and/or preparation of any natural or synthetic, concrete, masonry, stone or stucco.

The Bricklayer and Allied Craftworker shall have the right to use all tools necessary to complete the above work, including but not limited to hand tools and power tools.

J. Refractory Work -

The Employer agrees to assign to employees all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftworkers, including but not limited to: dipping, setting, buttering, bedding, handing, pointing, grouting, caulking, cutting, toothing, fitting, plumbing, aligning, laying, flagging, leveling, installation of gaskets and expansion joint material, grinding, vibrating, tamping, guniting, insulation, and spraying of all refractory materials, anchoring of all refractory materials by all means including bolting and welding, ceramic welding, removal and cleaning of masonry materials, to be reinstalled, final sandblasting of surfaces to receive additional refractory materials, installation of chemical coating, fireproofing, and membrane materials by any method required, surface spraying of all refractory materials, and cleaning of coke oven walls, chambers and flues. Temporary bracing in coke oven repairs shall be done by Employees represented by Bricklayers and Allied Craftworkers, in coordination with other trades.

Backfill and vibrating of all refractory materials with electrical vibrators, air vibrators or any other methods.

17

Use of the nozzle when the refractory materials are used in furnaces, boilers, stacks, breechings and vessels.

K. Tile, Marble, Terrazzo. The craft jurisdiction set forth in the Tile, Marble and Terrazzo Agreement shall be incorporated by reference.

Section 2. There shall be no strikes, picketing or lockouts over any jurisdictional dispute. Any assignment resulting in a jurisdictional dispute may not be grieved or arbitrated, except as set forth herein. In the event a jurisdictional dispute arises, the disputing unions shall request the other union or unions involved to send representatives to the job site to meet with representatives of the Union and Employer to settle the dispute. The dispute will be submitted to Arbitrator J. Larry Foy, or Arbitrator Larry Katz. The arbitrators shall be selected in rotating order. If an arbitrator is not available to hear the dispute within ten (10) days, he shall be skipped and the next arbitrator in rotation shall be selected. If necessary, the Arbitrator and all parties shall make themselves available for an evening hearing. The hearing will be completed within one (1) day, and the Arbitrator shall issue his decision within forty-eight (48) hours of the close of the hearing. If on of the disputing unions refuses to attend the hearing, the arbitration will proceed with the other union and the employer. If requested by either Union or the involved Contractor, a written Opinion and Award shall be issued by the Arbitrator within thirty (30) days. The decision of the Arbitrator shall be on the basis of industry practices within the geographical area covered by the local union where the dispute occurs, the efficiency and economy of operation (but without consideration of the comparative wage and benefits paid to the disputing trades) and,

where relevant, the Plan for the Settlement of Jurisdictional Disputes in the Constriction Industry. Fees and expenses shall be shared equally and shall be paid one-third by each of the involved Unions and one-third by the involved Contractor. Any such decision shall not result in damages being assessed against the Employer, double staffing, rework, or any other punitive provision. The arbitrator may award back pay where appropriate.

## ARTICLE XI
## WORK RULES

Section 1. A line must be pulled on two sides of all double unit walls eight (8) inches in thickness or over. Employer shall furnish all lines.

Section 2. No line shall be dropped before the course is laid and tooled unless job conditions delay the tooling. No mortar shall be spread ahead of the line and no line shall be raised more than one course at a time except to avoid obstructions. No employee shall work ahead of the line, except the employee on the leads and the employee of the trigging. The trigging employee shall be permitted to lay three (3) courses above the line.

Section 3. No employee shall be required to build a wall higher than five (5) feet from the ground or scaffold, whichever applies. No scaffold shall be built more than four (4) feet six (6) inches higher than the preceding working level. The Employer shall furnish ladders or other access to all scaffolds.

Section 4. All shafts or dangerous places of similar character must be sheeted tight to the floor above and a floor below to insure the safety of the men employed in the same and

18

PCT 0296

no employee shall work in any shaft or opening where elevators or counterweights are running, except where there is a bank of elevators in which one non-running elevator and counterweight must intervene. This paragraph does not apply to patching work.

Section 5. All mortar tubs are to be raised at least sixteen (16) inches above ground area, on scaffolds and floor level.

Section 6. Wherever practical, any method or device may be used in the construction of masonry work, provided that such methods and devices fall within the work jurisdiction claimed by members of the International Union of Bricklayers and Allied Craftworkers and are not expressly covered in other parts of this Agreement.

Section 7. All special tools and lines shall be provided by the Employer.

Section 8. The Employer shall provide clean covered drinking water from a water source approved by the Steward and Employer. The water shall be kept iced from May 1, to September1.

Section 9. Work rules for plastering work shall continue to be as follows:

(a) On plastering work, the Employer shall see that no gauging is made up later than thirty minutes of 12:00 and forty-five minutes of the regularly established quitting time. At no time shall a gauging be prepared before the preceding gauging is complete and especially no one shall prepare gauging for other than themselves except on cornice work.

(b) The plastering inside of a building shall be left straight with the rod and darby. These tools are to be furnished by the employer.

(c) Molding or covers of plaster walls shall be run with a regular mold properly screeded and run on rods. All noses must be properly screeded and run with a regular mold on rods.

(d) The finishing of plaster walls and ceilings cannot be done while the screeded cornices or covers with which they intersect are not in place.

(e) For plastering work all mortar boards shall not exceed four (4) feet X six (6) feet or an equivalent area and each gauging shall not be more than one and one-half (1-1/2) rods per man.

(f) There shall be no preference given to either white mortar hands or brown mortar hands in regards to working overtime or the regular work day.

(g) All plaster moldings or cornices, plasters or plaster paneling must be run in place and where cornices are ornamented proper beds must be made to secure same. All plaster capitals, bases, and molding if not ornamental, must be run on the job.

(h) Contractors shall furnish all screed rods, darbies and feather edges, which must be kept true and straight at all times.

(i) When plastering, the mortar boards shall be raised at least sixteen (16) inches from the scaffold or placed on barrels or stands.

(j) When working on bottoms all work shall be plastered at least one (1) foot above scaffold height. If necessary a foot scaffold not to extend one (1) foot in height shall be allowed for this purpose.

19

DCT 0298

(k) All plasterers shall be allowed ten (10) minutes clean up time before the established quitting time in which to change clothes and clean their tools.

(l) All stands for bottom work shall be no less than thirty (30) inches in height.

(m) There shall be no spacing of plank on scaffolds used for scratch, brown or white coat.

(n) For any scaffold up to four (4) feet in height, on side walls only, a scaffold twenty (20) inches in width shall be allowed. Anything four (4) feet or over in height shall be at least four (4) ten inch planks wide.

(o) No employee shall use stilts or other so called convenience which are hazardous in the opinion of the Field Representative.

(p) It is agreed that the plaster work if sublet or subcontracted by the Employer, shall be given to a contractor who agrees to be bound by the terms of this Agreement. There shall be no lumping of work.

Section 10. Work rules for cement finishing work shall continue to be as follows:

(a) There must be one (1) cement mason on the laying, placing or finishing of all concrete. On the floors there shall be two cement masons or plasterers to do rodding, screeding and top dressing. This does not prohibit bricklayers and masons from being so employed providing they are qualified.

(b) There shall be three (3) men to pull any rod over twelve (12) feet in length up to sixteen (16) feet, and an additional man for every four (4) feet thereafter.

(c) There shall be no lost time during normal working hours for the cement mason while waiting for concrete to set for finishing. No man shall be sent home until the concrete has been properly finished in the opinion of the Employer.

Knee boards are to be used when hand troweling or floating all slabs.

(d) All cement masons shall be allowed ten (10) minutes clean-up time before the established quitting time in which to change clothes and clean their tools.

Section 11. (a) There shall be no more than two (2) competent men on each two-man swing scaffold, and each man shall be supplied with a safety line and belt, tied to a separate anchorage.

(b) The erection of all two-man swing scaffolds shall be supervised and inspected by men working on said scaffold.

Section 12. One (1) man shall get coffee and deliver it to others who will not leave their work station. There will be one coffee break in the a.m. not to exceed fifteen (15) minutes.

Section 13. No employee shall contract by the unit, or lump work of any character, covered by our classification of work, or work for any person or persons contracting work by the unit, or lump work of any character, taken from general contractors, without furnishing material.

Section 14. Every journeyman shall tool off his own work.

Section 15. The line shall not be raised before the course laid.

20

DCT 0296

Section 16. All scaffolds shall be a minimum of five (5) ten (10) inch planks wide unless otherwise specified in the Agreement

Section 17. In addition to a locker on the ground floor, the Employer shall provide a gang box or tool box on every fifth floor above the ground floor. Tools shall be stored in the ground floor locker over the weekend. Employers shall not be responsible for tools stored in a gang box or tool box over the weekend.

## ARTICLE XII
## INTERNATIONAL MASONRY
## INSTITUTE TRUST AND IMI
## APPRENTICESHIP TRUST

Section 1. Each Employer signatory hereto subscribes and agrees to be bound by the Agreement and Declaration of Trust of the International Masonry Institute Trust (IMI), including the International Masonry Institute Apprenticeship Trust (IMI-AT).

Section 2. Each Employer agrees to pay to said Funds the amounts set forth in Schedule A, attached hereto for each hour worked by each bricklayer and mason, including apprentices, covered by this Agreement. Payment shall be reported and paid not sooner than the twenty-fifth day of the month following the month in which the work was performed along with the other contributions as provided in this Agreement.

Section 3. Failure to contribute to the Fund shall be a violation of this Agreement.

Section 4. Each Employer shall be required to employ a ratio of one (1) apprentice to seven (7) journeymen on the job when apprentices are available. When appropriate, a ratio of one (1) apprentice to three (3) journeymen may be employed.

The following percentages of journeymen's wage rates shall be paid to apprentices and the following fringe benefit contributions shall be made for hours worked by apprentices.

The Apprentice Standards for the International Union of Bricklayers and Allied Craftworkers Local 1 CT shall be incorporated by reference and the "Rates of Pay" section of the standards shall be as outlined in Appendix A. Fringe benefit contribution rates for apprentices shall be made as outlined in Article XVII Section 2.

Section 5. All parties to this Agreement shall adhere to the apprenticeship rules and regulations and standards approved by IMI and the Connecticut State Apprenticeship Council. IMI shall register the training program and all apprentices under supervision of IMI with the Connecticut State Apprentice Council and secure certification of the apprenticeship program so that payment of apprentice wage rates and fringe contribution rates will be permitted under state and federal prevailing rates laws. Contributions to the apprenticeship fund shall not be required during any period that payment of apprentice wage rates and fringe contribution rates are not permitted under state and federal prevailing rates laws.

Section 6. The Committee shall cooperate with the Bureau of Apprenticeship, United States Department of Labor, Connecticut State Apprenticeship Council, Connecticut State Agencies and trade related industries in advancing the training skills of apprentices.

21

Section 7. The apprentice shall train in all branches of the trade. The apprentice supervisor shall make changes of the apprentices if he sees the apprentice is not getting a fair share of all branches of the trade. No apprentice shall be exploited by being used for continuous periods on such jobs as washing down, cutting on the saw, and rubbing concrete. Other than grinding and rubbing concrete, the apprentices shall work no more than 20 hours per week on any washing down, cutting on the saw, installing wall anchors and waterproofing. All employers will endeavor to have apprentices work a minimum of 20 hours per week laying units in the wall.

## ARTICLE XIII
## INSURANCE

The Employer shall carry, on behalf of all employees covered under this Agreement, Workers' Compensation Insurance, through a carrier licensed to do business in the State of Connecticut, and shall make Unemployment Compensation payments as required by law. The Employer shall provide the Director or Field Representative of the Union with evidence of such coverages upon request.

## ARTICLE XIV
## STATE AND FEDERAL LAWS

It is assumed by the parties hereto that each provision of this Agreement is in conformity with all applicable laws of the United States and the State of Connecticut. Should it later be determined that it would be a violation of any legally effective Government or State order or statutes to comply with any provision or provisions of this Agreement, the parties hereto agree to renegotiate such

provision or provisions of this Agreement for the purpose of making them conform to such laws or statutes so long as they shall remain effective and the other provisions of this Agreement shall not be affected thereby.

## ARTICLE XV
## WORK STOPPAGES

Section 1. It is agreed that there shall be no work stoppages during the term of this Agreement except for the following causes only, and only forty-eight (48) hours (weekends excluded) after notice from the Union has been received by the Employer and the Association which clearly states the Union's intention to strike for:

"Willful non-payment of wages and/or fringe benefit contributions as required by this Agreement for time actually worked by employees covered under this Agreement."

The notice required by this Section shall be by telegram, registered or certified mail, and shall be authorized and signed by the appropriate Field Representative.

Section 2. Any Employee(s) who loses wages when this Article XV is implemented, due to the Employer's failure to pay wages and/or fringe benefit contributions as provided in this agreement, shall be compensated for each hour lost up to two (2) work days, (sixteen (16) hours).

Section 3. Except as specifically provided in Section 1 above, there shall be no work stoppages, strikes, slowdowns or other interference with the progress of the work during the term of this Agreement.

22

CT 0296

## ARTICLE XVI
## GRIEVANCE AND ARBITRATION PROCEDURE

Section 1. A grievance shall be defined as any dispute arising between the parties concerning interpretation and/or application of this Agreement during the term of this Agreement. The Union, the Employer, and/or the Association may file and process a grievance as provided herein.

Section 2. There shall be a Joint Arbitration Committee hereinafter referred to as the "Committee", made up of two representatives of the Association and two representatives of the Union which shall hear grievances referred to it by the Employer, the Association and/or the Union.

Any controversy arising out of this Agreement involving the interpretation of its terms and conditions shall be settled in accordance with the grievance procedure set forth in this Article. No grievance shall be recognized unless it is called to the attention of the Employer by the Union or to the attention of the Union by the Employer within five (5) days after the alleged violation is committed or within five (5) days after the party filing the grievance knew or should have known of the event giving rise to the grievance.

Section 3. All grievances between an employee or group of employees on the one hand and the Employer on the other shall be processed in accordance with the following procedures:

Step 1. The steward, within three (3) working days after the event giving rise to the grievance, shall first report the grievance to the Employer's representative and the

Field Representative or the President, Local 1, Connecticut.

Step 2. If the grievance is not resolved in Step 1 above, the Field Representative or the President, within three (3) working days after the occurrence which gave rise to the grievance, shall then discuss the grievance with the job superintendent or an officer of the Employer in a further attempt to resolve the matter informally.

Step 3. If the grievance cannot be resolved in Step 2 above, the Field Representative or the President shall send notice to the Employer and the Association within five (5) days after the occurrence which shall have given rise to the grievance requesting consideration by the Committee of the grievance. Such notice shall be by certified mail, return receipt requested, and must give the names of all parties involved, job site location and full particulars of the grievance including appropriate dates and ARTICLE(S) and Section(s) of this Agreement which the Union alleges have been violated.

Section 4. Either the Employer or the Association may submit a grievance for consideration by the Committee by sending notice to the Union requesting such consideration. Such notice shall be by certified mail, return receipt requested and shall give details of the grievance. A copy of any such notice by the Employer shall be sent to the Association.

Section 5. The Committee shall meet to consider the grievance within five (5) working days after the request for such consideration has been received by either the Association or the Union. The grievance shall be deemed settled and resolved in accordance with the majority vote of the

23

Committee, and the Committee's decision shall be binding upon the parties to the grievance. When decisions are reached by the Joint Arbitration Committee, a time frame for compliance of such decision shall be established by the Committee. Upon failure to comply with the decision of the Joint Arbitration Committee, the parties are free to take whatever action they deem necessary toward implementation.

Section 6. When a grievance is appealed to arbitration, the matter will be submitted to one of the following list of arbitrators, who will be used on a rotating basis or by mutual agreement for grievances submitted to arbitration during the term of this collective bargaining agreement. In the event the Arbitrator who is next in rotation is unable to schedule the arbitration within sixty (60) days of the referral, the arbitration will be submitted to the next arbitrator according to the following rotation:

> Albert G. Murphy
> Michael F. Walsh
> J. Larry Foy
> M. Jackson Webber
> Victor Muschell

Section 7. If either party refuses to participate in the selection of an impartial umpire, the other party shall select such umpire.

Section 8. If either party fails to appear at an arbitration proceeding before an impartial umpire, the umpire shall proceed ex parte.

Section 9. Each party shall bear the costs of its appointed arbitrators. The costs of the neutral arbitrator and an arbitration proceedings hereunder shall be borne by the party found in violation of the contract.

Section 10. The time limits set forth herein shall be strictly adhered to but may be extended by written agreement between the Association and the Union. A grievance shall be considered as being determined against the party in violation of the time limits set forth herein.

Section 11. Nothing set forth herein shall require the Union to process any Union or employee grievance which in its opinion is without merit and no employee has the right to arbitrate a grievance which the Union deems without merit. The Association has the right to determine whether or not it shall represent or continue to represent Employers with respect to grievances filed hereunder.

## ARTICLE XVII
## FRINGE BENEFIT FUNDS

Section 1.    Employers shall make contributions to following funds in the amounts specified in Schedule A attached to this Agreement and made a part hereof, for each hour worked by employees covered by this Agreement.

Zone A: All of Connecticut other than towns listed in Zone B.

IUBAC Local 1, Connecticut, Health Fund

International Union Pension Fund

International Union Retirement Savings Plan (Annuity Fund)

International Masonry Institute, Apprentice and Training (IMI/AT)

International Masonry Institute

24

PCT 0296

Zone B: Norwalk, Westport, Weston, Wilton, Ridgefield, New Canaan, Stamford, Redding, Darien and Greenwich

IUBAC Local 1, Connecticut, Health Fund

International Pension Fund

International Union Retirement Savings Plan (Annuity Fund)

International Masonry Institute, Apprentice and Training (IMI/AT)

International Masonry Institute

Section 2. Each Employer agrees to pay to the Funds listed for Zone A or Zone B, depending on the location of the project on which the employees are working, the required contribution rates for all hours worked by employees and apprentices, except as follows: up to 1,500 apprentice hours, only health contribution are required; 1500 to 3000 apprentice hours, only health and pension contributions are required; and over 3000 hours, all contributions are required. An hour of work for which overtime or any other premium wage must be paid, shall be considered a single hour for this purpose except for Cement Masons as set forth in Article V, Section 1.

Section 3. Not later than the 20th day following the month in which the hours of work were performed, each Employer shall submit to the Funds reports containing a complete list of the names of employees, social security numbers, and the number of hours worked by each employee during the previous month. In the event no employee worked during the previous month, the Employer shall submit a report attesting that

no Employees worked and this will be the Employer's final report until that Employer has reportable hours in the future.

Section 4. If an Employer fails to make the required contributions to any Fund by the end of the month following the month in which the work was performed, the Employer shall be considered a Delinquent Employer for that Fund.

If so determined by the trustees of any Fund, Delinquent Employers shall pay to each Fund for which it is a Delinquent Employer interest charges at the rate of one and one-half percent computed on the entire sum owed each Fund for each thirty (30) day period or fraction thereof that it is a Delinquent Employer.

If so determined by the trustees of any Fund, since the failure of a delinquent Employer to remit timely payment of contributions imposes additional accounting, handling and administrative expenses upon each of the Funds, each delinquent Employer shall pay, as liquidated damages the sum of one dollar ($1) per employee per Fund, up to a total maximum payment of three ($3) per employee, for each thirty (30) day period or fraction thereof that the Employer is delinquent.

If so determined by the trustees of any Fund, an Employer whose check is returned for insufficient funds will be required to make payments by certified check for the next six months.

Section 5. The failure of any Employer to make the required reports and contributions to each Fund shall make the Employer liable (1) to each employee damaged by such failure for whatever benefits the employer and his or her beneficiaries were denied

25

because of the Employer's failure to make the required reports and contributions and (2) for court costs and attorney's fees reasonably necessary in collecting the contributions, provided however, that no Employer shall have any liability to any employee or beneficiary as set forth above, if the failure to pay the required contribution or any part thereof was the result of honest mistake or inadvertence.

Section 6. Employer contributions to the Pension and Annuity Funds shall be consistent with applicable federal law.

Section 7. All fringe benefit funds to which Employer contributions are required by this Agreement shall be maintained at all times as jointly administered Taft-Hartley trust funds with an equal number of employer trustees and labor trustees, herein referred to as the "Trustees", with such powers and duties as may be provided from time to time by the applicable Trust Agreement. The Funds shall furnish to the Association and the Union copies of their respective annual audit reports and annual actuarial or consulting reports and information concerning contributions received or due as might be requested from time to time.

Section 8. The Funds shall at all times be operated in conformance with applicable Federal and State laws and regulations, and shall be maintained as tax exempt trusts under provisions of the Internal Revenue Code and Employer contributions to said Fund shall at all times be deductible by the Employer for Federal incomes tax purposes. In the event that a Fund fails to retain approval as a tax exempt trust so that Employer contributions shall not be deductible as a business expense, the Employer shall not be liable to contribute to such Fund for hours worked during the

period that the contribution is not deductible.

Section 9. At the discretion of the Fund's Trustees, an Employer determined to be delinquent in its payments as required herein may be held liable for all contributions due to the Fund and reasonable attorney's fees, court costs, audit fees and other expenses incurred incidental to collection of contributions due the Fund, including a reasonable rate of interest on contributions due. Appropriate payroll records of the Employer may be subject to audit by the Trustees or their authorized representative upon reasonable notice. The Trustees shall have all powers with respect to the audit of appropriate payroll records and the collection of delinquent contributions, interest, audit fees, attorney's fees and other expenses of collection as may be provided from time to time by the applicable Trust Agreement.

Section 10. Fringe Benefit Bond Requirement. If so determined by the trustees of a Fund, any Employer who has not been signatory to this agreement and any prior agreement for two (2) consecutive years, or any Employer whose employees have been removed in accordance with Article XV, Section 1 of this Agreement, or who is or has been a delinquent Employer at any time within any twelve (12) month period shall be required to furnish a surety bond or cash deposit escrowed with the Trustees in a sufficient amount to protect a Fund, against the failure of the Employer to make any payment due currently or in the future under the terms of this Agreement.

The following procedures and amounts shall govern fringe benefit bonds:

a. The total amount of the bond or bonds to be posted or cash to be deposited shall equal 480 hours times the total of the contributions to the employee fringe benefit funds required by this Agreement for each employee employed by the Employer.

b. If at any time after a bond or bonds are posted or money is deposited, and the Employer's work force increases, the fund trustees may require a corresponding increase in bonding or money deposited.

c. If an Employer chooses to post one bond, it shall be in the name of the Bricklayers fringe benefit funds. The bond may not require as a condition of payment that the Employer be delinquent in contributions to all of the funds, but rather a pro-rata share of the bonded amount shall be collectable by any fund to which the Employer is delinquent in the payment of contributions.

If an Employer chooses to post a separate bond for each fund, the amount of each bond shall be computed in accordance with the method described above, and the total of the separate bonds shall equal the total amount required as stated in Section a.

If an Employer chooses to deposit a bank certified check or money order, said check or money order shall be made payable to the Bricklayers fringe benefit funds. The check or money order shall be cashed immediately and allocated in accordance with Section (a) to a non-interest bearing checking account.

d. If no delinquency occurs during the first 12 months after bonds are posted, the Fund Office will notify the Employer that the bonds may be canceled, or the entire amount of the money deposited, without interest, will be returned to the Employer.

e. If, during the time that bond(s) or cash is being held by the Funds, an Employer is delinquent more than once, the Funds shall have the right to:

1. On the due date of the second delinquent contribution, recover the amount of delinquency by taking action to collect on the bond or bonds posted or withdrawing from the monies deposited by the Employer, and

2. Notify the Employer that weekly payments by certified check will be required for the next six months, and

3. Require that a new bond or bonds be posted, or additional monies be deposited, to make-up for the amount collected or withdrawn under paragraph (a) of the Section.

f. If an Employer fails to provide or replenish a cash or surety bond as required by this policy, the trustees of any fund may write to the Employer requesting the bond. If the bond is not received in the fund office within 30 days after the fund's written request, the matter shall be referred to the Fringe Benefit Fund(s)' collection attorney(s) and treated as a delinquency, and the Employer will not be allowed to employ any bricklayers whatsoever in the jurisdiction of the Union until the delinquency has been eliminated.

Section 11. Nothing in this Agreement, any trust agreement for a fund to which contributions are required by this Agreement, a plan of benefits or any other document shall be construed to impose upon the Employer or other contributor any liability or obligation to contribute or make any other payments to any Fund toward the cost of benefits or the cost of administration or funding to the Plan beyond the obligation

27

CT 0296

of the Employer to make contributions, provide any required bonding and pay the expenses of collection as specified in this Agreement. Except to the extent that the Association and the Union may participate in the selection of their respective trustees, neither the Association, nor the union nor any Employer shall be responsible for the operation or administration of the Funds. In no event shall the Association, the Union or any Employer be liable for any action or failure to act of any trustee. It is agreed and understood that this section shall serve as a defense to any allegation or course of action wrought by any individual or entity which might jeopardize the employer's or other contributor's position that its liability is strictly limited as stated herein. In no event shall the Employer be liable to make duplicate contributions to more than one Fund providing the same type of benefits.

## ARTICLE XVIII
## DUES CHECK-OFF

Section 1. During the term of this Agreement, and in accordance with the terms of an individual and voluntary written authorization for check off of union membership dues to be furnished to the Employer in a form as specified in Section 3 below, and permitted by law including the provisions of Section 302 (c) of the Labor-Management Relations Act, as amended, the Employer agrees to deduct once each week from the net pay of each employee covered by this Agreement, who signs said authorization, the sum which the Union has specified, or from time to time later specifies, in writing to the Employer as the dues for the Union and its International Union for each payroll hour worked by said employee during the week as part of the employee's membership dues in the Union, provided however, that no change in the

amount of hourly dues shall take effect until after the Union shall have given the Association thirty (30) days' prior written notice thereof. Said deductions shall be made solely for each employee who is a member of the Local Union and who is working in the geographical jurisdiction of the Local One, Connecticut.

Section 2. The Union agrees to indemnify and save the Employer and the Association harmless against any and all claims, suits, or other forms of liability arising out of the Employers' participation in or performance of the provisions of this Article. The Union assumes full responsibility for the disposition of the monies so deducted once they have been paid to the Union.

COMBINED WORKING DUES AND
BACPAC CHECK-OFF
AUTHORIZATION

I hereby authorize any of the various individual Employers who are signatory to a collective bargaining agreement with any Bricklayers & Allied Craftworkers Local Union 1, the International Union, or any other BAC affiliate, and by whom I may be employed during the term of such agreement, or any renewal or extension, or any subsequent agreement, to deduct from my wages and transmit monthly to said Union the sum which the Union has specified, or specifies from time to time, as the portion of my union dues to said Union, to the International Union, or to any other BAC affiliate, subject to check-off through procedures conforming to applicable law. This authorization shall be irrevocable for a period of one (1) year following the date it was signed or until the current applicable collective bargaining agreement expires, whichever occurs sooner. This authorization shall be automatically renewed from year to

CT 0296

year, unless sixty (60) days prior to the termination or the annual renewal date I revoke this authorization by written notice to the Union and to the individual employer by whom I am employed.

I also hereby authorize the Employer (as described above) to deduct from my wages the sum of _____ for each hour paid and to transmit that amount in the manner prescribed by the Union to the Bricklayers & Allied Craftworkers Political Action Committee (BACPAC). This authorization is signed freely and voluntarily and not out of fear of reprisal, and on the understanding that BACPAC is engaged in a joint fund raising effort with Committee on Political Education of the American Federation of Labor & Congress of Industrial Organizations, that BACPAC will use the money contributed to that effort to make political contributions and expenditures in connection with federal, state and local elections, and this voluntary authorization may be revoked at any time by written notice to the Employer and BACPAC of a desire to do so.

* To authorize the deduction of both working dues and BACPAC contribution, please sign and date this form.

* To limit the authorization to the deduction of either the working dues or BACPAC contribution, please check the appropriate box, sign and date this form.

Date _____, 19____
Social Security
No._____

Signature_____

## ARTICLE XIX
## BUILDING AND CONSTRUCTION
## ADVANCEMENT PROGRAM

The Building and Construction Advancement Program (BCAP), a division of the AGC/CCIA Building Contractors Labor Division of Connecticut, Inc., (hereinafter referred to as the "Program" or "BCAP") has been established and organized to improve public relations; to improve the standards of the construction industry; to conduct education and training programs and to conduct any program for the benefit of the construction industry. The Program shall not conduct any anti-union or political activity.

The Employer agrees, commencing with the first payroll following the effective date of this Agreement, to make payments of twenty-one (\$.21) cents per hour to BCAP for each hour each employee covered by this Agreement works. Payments to AGC are due and payable on or before the twenty-fifth day of the month following the month during which the work was performed. All contributions shall be in such manner as AGC shall require.

If the Employer fails to make contributions to BCAP within the period required by AGC, the delinquent Employer shall be liable for all reasonable costs for collecting the payments due, including but not limited to reasonable attorney's fees and court costs, audit costs, a reasonable rate of interest on the outstanding balance due BCAP, and liquidated damages assessed by AGC as an "administrative fee". The Union shall incur no liability or responsibility for the collection of such contributions.

The Union agrees to propose that all the provisions in this Article XIX Building and

CT 0296

Construction Advancement Program shall be included in every independent agreement. The Union further agrees that the total hourly economic cost (i.e. hourly payments required) including payments to the Association for companies covered under such independent agreements shall not be less than the total hourly economic cost for Employers covered under this Agreement. In the event the total hourly economic costs for Employers covered under this Agreement are greater than the total hourly economic costs for any employer covered under an independent agreement, all Employers covered under this Agreement shall have the option to equalize the total hourly economic cost as provided in such independent agreement but shall not thereby be relieved from making payments to the AGC as provided in this Article XIX. In the event a non-member employer does not make contributions to the CCIA or the MCA Industry Advancement Programs (IAP), then the employer shall be required to make the equivalent contribution(s) to the IMI-AT fund. Neither the Union or its representatives may encourage or persuade any Employer to (1) not make contributions in the amount set forth in this Agreement to the Association Construction Program or (2) make such contributions to the IMI-AT rather than the IAP.

## ARTICLE XX
## MANAGEMENT PREROGATIVES

The Employer hereunder shall have full authority to manage the work, direct the work force, and decide all matters except to the extent he is specifically prohibited from doing so under this Agreement. All Employers reserve the sole right to employ and discharge whomsoever they choose, provided only that they do not discriminate against any employee for any reason, including union or concerted activities, union membership, and the reasons set forth in Article III, Equal Employment Opportunity.

## ARTICLE XXI
## SEVERABILITY

The obligations of the Employers bound by this Agreement shall be several and not joint, and the acts, omissions or violations of this Agreement by an Employer or any individual or entity, whether alleged or in fact, shall not be held against any other Employer or against the Association.

[no text missing]

30

## ARTICLE XXII
## TERM OF AGREEMENT

This Agreement shall remain in full force and effect from April 1, 2002, through March 31, 2006, and shall renew itself annually thereafter unless either party shall have given written notice to the other party of its desire to terminate this Agreement and negotiate a successor agreement at least sixty (60) days prior to March 31, 2006 or any March 31 thereafter.

AGC/CCIA BUILDING CONTRACTORS
LABOR DIVISION OF CONNECTICUT,
INC.

LOCAL 1, CONNECTICUT,
INTERNATIONAL UNION OF
BRICKLAYERS AND ALLIED
CRAFTWORKERS, AFL-CIO

by _MB Morganbesser_

by _Harold B. Warch_

MASON CONTRACTORS ASSOCIATION OF CONNECTICUT

by _C Mitchell Sr._

Angelo Morrica Contracting LLC
Company Name

_Angelo Calfani_   managing member
Signature and Title

_111 Acholas St._
Address (Number and Street)

_860 347-0663_   _860 347-1579_
Phone Number   ·   Fax Number

_Middletown CT 06457_
City or Town   Zip

Date Signed_____

June 14

31

 

## SCHEDULE A
## LOCAL ONE, CONNECTICUT, BAC
## BUILDING AGREEMENT

ZONE A  All of Connecticut other than towns listed in Zone B

*Total wage and fringe package:

| | |
|---|---|
| 4/1/02 - 10/5/02 | $36.61 |
| 10/6/02 - 4/5/03 | $38.11 |
| 4/6/03 - 10/4/03 | $39.11 |
| 10/5/03 - 4/3/04 | $40.11 |
| 4/4/04 – 10/2/04 | $40.76 |
| 10/3/04 - 4/2/05 | $41.41 |
| 4/3/05 - 10/1/05 | $42.66 |
| 10/2/05 -3/30/06 | $43.91 |
| 3/31/06 – 10/2/06 | $45.91 |

*For exterior Pointing, Caulking and Cleaning, effective October 1, 1999, if going over ten (10) floors, a $1.00 per hour premium shall be paid for work at the tenth floor and above.

Employer Contributions:

Cement Masons will receive one and one-half times fringe contributions for hours worked over eight hours per day.

IUBAC, Local 1, Connecticut Health Fund
    4/1/02 - 3/31/06     $4.70

International Union Pension Fund
    4/1/02 - 3/31/06     $3.50

International Union Retirement Savings Plan (Annuity Fund)
    4/1/02 - 3/31/06     $2.40

International Masonry Institute, Apprentice and Training Trust (IMI/AT)
    4/1/02 - 3/31/06     $0.80

Association Program
    4/1/02 - 3/31/06     $0.21

The total of the Local 1, Connecticut, BAC, and the International dues deductions shall be equal to 3.25% of the total wage rate and fringe benefit contribution rate package.

(See special agreement for Apprentices in Article XII.)

32

CT 0296

ZONE B Local Chapter No. 4 (Norwalk, Westport, Weston, Wilton, New Canaan, Stamford,
*Total wage and fringe package:

| | |
|---|---|
| 04/1/02 - 10/5/02 | $37.64 |
| 10/6/02 - 04/5/03 | $39.14 |
| 04/6/03 - 10/4/03 | $40.14 |
| 10/5/03 - 04/3/04 | $41.14 |
| 04/4/04 - 10/2/04 | $41.79 |
| 10/3/04 - 04/2/05 | $42.44 |
| 04/3/05 - 10/1/05 | $43.69 |
| 10/2/05 - 3/30/06 | $44.94 |
| 3/30/06 - 10/2/06 | $46.94 |

*For exterior Pointing, Caulking and Cleaning, effective October 1, 1999, if going over ten (10) floors, a $1.00 per hour premium shall be paid for work at the tenth floor and above.

Cement Masons will receive one and one-half times fringe contributions for hours worked over eight hours per day.

Employer Contributions

IUBAC, Local 1, Connecticut Health Fund
4/1/02 - 3/31/06     $4.70

International Pension Fund
4/1/02 - 3/31/06     $3.05

International Union Retirement Savings Plan (Annuity Fund)
4/1/02 - 3/31/06     $3.88

International Masonry Institute, Apprentice and Training Trust (IMI/AT)
4/1/02 - 3/31/06     $0.80

Association Program
4/1/02 - 3/31/06     $0.21

The total of the Local 1, Connecticut, BAC and the International dues deductions shall be equal to 3.25% of the total wage rate and fringe benefit contribution rate package.

(See special agreement for Apprentices in Article XII.)

## SCHEDULE B
## LOCAL ONE, CONNECTICUT, BAC
## BUILDING AGREEMENT

### LOCAL UNIONS AND THEIR JURISDICTIONS

#### ZONE A

Local 1, Connecticut

CT 0298

45 Water Street, New Haven, Connecticut 06511
Telephone:     203-562-8141
                 800-452-4354

356 Franklin Avenue, G5, Hartford, CT 06114
Telephone:     860-296-8014

All of Connecticut except Zone B

#### ZONE B

43 North Avenue Norwalk, CT 068517
Telephone: 203-853-6838

Territory: Darien, Greenwich, New Canaan, Norwalk, Redding, Ridgefield, Stamford, Westport, Weston, Wilton

34

## APPENDIX A
## APPRENTICE RATES

Bricklayer, Cement Mason, Plasterer (6000 hours)

| | |
|---|---|
| 1st 750 hours | 60% * |
| 2nd 750 hours | 65% |
| 3rd 750 hours | 70 % |
| 4th 750 hours | 75% |
| 5th 750 hours | 80% |
| 6th 750 hours | 85% |
| 7th 750 hours | 90% |
| 8th 750 hours | 95% |

Pointer, Caulker, Cleaner (4500 hours)

| | |
|---|---|
| 1st 750 hours | 50% |
| 2nd 750 hours | 55% |
| 3rd 750 hours | 60% |
| 4th 750 hours | 70% |
| 5th 750 hours | 80% |
| 6th 750 hours | 90% |

Tile setter (6000 hours)

| | |
|---|---|
| 1st 500 hours | 50% |
| 2nd 500 hours | 55% |
| 3rd 500 hours | 60% |
| 4th 500 hours | 65% |
| 5th 500 hours | 70% |
| 6th 500 hours | 75% |
| 7th 500 hours | 80% |
| 8th 500 hours | 85% |
| 9th 1000 hours | 90% |
| 10th 1000 hours | 95% |

Tile Finisher (2000 hours)

| | |
|---|---|
| 1st 500 hours | 60% |
| 2nd 500 hours | 70% |
| 3rd 500 hours | 80% |
| 4th 500 hours | 90% |

Dual Trades (For Apprentices who chooses more than one trade, 7000 hours)

| | |
|---|---|
| 1st 875 hours | 60% |
| 2nd 875 hours | 65% |
| 3rd 875 hours | 70% |
| 4th 875 hours | 75% |
| 5th 875 hours | 80% |
| 6th 875 hours | 85% |
| 7th 875 hours | 90% |
| 8th 875 hours | 95% |

*Of the journey man's rate

CT 0296

CT 0296

# AGC BRICKLAYER EMPLOYERS

Bismark Construction Co., Inc.
100 Bridgeport Avenue
Milford, CT 06460

DeLuca Construction Company, The
27 Crescent Street
P.O. Box 2186
Stamford, CT 06906

B.W. Dexter, II, Inc.
556 Westcott Rd.
Danielson, CT 06239

Frank E. Downes Construction Company,
Inc.200 Stanley Street
New Britain, CT 06050

Joseph F. Kelly Co., Inc.
184 Front Avenue
West Haven, CT 06516

Lombardo Brothers
121 Elliott St East
Hartford, CT 06114

Marshall & Sons, Inc., J.L.
P.O. Box 2210
Pawtucket, RI 02861

Mercede & Sons, Inc., Frank
700 Canal Street
Stamford, CT 06902

Milazzo & Company, S.G.
148 Dividend Road
Rocky Hill, Ct 06067

New England Plasterers
75 Charles Street
E. Hartford, CT 06108

Nickerson Company, Inc., C.H.
49 Hayden Hill Rd., PO Box 808
Torrington, CT 06790

Taylor Precast, Inc.
120 Highwoods Drive
Guilford, CT 06437

Tomlinson-Hawley-Patterson
2225 Reservoir Avenue
Trumbull, CT 06611

36



## MASON CONTRACTORS ASSOCIATION OF CONNECTICUT EMPLOYERS

Armani Restoration Inc.
191 Franklin Ave.
Hartford, CT 06114

Civitillo Masonry
28 Shepard Drive
Newington, CT 06111

Civitillo/Lombardo - A Joint Venture
121 Elliot Street East
Hartford, CT 06114

J. DeLuca Construction Co.
414 Greenfield Street
Fairfield, CT 06430

B.W. Dexter, II, Inc.
556 Westcott Rd.
Danielson, CT 06239

Ebobean Corporation
PO Box 340387
Hartford, CT 06134-0387

G & G Masonry
191 Franklin Ave.
Hartford, CT 06114

Gullotta Masonry Inc.
Limerick Place
Cos Cob, CT 06807

Lombardo Brothers Mason Contractors
121 Elliot Street East
Hartford, CT 06114

DCT 0296

# BRICKLAYERS AND ALLIED CRAFTWORKERS

## BUILDING INDEX

Subjects                                                                     Pages

Acid Brick...............................................................................................6
Affirmative Action Programs .............................................................2
AGC/CCIA Building Contractors Labor Division of Connecticut, Inc.........1, 29,A1, A3
Agreement of the Parties..................................................................1
Alcohol Testing..............................................................................8-9
Alteration Work in Occupied Areas ....................................................6
Annuity Plan (International Union Retirement Savings Plan)....................3, 24-26, 32-33
Apprentice, Ratio .........................................................................20, 35
Apprentice Wage Rates...................................................................35
Apprentices ...............................................................................20-21, 35
Arbitration...................................................................................23, 1, 2, 11, 18
Arbitrator, appointment of ...............................................................23
Arbitration Committee....................................................................23-24
Artificial Masonry..........................................................................14
Association Liability.......................................................................23
Association Program.......................................................................32, 33
Authority for Establishment of Pay Rates ...........................................3
Authorization for Check-off Dues .....................................................28

Breach of Agreement .....................................................................20
Brick Masonry ..............................................................................11
Building and Construction Advancement Program (BCAP).......................29-30
Bureau of Apprenticeship ...............................................................21

Carryover Provision .......................................................................7
Cement Finishing Work Rules...........................................................20
Cement Masonry............................................................................14
Cement Masons.............................................................................3, 20, 25, 32, 33
Clothing .....................................................................................6, 8
Coffee........................................................................................20
Competency of Employees ..............................................................10
Competent Men.............................................................................20
Connecticut State Apprentice Council.................................................21
Contributions to Funds....................................................................3, 7, 21, 25-28, 33
Costs of Collection and Attorneys' Fees..............................................26, 29

Defenses to Course of Action ..........................................................28
Department of Labor, U.S................................................................21
Department of Labor Form WD10 ......................................................7

CT 0296

## BRICKLAYERS AND ALLIED CRAFTWORKERS BUILDING INDEX, continued

| Subjects | Pages |
|---|---|
| Direct Deposit | 4 |
| Discharge | 6, 7, 9, 11, 30 |
| Discharge for Intoxication | 6 |
| Discrimination, No | 1, 2 |
| Dispute Settlement | 1, 23 |
| Double Time | 3, 4 |
| Drinking Water Containers | 10, 19 |
| Drug Testing | 8 |
| Dryvit Systems | 16 |
| Dues and Initiation Fees, Union | 2 |
| Dues Check-off | 28 |
| Dues Deduction | 29, 32-33 |
| Dust, Excessive | 6-9 |
| Dust Masks | 6-9 |
| | |
| Employee Competence | 10, 20 |
| Employer, Delinquent | 25-27 |
| Employer, defined | 1 |
| Employer Liability | 23 |
| Employer's Property | 8 |
| Equal Employment Opportunity | 2 |
| | |
| Failure to Contribute to Funds | 25, 26, 28, 29 |
| Favored Nations Clause | 1 |
| Field Representative | 6, 9, 10, 20, 22, 23 |
| Foreman | 4, 9, 10 |
| Forty Pound Units | 7 |
| Forty-five pound limit | 16 |
| Fringe Benefit Bond Requirement | 26-27 |
| Fringe Benefit Funds | 3, 24-27, 32-33 |
| Furnish Information to Union | 7, 26 |
| | |
| Gang Box | 21 |
| Geographical Jurisdiction | 1, 28 |
| Government Restricted Work | 4 |
| Grievance and Arbitration Procedure | 23-24 |
| Grievance Committee | 23-24 |
| Grievances | 23-24 |

39

CT 0296

BRICKLAYERS AND ALLIED CRAFTWORKERS BUILDING INDEX, continued

Subjects                                                                    Pages

Health and Safety Standards ..................................................................7
Health Funds ...............................................................................3, 24, 25, 32-33
Health Risks................................................................................6, 7
Hiring.........................................................................................1, 2, 9
Holidays .....................................................................................3-5
Hours of Work and Working Conditions.......................................4, 9, 25, A1

Inclement Weather.......................................................................4, 5, 7
Increases in Benefit Funds...........................................................32-33
Independent Agreement................................................................30
Industry Quarterly Meetings.........................................................A2
Initiation Fees, Union....................................................................2
Injury...........................................................................................6, 7, 8, 10
Insurance (Workers' Compensation and Unemployment Compensation).....6, 22
International Constitution and Rules of Order...............................11
IUBAC, Local One, Connecticut Health Fund ............................1, 24, 25, 32-33, A3
International Masonry Institute.....................................................24
International Masonry Institute Apprenticeship Trust (IMI-AT) .................3, 21, 25, 32, 33
International Masonry Institute Marketing Program .....................30, A1
International Pension Fund ...........................................................3, 24, 25, 32-33
International Union Retirement Savings Plan (Annuity Plan).......................3, 24-27, 32-33
IRS Approval of Funds .................................................................26

Joint Arbitration Committee .........................................................23, 24
Journeyman's Rate ......................................................................32-33
Jurisdiction (See Trade Jurisdiction) .............................................18-19
Jurisdictional Claims....................................................................11-18
Jurisdiction, Territorial .................................................................1-2, 8, 34

Layoffs, Discharge.......................................................................2, 6, 7, 9, 11, 30
Letter Agreement .........................................................................A1, A3
Liability .......................................................................................25-29
Liability for Loss by Fire/Theft .....................................................10
Local One,  Connecticut, of the International Union
    of Bricklayers and Allied Craftworkers, AFL-CIO, defined ....................1
Lockers........................................................................................6, 21
Loss of Tools................................................................................10
Lost Time Pay..............................................................................5, 22
Lunch Period ...............................................................................3, 6

CT 0296

<u>BRICKLAYERS AND ALLIED CRAFTWORKERS BUILDING INDEX</u>, continued

| <u>Subjects</u> | <u>Pages</u> |
|---|---|
| Machine Safety Devices | 8 |
| Management Prerogatives | 30 |
| Manning Requirements | 3 |
| Mason Contractors Association of Connecticut | 1, 37 |
| Masonry Saw | 7, 8 |
| Membership in Union | 2 |
| Mobility | A3 |
| Modifications of Agreement | 3 |
| Notice to Increase Fund Contributions | 3 |
| Object | 1 |
| Overhead Protection | 7 |
| Overtime | 4, 5, 6, 7, 19, 25 |
| Owner Restrictions | 4 |
| Parties to Agreement | 1 |
| Pay Day | 4-6 |
| Payment of Wages | 4, 5, 6, 32-33 |
| Payroll Record Audit | 26 |
| Pension Funds | 3,24-26,32-33 |
| Personal Protection | 7 |
| Plastering | 16, 19 |
| Plastering Work Rules | 19 |
| Pointing, Caulking, & Cleaning | 3, 12, 16,32-33 |
| Political Action Check-Off | 29 |
| Pre-Job Notification | 8 |
| Preference in Employment | 7, 10 |
| Premium Pay | 3, 6, 25, 32-33 |
| President and Field Representatives | 9 |
| Purpose of Agreement | 1 |
| Pyramiding of Overtime, No | 4 |
| Quit, Willful | 6 |
| Quitting Time | 4, 5, 6, 19-20 |
| Refractory Work | 17 |
| Reporting Pay | 5 |
| Residents of Connecticut | 2, A3 |

41

CT 0296

## BRICKLAYERS AND ALLIED CRAFTWORKERS BUILDING INDEX, continued

Subjects                                                                                Pages

Safety ............................................................................................7-8, 18-20
Saturday Make-Up Work.................................................................4
Saws, Operation ...............................................................................7
Scaffolds/Safety ............................................................................8, 10, 21
Scope of Agreement.........................................................................1
Severability .....................................................................................30

Shed ..................................................................................................6, 10
Shift Provision ................................................................................6
Special Agreement for Targeted Projects ..................................A1-A2
Special Tools and Lines .................................................................19
Stand In Line....................................................................................5, 16-19
Starting Time ...................................................................................4
State and Federal Laws ..................................................................22
Steward ...........................................................................................10, 11, 19, 23, A3
Stonemasonry...................................................................................13-14
Strikes (see work stoppages)
Subcontractors..................................................................................1, 20
Sunday...............................................................................................4, 5

Term of Agreement...........................................................................31
Territorial Jurisdiction ...................................................................1, 34
Toilet Facilities ...............................................................................10
Tools, Tool Box ................................................................................5, 6, 7, 9, 10,12,16-21
Tool House ........................................................................................10
Tools, Loss of....................................................................................10
Tower scaffolding ...........................................................................9
Trade Jurisdiction............................................................................11-18
Transfer of Employee ......................................................................4, 10

Umpire, Impartial.............................................................................24
Unemployment Compensation Slip ...............................................6
Union Membership ..........................................................................2
Union Security and Employment....................................................25
Unit or Lump Work .........................................................................20
Use and Return of Tools/Replacement Cost.................................10

Wage Rates and Classifications .....................................................3, 5, 7, 9, 32-33
Wages.................................................................................................32-33
Wages, Hours, Working Conditions and Holidays.......................3-7
Waiting Time ....................................................................................6
Wall Height Limits ..........................................................................7, 16

CT 0296

<u>BRICKLAYERS AND ALLIED CRAFTWORKERS BUILDING INDEX</u>, continued

<u>Subjects</u>                                                                                        <u>Pages</u>

Wash Up Time ............................................................................6
Work Day..............................................................................3, 4, 6, 7, 19, 22
Work Rules ...........................................................................18-20
Work Stoppages ....................................................................18, 22
Work Week ...........................................................................3

Zones A and B ......................................................................1, 3, 24, 25, 32, 33, 34

43

F:\IJH\BKKLAERS\CBAS\Bricks Memorandum of Settlement.docJune 13, 20023:29 PM

# CT   0296

9-18-02
(cdn)
CT 0296

## MEMORANDUM OF AGREEMENT

This Agreement made and entered into this _____ day of June, 2002; by and between the AGC/CCIA BUILDING CONTRACTORS LABOR DIVISION OF CONNECICUT INC, acting for and in behalf of and under the authority of its members who have authorized representation for the Building Agreement and the MASON CONTRACTORS ASSOCIATION OF CONNECTICUT (herein after the "Associations") and the INTERNATIONAL UNION OF BRICKLAYERS & ALLIED CRAFTWORKERS, AFL-CIO (herein after the "Union")

### WITNESSETH

WHEREAS, the parties have been bound by collective bargaining agreement (BUILDING AGREEMENT), which expired March 31, 2002 (hereinafter 1999-2002 agreement) and have negotiated the terms of a successor agreement to be effective April 1, 2002.

NOW THEREFORE, in order to resolve all outstanding matters between the parties, the following terms and conditions of the successor agreements are to be put into effect:

The 1999-2002 Agreement shall be continued in full force and effect without change for the duration of the newly negotiated Agreement except as follows:

## BUILDING AGREEMENT:

1. The term of the Agreement is four years, from April 1, 2002 – March 31, 2006.

2. The wage and fringe benefit package is as follows:
   a. October 6, 2002       $1.40   $.10 (IMI)  Total $1.50
   b. April 6, 2003         $1.00
   c. October 5, 2003       $.90    $.10 (IMI)  Total $1.00
   d. April 4, 2004         $.65
   e. October 3, 2004       $.65
   f. April 3, 2005         $1.15   $.10 (IMI)  Total $1.25
   g. October 2, 2005       $1.25
   h. March 31, 2006        $2.00
   The allocation will be determined at a later date.

3. **Article V Section 27 Carry Over Provision:** The parties will maintain the wage and benefit rates in effect on March 31, 2006 until October 1, 2006, notwithstanding the contract expiration date or any other provision of this Agreement.

1




# International Union of
# Bricklayers & Allied Craftworkers
# Local 1 Connecticut

45 Water Street • P.O. Box 9621 • New Haven, CT 06535
Office: 203-562-8141 • 1-800-452-4354 • Fax: 203-497-8348

**Vincent Convertito**
Executive Vice President

**Gerald Marotti**
President
Secretary/Treasurer

**Edward Moavero, Jr.**
Vice President

**Timothy Palmeri**
Vice President
Recording Secretary

**Todd Dexter**
Vice President

CT 0296

## Wage and Fringe Benfit Rates

## BUILDING ZONE A
**(Consists of: All other towns other than those listed in Zone B)**

CT 0296
A0

| FROM | TO | Hourly Rate | Health Fund | Pension Fund | Annuity Fund | IMI/AT | AGC/CCIA | TOTAL Pkg |
|------|----|-----------|-----------|-----------|-----------|------|--------|---------|
| 10/6/02 | 4/5/03 | $25.65 | $4.85 | $3.75 | $2.75 | $0.90 | $0.21 | $38.11 |

(Dues check-off is 3.25% of total pa    package)    (Journeyman $1.23    Apprentice $.98)

## BUILDING ZONE B
**Consists   Darien, Greenwich, New Canaan, Norwalk, Ridgefield, Stamford, Weston, Westport, Wilton**



RECEIVED
SEP 18 2002
COLLECTIVE BARGAINING SERVICES

A0

| FROM | TO | Hourly Rate | Health Fund | Pension Fund | Annuity Fund | IMI/AT | AGC/CCIA | TOTAL Pkg |
|------|----|-----------|-----------|-----------|-----------|------|--------|---------|
| 10/6/02 | 4/5/03 | $25.65 | $4.85 | $3.30 | $4.23 | $0.90 | $0.21 | $39.14 |

(Dues check-off is 3.25% of total pa    package)    (Journeyman $1.27    Apprentice $1.01)

## Heavy/Highway
**(Zone A and Zone B areas)**

CT 0216
K0

| FROM | TO | Hourly Rate | Health Fund | Pension Fund | Annuity Fund | IMI/AT | Total Pkg. |
|------|----|-----------|-----------|-----------|-----------|------|----------|
| 10/6/02 | 4/5/02 | $25.65 | $4.85 | $3.75 | $2.10 | $0.90 | $37.25 |

(Dues check-off is 3.25% of total package)    (Journeyman $1.21    Apprentice $.96)

