**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOHN FLYNN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No. 1:08-CV-00222** |
| **v.** ) | |
| ) | **Judge Henry H. Kennedy** |
| **ANGELO MONARCA, INC.,** ) | |
| **d/b/a ANGELO MONARCA CONTRACTING, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## PLAINTIFF FUNDS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND LACK OF PERSONAL JURISDICTION

### INTRODUCTION

This is a garden variety ERISA delinquent contribution case filed by the Trustees of the Bricklayers and Trowel Trades International Pension Fund and International Masonry Institute (collectively, "Funds") against a Connecticut contracting company and its principal officer and controlling owner. At the very inception of the case, before any discovery, Defendants have nonetheless moved to dismiss the Complaint for failure to state a claim against Angelo Monarca, Inc. and lack of personal jurisdiction over Angelo Monarca individually. As set forth below, Defendants' motion is without merit because (i) the Complaint alleges that Angelo Monarca, Inc. is "doing business as" Angelo Monarca Contracting LLC, the name on the collective bargaining agreements that form the basis for this action, (ii) this Court has held that ERISA's nationwide service or process provision permits this Court to exercise personal jurisdiction over any Defendant that has minimum contacts with the United States as a whole, and (iii) this Court has further held that a defendant's payments of contributions to employee benefit funds located in the District of Columbia necessarily subjects that defendant to the jurisdiction of this Court. Accordingly, Defendants' motion to dismiss should be denied.

# BACKGROUND

On February 8, 2008, the Plaintiff Funds, which are employee benefit funds administered in the District of Columbia, filed a Complaint against "Angelo Monarca, Inc. d/b/a Angelo Monarca Contracting LLC," and Angelo Monarca, individually, under Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132, 1145. The Funds alleged that Angelo Monarca signed Bricklayers collective bargaining agreements, on behalf of his Connecticut company, that required the payment of fringe benefit contributions to the Funds, that the Defendants performed covered work but failed to pay the required contributions, and that the Funds were therefore entitled to recover under the applicable provisions of ERISA all delinquent contributions plus statutory damages, in the total amount of $31,305.71, as well as attorney's fees and costs in an amount to be determined. *See* Complaint ¶¶ 9-14, pgs. 5-6.

The Funds also alleged that although it is their understanding that the corporate status of Angelo Monarca, Inc. has been dissolved, Angelo Monarca, the company's principal officer and controlling owner, has continued to carry on the business beyond that necessary to wind up its affairs. *Id.* ¶¶ 15-16. Accordingly, the Funds allege, Angelo Monarca is personally liable for the debts of Angelo Monarca, Inc. *Id.* ¶ 16.

Defendants have now filed a motion to dismiss (i) the claim against Angelo Monarca, Inc., pursuant to Rule 12(b)(6), for failure to state a claim upon which relief may be granted; and (ii) the claim against Angelo Monarca individually, pursuant to Rule 12(b)(2), for lack of personal jurisdiction.[1] Defendants claim that there is no basis for suing Angelo Monarca, Inc. because it was Angelo Monarca Contracting LLC that signed the collective bargaining agreements attached to the Complaint and Angelo Monarca, Inc. is not the alter ego of Angelo Monarca Contracting LLC. *See* Defendants' Memorandum of Law in Support of Motion to

---

[1] Based on their motion, Defendants do not appear to be moving to dismiss "Angelo Monarca Contracting LLC" from this case.

2

Dismiss ("D.Mem."), 2-4. Defendants claim that there is no basis for personal jurisdiction over Angelo Monarca individually because the Funds have not established a basis for piercing the corporate veil and Mr. Monarca otherwise has insufficient contacts with the District of Columbia to satisfy the D.C. long-arm statute. *Id.* 5-8. Defendants support their motion with the following documents not accompanying the Complaint – a July 14, 2000 documents from the Connecticut Secretary of State, a March 29, 2003 letter from Angelo Monarca Contracting LLC to the "International Trowel Trades Fringe Benefit Funds," and an unidentified printout regarding the purported corporate status of Angelo Monarca Contracting LLC.

Discovery has not yet begun in this case.

## ARGUMENT

**I.      The Allegations Of The Funds' Complaint Are Sufficient To State A Claim Upon Which Relief May Be Granted Against Angelo Monarca, Inc.**

Defendants claim that the Funds have failed to state a claim against Angelo Monarca, Inc. because the collective bargaining agreements attached to the Complaint are signed by Angelo Monarca Contracting LLC and the Funds have failed to show that these entities are alter egos. *See* D.Mem. 2-4. Defendants' argument is without merit, as the Funds' allegations are more than sufficient to state an ERISA delinquent contribution claim against Angelo Monarca, Inc. under the liberal, notice-pleading standards of the Federal Rules of Civil Procedure.

**A.      Only The Funds' Allegations, Not Any "Evidence," Is Relevant At This Motion To Dismiss Stage**

The main theme of Defendants' brief is that the Funds' claims against Angelo Monarca, Inc. and Angelo Monarca individually should be dismissed because the Plaintiffs have failed to submit "evidence" supporting their allegations or because the "evidence" will show facts different than those alleged by the Funds. For instance, Defendants contend that:

- "the only evidence" Plaintiffs submit to support their allegation that Angelo Monarca continued the business of Angelo Monarca, Inc. beyond that necessary

DSMDB-2424699v01

to wind up its affairs is a conclusory statement. *See* D.Mem. 4. Plaintiffs have submitted "no evidence" in support of this allegation. *Id.*

- there is "no evidence" that corporate formalities have not been respected or evidence of any other basis for piercing the corporate veil. *Id.*

- there is "no evidence" that Angelo Monarca Contracting LLC dominated Angelo Monarca, Inc. *Id.*

- the "evidence shows" that Angelo Monarca has respected the corporate entity of Angelo Monarca, Inc. *Id.* 6.

Plaintiffs put the cart before the horse. At the pre-discovery, motion to dismiss stage, a plaintiff has no obligation to proffer any *evidence*. Whether there is now *evidence* to establish Plaintiffs' case is irrelevant. Rather, all that matters under the notice pleading standards of the Federal Rules of Civil Procedure is whether the Plaintiffs' *allegations* provide a short and plain statement of the claim and give the defendant fair notice of the claim and the grounds upon which it rests. *See, e.g., Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1040 (D.C. Cir. 2003). As explained by this Court, "[s]uch simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Simpson v. Socialist People's Libyan Arab Jamahiriya,* 529 F. Supp. 2d 80, 83 (D.D.C. 2008) (quoting *Conley v. Gibson,* 355 U.S. 41, 47-48 (1957)).

Consistent with these principles, the sole purpose of a Rule 12(b)(6) motion to dismiss is to test the *legal* sufficiency of a complaint. *See e.g., Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). In determining whether this standard has been met, the court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor.[2] *See, e.g., Simpson,* 529 F. Supp. 2d at

---

[2] In deciding a Rule 12(b)(6) motion, a court may rely upon only the allegations in the complaint, those documents attached as exhibits or incorporated by reference, and matters subject to judicial notice. *See, e.g., EEOC v. St. Francis Xavier Parochial School,* 117 F.3d 621, 624 (D.C. Cir. 1997). Here,

DSMDB-2424699v01

84.  As explained by this Court, a complaint should not be dismissed unless the plaintiff is unable to allege a "plausible entitlement to relief." *Simpson*, 529 F. Supp. 2d at 83 (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007)).  Moreover, any ambiguities or doubts concerning the sufficiency of the clam must be resolved in favor of the pleader.  *See, e.g., Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985).  Because this is such an exacting standard, the D.C. Circuit has stated that motions to dismiss for failure to state a claim are "rarely" granted.  *See, e.g., Doe*, 753 F.2d at 1101 (dismissals for failure to state a claim are "generally viewed with disfavor" by the federal courts and "rarely granted").  As emphasized by this Court, "the issue presented by a motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *American Federation of Government Employees v. Hawley*, No. 07-00855, 2008 WL 835856, *6 (D.D.C. March 31, 2008) (Kennedy, J.) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006)), attached hereto as Exhibit A.

**B.      The Funds' Allegations Are Sufficient To State An ERISA Delinquent Contribution Claim Against Angelo Monarca, Inc.**

Defendants argue that the Funds have failed to state a claim against Angelo Monarca, Inc. because they have not demonstrated that this company is the alter ego of Angelo Monarca, LLC applying the traditional factors for alter ego liability.[3]  *See* D.Mem. 3-4.  But the Funds have not

---

Defendants have supported their motion to dismiss with materials outside the Complaint.  Although the Defendants have not requested the Court do so, submission of these materials permits the Court to treat the motion as one for summary judgment.  If this is done, the motion should be dismissed as premature because discovery has not begun and the Funds have therefore have had no opportunity to discover the facts pertaining to the relationship between Angelo Monarca, Inc. and Angelo Monarca Contracting LLC.

[3] Defendants confuse the doctrines of "alter ego" and "piercing the corporate veil" liability.  Although the cases themselves sometimes confuse these doctrines, "alter ego" liability refers to the situation where there is such an inter-connectedness between two supposedly distinct companies (such as common employees, common officers, common office location, etc.) that they each will be deemed liable for each other's debts and liabilities.  *See, e.g., Flynn v. R.C. Tile*, 353 F.3d 953, 958 (D.C. Cir. 2004).  "Piercing the corporate veil," on the other hand, addresses situations where an individual may be liable for the debts and obligations of a corporation because the facts (such as failure to maintain corporate formalities, commingling of the individual's assets with those of the corporation, etc.) demonstrate that the individual

DSMDB-2424699v01

alleged that Angelo Monarca, Inc. and Angelo Monarca Contracting LLC are two separate companies with such an inter-connectedness that they should be deemed alter egos under the traditional factors applied by this Court.  Although discovery may ultimately reveal facts establishing such an alter ego relationship, in which case a motion to amend the pleading would be appropriate, the Funds' existing Complaint seeks to hold Angelo Monarca, Inc. liable because it is believed to be "doing business as" Angelo Monarca Contracting LLC.  *See* Complaint ¶ 6.

Under the Funds' allegations, Angelo Monarca, Inc. and Angelo Monarca Contracting LLC are not separate companies at all – they are one and the same.  Stated differently, they are one company that uses two different names.  Although Defendants have now come forward, in their motion to dismiss, and claimed that Angelo Monarca, Inc. and Angelo Monarca Contracting LLC are actually separate entities (*see* D.Mem. 3-4), whether that is true cannot be determined without discovery.  As it now stands, the Funds have alleged that there is but one company operating under these two names, that this company signed a collective bargaining agreement requiring it to make contributions to the Funds, and that the company failed to make those contributions in violation of the collective bargaining agreement and ERISA.  *See* Complaint ¶¶ 6, 9-12.  If they are able to prove these allegations, following discovery, the Funds will have stated a claim against the "Angelo Monarca" business entity, regardless of which name it is currently using, under Sections 502 and 515 of ERISA.  Thus, because the Funds allegations establish a "plausible entitlement to relief," the motion to dismiss for failure to state a claim against Angelo Monarca, Inc. should be denied.  *Simpson*, 529 F. Supp. 2d at 83 (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007)).

---

himself has not respected the independent existence of the corporation.  *See, e.g., Flynn v. Thibodeaux Masonry, Inc.*, 311 F. Supp. 2d 30, 41 (D.D.C. 2004).

DSMDB-2424699v01

II.     **The Funds' Allegations Are Also Sufficient For This Court To Exercise Personal Jurisdiction Over Angelo Monarca, Individually**

Defendants also claim that this Court cannot exercise personal jurisdiction over Angelo Monarca individually because there is no basis for holding Mr. Monarca liable on piercing the corporate veil grounds, and he otherwise has no contacts with the District of Columbia. *See* D.Mem. 5-8. Defendants' argument is without merit because (i) it is based on the false premise that the Funds are seeking to hold Mr. Monarca liable on piercing grounds; (ii) ERISA authorizes personal jurisdiction over any defendant who has minimum contacts with the United States as a whole; and (iii) personal jurisdiction is also proper based upon the payment of fringe benefit contributions to employee benefit funds administered in the District of Columbia.

A.     **Contrary To Defendants' Contention, The Funds Are Not Seeking To Hold Angelo Monarca Individually Liable On Piercing The Corporate Veil Grounds**

Contrary to Defendants' suggestion, the Funds are not seeking, and have never alleged, that Mr. Monarca is liable in this case on piercing the corporate veil grounds. While liability on this basis might become relevant depending on the facts revealed in discovery, the Funds' Complaint currently seeks to hold Mr. Monarca individually liable on entirely distinct grounds. Specifically, it is alleged that Mr. Monarca is personally liable because, after the dissolution of Angelo Monarca, Inc., he "has continued to carry on the business of Angelo Monarca, Inc. beyond that necessary to wind up its affairs."[4] *See* Complaint ¶ 16. Under the law of most States, including Connecticut where Defendants operate, this is a valid basis for imposing individual liability. *See, e.g., Fox Run Mall Assocs. Ltd. v. Lawler*, 2001 WL 65592, *3 (Conn. Super. Ct. Jan. 15, 2001) (finding individual personally liable where corporation was dissolved and never reincorporated, consistent with the cases holding that "when a corporation continues to carry on as a corporation after dissolution, and does business beyond that necessary to wind up

---

[4] Defendants admit that Angelo Monarca, Inc. was dissolved and never reinstated. *See* D.Mem. 2.

DSMDB-2424699v01

its affairs, those operating the corporation become individually liable for corporate obligations" (internal citation omitted)), *aff'd*, 796 A.2d 634 (Conn. App. 2002), attached hereto as Exhibit B; *Connecticut Light and Power Co. v. Patel*, 2000 WL 1391739, *2 (Conn. Super. Ct. Sept. 12, 2000) (finding individual personally liable on the same grounds where defendants never undertook reinstatement of corporation), attached hereto as Exhibit C; *Perri v. Duni*, 1995 WL 43713, *1 (Conn. Super. Ct. Jan. 31, 1995) (finding individually personally liable on the same grounds, noting that "it appears that the majority rule is that officers that continue to conduct business after dissolution may be personally liable regardless of subsequent reinstatement"), attached hereto as Exhibit D; *see also J.M. Lynne Co. v. Geraghty*, 528 A.2d 786 (1987) (imposing individual liability, under New York law, where a corporate officer and the sole stockholder continued to conduct business after the corporation had been dissolved but before its reinstatement, noting that this is the "majority rule").[5]

Pursuant to these authorities, liability can be imposed on Mr. Monarca irrespective of whether any piercing the corporate veil factors can be proven and irrespective of whether Mr. Monarca would otherwise satisfy the definition of an "employer" under ERISA. Because Mr. Monarca is alleged to have continued the business of Angelo Monarca, Inc. beyond that necessary to wind up its affairs, he is liable for any debts owed by Angelo Monarca, Inc. to the Funds. He loses the protection of the corporate shield because he failed to follow state procedures necessary to maintain that shield.

### B.   Angelo Monarca Is Subject To The Personal Jurisdiction Of This Court Based Upon His Minimum Contacts With The United States As A Whole

Not only is Defendants' personal jurisdiction argument based on the false premise that the Funds are seeking to hold Mr. Monarca individually liable on piercing the corporate veil

---

[5] *See also* Conn. Gen. Statutes, § 33-884 ("[a] dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs").

DSMDB-2424699v01

grounds, but it also erroneously assumes that personal jurisdiction cannot be exercised over Mr. Monarca absent a showing sufficient contacts with the District of Columbia to satisfy the D.C. long-arm statute. *See* D.Mem. 7. Because this is an ERISA action, however, no such contacts with the District of Columbia need be shown. As held by this Court in *Flynn v. Ohio Building Restoration, Inc.*, 260 F.Supp.2d 156 (D.D.C. 2003), ERISA's nationwide service of process provision authorizes this Court to exercise personal jurisdiction over any ERISA defendant who has minimum contacts with the United States as a whole, irrespective of whether they have sufficient contacts with the District of Columbia specifically:

> For purposes of ERISA actions, the fact that defendant Exact Construction has not conducted business in this district does not preclude the Court's exercise of personal jurisdiction over it. Section 1132(e)(2) of ERISA "has been interpreted to authorize nationwide service or process."
>
> And, because ERISA's nationwide service provision permits the Court to exercise jurisdiction over Exact Construction because it is a citizen of the United States, the Court concludes it has personal jurisdiction over defendant Exact Construction. Accordingly, defendant Exact Construction's motion to dismiss, which is predicated on its claim that the Court cannot exercise personal jurisdiction over it, must be denied.

*Ohio Building*, 260 F.Supp.2d at 170, 173. Pursuant to Section 1132(e)(2) and *Ohio Building*, this Court may assert personal jurisdiction over Angelo Monarca individually.

### C.    Angelo Monarca Is Also Subject To Personal Jurisdiction Based Upon His Payment Of Fringe Benefit Contributions To Employee Benefit Funds Administered In The District Of Columbia

A separate and independent ground upon which this Court may exercise personal jurisdiction over Mr. Monarca individually is based on his company's payment of fringe benefit contributions to employee benefit funds administered in the District of Columbia. The Complaint filed by the Funds alleges that Angelo Monarca is the principal officer and controlling owner of Angelo Monarca, Inc. d/b/a Angelo Monarca Contracting LLC, that the company submitted some fringe benefit contributions to the IPF and IMI on behalf of its covered

DSMDB-2424699v01

employees, and that the IPF and IMI are employee benefit plans administered in the District of Columbia. *See* Complaint ¶¶ 7, 10-11, 2. By submitting contributions to plans administered in the District of Columbia, Mr. Monarca and his company became subject to the personal jurisdiction of this Court.[6] As stated by this Court in *Ohio Building*:

> Here, defendant Ohio Building does not contest the fact that the plan at issue is administered in the District of Columbia or that it knowingly made contributions to the plan in this district. Therefore, in accordance with the holdings in *I.A.M.* and *Varsic*, this Court has no reservations about holding that Defendant Ohio Building is subject to this Court's jurisdiction.

*Ohio Building*, 260 F.Supp.2d 156 (D.D.C. 2003) (discussing *I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc.*, 699 F.2d 1254, 1259 (D.C. Cir. 1983) and *Varsic v. United States District Court for the Central District of California*, 607 F.2d 245 (9th Cir. 1979)). Because the exercise of jurisdiction in these circumstances comports with constitutional due process, the requirements of the D.C. long-arm statute did not need to be satisfied in *Ohio Building* and need not be satisfied here.[7]

---

[6] Because Mr. Monarca's failure to maintain the status of his company as required by statute means he is not protected from personal liability, he should be deemed to have the same contacts with the District of Columbia as did his corporation.

[7] Even if the Funds needed to satisfy the requirements of the D.C. long-arm statute in order for this Court to exercise personal jurisdiction over Mr. Monarca (which they clearly do not), the Funds would be entitled to jurisdictional discovery before their Complaint could be dismissed. *See, e.g., Diamond Chemical Co. v. Atofina Chemicals, Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003) ("A plaintiff faced with a motion for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum").

DSMDB-2424699v01

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Funds' claims against Angelo Monarca, Inc. and Angelo Monarca, individually, should be denied in its entirety.[8]

Dated:  April 14, 2008                    Respectfully submitted,

                                          By: _____
                                          Ira R. Mitzner, DC Bar No. 184564
                                          Charles V. Mehler III, DC Bar No. 475909
                                          Dickstein Shapiro LLP
                                          1825 Eye Street, N.W.
                                          Washington, D.C.  20006
                                          (202) 420-2234

                                          *Attorneys for Plaintiffs*

---

[8] If, despite the above authorities, this Court were to find the allegations of the Funds' Complaint insufficient, any dismissal should be without prejudice to the Funds' refiling of a new Complaint. This Court has consistently held that when a complaint is dismissed under Federal Rule of Civil Procedure 12, leave to amend should be freely granted at least once, in recognition of federal policy favoring decisions on the merits. *See, e.g., Simpson,* 529 F. Supp. 2d at 84.

DSMDB-2424699v01

EXHIBIT A

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

American Federation of Government Employees v. Hawley
D.D.C.,2008.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, et al., Plaintiffs,
v.
Kip HAWLEY, in his official capacity as Adminis-
trator, et al., Defendants.
**Civil Action No. 07-00855 (HHK).**

March 31, 2008.

Mark D. Roth, Charles Arthur Hobbie, American
Federation Of Government Employees, Washing-
ton, DC, for Plaintiffs.
Jacqueline E. Coleman, U.S. Department of Justice,
Washington, DC, for Defendants.

*MEMORANDUM OPINION*

HENRY H. KENNEDY, JR., District Judge.
**\*1** Plaintiffs, four transportation security officers
employed by the Transportation Security Adminis-
tration ("TSA") and the unions that represent them,
bring this action against defendants TSA, Kip Haw-
ley in his capacity as Administrator of the TSA, the
Department of Homeland Security ("DHS"), and
Michael Chertoff in his capacity as Secretary of the
DHS. Plaintiffs allege that defendants violated the
Aviation and Transportation Security Act
("ATSA"), 49 U.S.C. §§ 44901 and 44935, and the
Privacy Act, 5 U.S.C. § 552a, by failing to establish
appropriate safeguards to insure the security and
confidentiality of personnel records.

Before the court is defendants' motion to dismiss [#
3]. Upon consideration of the motion, defendants'
opposition thereto, and the record of this case, the
court concludes that the defendants' motion should
be granted in part and denied in part.

## I. BACKGROUND

On May 3, 2007, TSA discovered that a hard drive
was "missing from a controlled area at the TSA
Headquarters Office of Human Capital."Compl. ¶¶
28-29. The hard drive contained personnel data for
approximately 100,000 individuals employed by
TSA between January 2002 and August 2005, in-
cluding names, social security numbers, birth dates,
payroll information, financial allotments, and bank
account and routing information. Compl. ¶¶ 28, 29,
31. On May 4, 2007, Administrator Kip Hawley is-
sued a broadcast email to all TSA employees
providing notice of the incident and stating that
TSA would provide employees with free credit
monitoring for one year free of charge. *Id.;* Defs.'
Mot. Dismiss, Exh. 1 (Decl. of Holmes), Att. 1 at 1
(5/4/2007 TSA Broadcast).[FN1]

> FN1. Although plaintiffs' complaint quotes
> only part of TSA's May 4, 2007, email to
> employees, Compl. ¶ 31, the court refers to
> the complete email, which defendants at-
> tached to their motion. Mot. Dismiss, Exh.
> 1 (Decl. of Holmes). Because the com-
> plaint quotes the email in part, the court
> may consider the email's full text. *See
> Baker v. Henderson,* 150 F.Supp.2d 13, 15
> (D.D.C.2001) ("In determining whether a
> complaint fails to state a claim, the court
> may consider facts alleged in the com-
> plaint, any documents either attached to or
> incorporated in the complaint and matters
> of which the court may take judicial no-
> tice.").

## II. ANALYSIS

On May 8, 2007, four TSA security officers
("individual plaintiffs") and their unions ("union
plaintiffs") filed this class action complaint,[FN2] al-
leging that defendants violated ATSA and the Pri-
vacy Act by failing to ensure the security of the
missing hard drive. In their motion to dismiss, de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

Page 2

fendants argue (1) ATSA does not provide a private right of action; (2) the union plaintiffs lack standing to bring their Privacy Act claim under both the act and the requirements of associational standing; (3) the individual plaintiffs lack standing because they do not allege a cognizable injury; (4) plaintiffs' Privacy Act claim is unripe; and (5) plaintiffs' allegations are insufficient to state a Privacy Act claim. To these arguments the court now turns.

> FN2. Plaintiffs bring this action on behalf of a purported class of "all persons who have been adversely affected by Defendants' Privacy Act violations."Compl. ¶ 17.

## I. Plaintiffs' ATSA Claim

In response to the events of September 11, 2001, Congress enacted the Aviation and Transportation Security Act, Pub.L. No. 107-71, 115 Stat. 597 (2001), which created TSA and a federal workforce to screen passengers and cargo at commercial airports. 49 U.S.C. § 114. Among other things, ATSA requires the Administrator to "enforce security related regulations and requirements" and "oversee the implementation, and ensure the adequacy, of security measures at airports."§§ 114(f)(7), (11). Plaintiffs claim defendants violated ATSA by "fail[ing] to maintain personnel data from loss consistent with security-related regulations" and by "fail[ing] to ensure the adequacy of security measures at airports resulting in the loss of personnel data."Compl. ¶¶ 45-46.

**\*2** Defendants move to dismiss plaintiffs' ATSA claim, arguing that the statute does not provide a private cause of action, either express or implied. Plaintiffs admit that ATSA contains no express grant of a private cause of action, but contend that the court should find the act contains an implied cause of action because it "was enacted specifically to create a secure workforce of TSA screeners such as the Plaintiffs" and "protecting screeners' personnel data is vital to the protection of a secure workforce and security at the airports."Pls.' Opp'n to Defs.' Mot. Dismiss ("Opp'n") at 4. Plaintiffs further

ther argue that "[t]here can be no doubt that the Plaintiffs ... are within the zone of interests created by the ATSA" because "the main purpose of the ATSA was to create this federal, security screening workforce."*Id.* The court agrees with defendants and finds that ATSA does not provide plaintiffs with a cause of action.

"[P]rivate rights of action to enforce federal law must be created by Congress."*Alexander v. Sandoval,* 532 U.S. 275, 286 (2001) (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578 (1979))."The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."*Id.* (citing *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15 (1979)). The court's analysis "must begin with the language of the statute itself."*Touche Ross & Co. v. Redington,* 442 U.S. at 568. Absent statutory language that expressly grants a private right of action, the court must determine whether the statute contains an implied right of action. *Anderson v. USAir, Inc.,* 818 F.2d 49, 54 (D.C.Cir.1987). Four factors are relevant to discerning congressional intent to provide a private remedy:

> (1) [W]hether the plaintiff is one of the class for whose benefit the statute was enacted;

> (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law.

*Tax Analysts v. IRS,* 214 F.3d 179, 185-186 (D.C.Cir.2000) (citing *Cort v. Ash,* 422 U.S. 66, 78 (1975)). Of the four factors, "the most important consideration is whether the legislature intended to create a private right of action."*Dial-A-Car, Inc. v. Transportation, Inc.,* 132 F.3d 743, 744

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

(D.C.Cir.1998).

As to the first factor, the court finds that Congress did not enact ATSA for the special benefit of TSA employees,[FN3] but rather for purposes of national security:

> FN3. Indeed, plaintiffs do not contend that they are of the class for whose benefit the statute was enacted. Instead they argue that because ATSA was enacted to create a secure workforce of airport security screeners and protecting the screeners' personnel data is vital to protecting the workforce and the airport, "implying a private right of action to enforce a security regime is consistent with the underlying purposes of enacting the ATSA, specifically, to secure the traveling public by creating a federalized security workforce."Opp'n at 4. The Supreme Court has squarely rejected this type of argument for implying a private cause of action, holding that without statutory intent "to create not just a private right but a private remedy .... a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or *how compatible with the statute."Alexander,* 532 U.S. at 286-87 (emphasis added).

Plaintiffs' alternative argument that plaintiffs are "within the zone of interests created by the ATSA," Opp'n at 4, is equally unavailing. The Supreme Court has explained that the "zone of interest" test is used principally to determine standing to bring APA claims and is not a universal test for standing. *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 401 n. 16 (1987). As demonstrated in *Cort v. Ash,*"the Court was requiring more from the would-be plaintiffs ... than a showing that their interests were arguably within the zone protected or regulated by [the statute at issue]."*Id.*(citing *Cort v. Ash,*

422 U.S. at 81).

Recognizing that "the terrorist hijacking and crashes of passenger aircraft on September 11, 2001, which converted civil aircraft into guided bombs for strikes against the United States, required a fundamental change in the way [the government] approaches the task of ensuring the safety and security of the civil air transportation system," Congress enacted [ATSA] to improve security in the nation's transportation system. H.R. Conf. Rep. No. 107-296, at 53 (2001), *reprinted in* 2001 U.S.C.C.A.N. 589, 590. In order to achieve this goal, Congress created the Transportation Security Administration within the Department of Transportation and charged it with assuring "security in all modes of transportation."49 U.S.C. § 114(d) (Supp. III 2003). *3 Coalition of Airline Pilots Ass'n v. FAA,* 370 F.3d 1184, 1186 (D.D.C.2004); *see also Springs v. Stone,* 362 F.Supp.2d 686, 694, 705 (E.D.Va.2005) ("ATSA is a legislative initiative aimed a strengthening the security of this Nation's transportation infrastructure-the civil air transportation system in particular-and nothing else.... ATSA was not promulgated in order to protect the employment interests of federal screeners, but instead to address national security and passenger safety.... Security was Congress's paramount concern.").[FN4]

> FN4. Presented with this same question about a statute that regulated the taxi industry, the D.C. Circuit found that the D.C. Council intended the regulation not only to foster a healthy taxi industry and to justly compensate taxi companies, but also to foster competition and create a centralized system of regulation for the general public's benefit. *Dial-A-Car, Inc.,* 132 F.3d at 745. In light of these "mixed motives," the D.C. Circuit could not conclude that the regulation was enacted to benefit the industry members rather than the general

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

public. *Id.*

Turning to the second factor-whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy-the court finds none. The text of § 114 creates the Transportation Security Administration and outlines the responsibilities of the Under Secretary of Transportation for Security. The specific sections plaintiffs allege defendants failed to implement are subparts of § 114(f),[FN5] which is titled "[a]dditional duties and powers" and provides that "[i]n addition to carrying out the functions specified in subsections (d) and (e), the Under Secretary shall ..." perform specific additional duties. 49 U.S.C. § 114(f). The Supreme Court has held that statutes like this, which focus on the person regulated rather than the individuals protected, create "no implication of an intent to confer rights on a particular class of persons."*Alexander,* 532 U.S. at 288-89.

> FN5. In their complaint, plaintiffs quote from § 114(f)(7) and § 114(f)(11), Compl. ¶ 25, while their opposition states that "Plaintiffs challenge the Defendants' failure to implement ATSA, 49 USC § 114(f)(7) and § 114(f)(9). The discrepancy is irrelevant to the court's analysis.

Additionally, § 114 contains no "rights-creating language," *Alexander,* 532 U.S. at 288, or any other indication that any individual or any entity may file a suit to enforce its provisions. *See Anderson,* 818 F.2d at 54 (recognizing that "phrasing a statute in general terms rather than specifically identifying the benefitted class indicates a lack of intent to create a private right of action.") (internal quotation omitted). The court finds no congressional intent to allow individuals to bring an action against the TSA for violating § 114 and concludes that no private right of action exists to enforce ATSA.[FN6]Accordingly, plaintiffs' ATSA claim will be dismissed. [FN7]

> FN6. In the absence of congressional intent

to provide a private remedy under the first two factors, analysis under the final two factors is unnecessary. *Anderson,* 818 F.2d at 55 (citations omitted).

> FN7. Other district courts presented with the issue have also declined to find an implied private right of action in ATSA. *Ivyport Logistical Serv., Inc. v. Caribbean Airport Facilities, Inc.,* 502 F.Supp.2d 227, 230 (D.P.R.2007) (finding no private cause of action in ATSA that could be used as a basis for the lawsuit); *Nabozny v. NCS Pearson, Inc.,* 270 F.Supp.2d 1201, 1205 (D.Nev.2003) (holding that "in as much as ATSA does not afford Plaintiff individual rights, Plaintiff cannot state a claim for violation of the ATSA under Section 1983"); *see also American Fed'n of Gov't Employees TSA Local 1 v. Hawley,* 481 F.Supp.2d 72, 93 n. 10 (D.D.C.2006) (noting that "the prospect that Congress intended to create a private cause of action for a violation of ATSA § 110(c)(1) does not warrant a discussion.").

## II. Privacy Act Claim

The Privacy Act of 1974, 5 U.S.C. § 552a, regulates the collection, maintenance, use, and dissemination of an individual's personal information by federal government agencies. *See*5 U.S.C. § 552a. Plaintiffs claim that defendants violated § 552a(e)(10), which requires that

> Each agency that maintains a system of records shall ... establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained ...

§ 552a(e)(10).*See* Compl. ¶ 48; Opp'n at 17 (citing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6 of 11

§ 552a(e)(10)). Plaintiffs bring their claim under 5 U.S.C. § 552a(g)(1)(D), which provides that whenever an agency "fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual ... the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction ...." § 552a(g)(1)(D).

**\*4** Defendants move to dismiss plaintiffs' claim on several grounds. First, they argue, the union plaintiffs lack standing to bring a claim under the Privacy Act and do not meet the requirements of associational standing, while the individual plaintiffs lack standing because their allegations of harm are speculative and dependent upon third parties' criminal actions. Mot. Dismiss at 11-15. Second, defendants argue the court should dismiss plaintiffs' Privacy Act claim as unripe. *Id.* at 16-18.Third, defendants contend plaintiffs have failed to state a claim. *Id.* at 18-24.To these arguments the court now turns.

**1. Standing**

**A. Union Plaintiffs lack standing to bring a Privacy Act claim .**

Plaintiffs do not dispute that only individuals have standing to bring Privacy Act claims.[FN8]Opp'n at 13. Instead they urge the court to find that the union plaintiffs have associational standing to bring their Privacy Act claim. Defendants argue that the union plaintiffs fail to meet the requirements of associational standing because the suit would require participation of its individual members. Defendants are correct.

> FN8. Indeed, any attempts to argue otherwise would fail, as the Privacy Act's text permits no other interpretation. The subsection entitled "Civil Remedies" provides that "[w]henever any agency" violates the act in ways specified in § 552a(g)(1)(A)-

(D), "*the individual* may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection." § 552a(g)(1) (emphasis added). The act defines "individual" as "a citizen of the United States or an alien lawfully admitted for permanent residence."§ 552a(a)(2); *see Committee in Solidarity with the People of El Salvador v. Sessions,* 738 F.Supp. 544, 547 (D.D.C.1990) ("[T]he Privacy Act does not confer standing upon organizations on their own or purporting to sue on behalf of their members."); *see also Dresser Indus., Inc. v. United States,* 596 F.2d 1231, 1237-38 (5th Cir.1979) (explaining that "[t]he Senate Report indicates that Congress, by using this definition [of individual], intended to distinguish 'between the rights which are given to the citizen as an individual under this *Act* and the rights of proprietorships, businesses and corporations which are not intended to be covered by this Act.'") (citing S.Rep. No. 1183, 93d Cong., 2d Sess. 79, *reprinted in* 1974 U.S.C.C.A.N 6916, 6993); *Cell Assoc., Inc. v. Nat'l Inst. of Health,* 579 F.2d 1155, 1157 (9th Cir.1978) (remanding "with directions to dismiss Cell Associates, Inc., as a plaintiff for lack of standing under the Privacy Act" because "[i]t is clear that Cell Associates, a corporation formed in 1974, is not an 'individual' within the meaning of the statute"); *Socialist Workers Party v. Attorney Gen. of the United States,* 642 F.Supp. 1357, 1431 (S.D.N.Y.1986) (holding that political party plaintiff lacked standing because "[o]nly an individual, not an organization, has standing to obtain a remedy under the Act.").

To meet the requirements of associational standing, the union plaintiffs "must demonstrate that at least one member would have standing under Article III

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

to sue in his or her own right, that the interests it seeks to protect are germane to its purposes, and that neither the claim asserted nor the relief requested requires that an individual member participate in the lawsuit."*Natural Res. Def. Council v. EPA,* 489 F.3d 1364, 1370 (D.C.Cir.2007) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 342-43 (1977); *Sierra Club v. EPA,* 292 F.3d 895, 898 (D.C.Cir.2002)). Here, because the sole remedy for plaintiffs' Privacy Act claim is actual damages,[FN9] the union plaintiffs' individual members would be required to participate in the lawsuit to prove their individual damages.[FN10]*See Parks v. IRS,* 618 F.2d 677, 685 (10th Cir.1980) (holding that union plaintiff lacked standing to maintain a Privacy Act action in a representative capacity for damages suffered by its individual members because "[e]ach of the plaintiffs would have to testify because the actionable injury and the damages are individual ... not common to nor shared by all of the Union members.") (citing *Warth v. Seldin,* 422 U.S. 490, 515-16 (1975)). As such, the union plaintiffs fail to meet one of the required elements of associational standing, and their claim must be dismissed.

> FN9. As discussed in section II.4, declaratory and injunctive relief are not available for plaintiffs' Privacy Act claim.

> FN10. Plaintiffs' concede that "the unique facts of individual members may have to be considered for a portion of the relief requested, such as financial loss...." Opp'n at 15.

**B. The Individual Plaintiffs have standing to bring their Privacy Act claim.**

Defendants argue that the individual plaintiffs should be dismissed for lack of standing for failing to demonstrate an injury-in-fact. Mot. Dismiss at 13.[FN11] According to defendants, plaintiffs' concerns about future harm are speculative and dependent upon the criminal actions of third parties. Mot. Dismiss at 13-15. The court disagrees.

> FN11."To have Article III standing, a plaintiff must demonstrate an 'actual or immediate' 'injury-in-fact' that is 'fairly traceable' to the challenged conduct and 'likely' to be 'redressed by a favorable decision.' " *Tozzi v. U.S. Dep't of Health and Human Servs.,* 271 F.3d 301, 307 (D.C.Cir.2002) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992)). Defendants challenge only plaintiffs' ability to meet the injury-in-fact requirement, not causation or redressibility. Mot. Dismiss at 13-15.

*5 Plaintiffs allege that because TSA violated § 552a(e)(10) by failing to establish safeguards to secure the missing hard drive, they have suffered an injury in the form of "embarrassment, inconvenience, mental distress, concern for identity theft, concern for damage to credit report, concern for damage to financial suitability requirements in employment, and future substantial financial harm, [and] mental distress due to the possibility of security breach at airports."Compl. ¶¶ 41-42. As such, plaintiffs' alleged injury is not speculative nor dependent on any future event, such as a third party's misuse of the data.[FN12]The court finds that plaintiffs have standing to bring their Privacy Act claim.

> FN12. Although defendants argue that plaintiffs "have not alleged any injuries as a result of Defendants' actions that are real and immediate," in this circuit, "emotional trauma alone is sufficient to qualify as an 'adverse effect' under Section 552a(g)(1)(D) of the [Privacy] Act."*Kreiger v. Dep't of Justice,* 529 F.Supp.2d 29, 53 (D.D.C.2008) (quoting *Albright v. United States,* 732 F.2d 181, 186 (D.C.Cir.1984)).

**2. Plaintiffs' Privacy Act claim is ripe.**

Defendants contend that plaintiffs' claim is not ripe for adjudication because neither plaintiffs nor de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

Page 7

fendants can account for the hard drive's location and there is no evidence of unauthorized use of plaintiffs' information. Defendants' ripeness argument suffers from the same infirmity as its standing argument: future unauthorized use is not the basis of plaintiffs' claim. Plaintiffs are asking the court to determine whether defendants violated § 552a(e)(10) by failing to establish appropriate safeguards to insure the security of the hard drive, which, plaintiffs allege, resulted in the hard drive's loss and plaintiffs' injury.

"To determine whether a controversy is ripe, we must consider both the 'fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " *Exxon Mobil Corp. v. Federal Energy Regulatory Comm'n,* 501 F.3d 204, 208 (D.C.Cir.2007) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)). Plaintiffs' claim is fit for judicial decision at this time. It does not, as defendants contend, "rest[ ] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Worth v. Jackson,* 451 F.3d 854, 861 (D.C.Cir.2006) (quoting *Texas v. United States,* 523 U.S. 296, 300 (1998)). As for the hardship prong, the D.C. Circuit has ruled that where "there are no institutional interests favoring postponement of review, [plaintiff] need not satisfy the hardship prong. *AT & T Corp. v. FCC,* 349 F.3d 692, 700 (D.C.Cir.2003). Accordingly, the court finds plaintiffs' claim ripe for adjudication.

**3. Plaintiffs have stated a Privacy Act claim.**

Defendants argue plaintiffs have failed to state a claim by failing to allege facts from which this court could infer (a) defendants acted intentionally or willfully; (b) plaintiffs were adversely affected; and (c) plaintiffs sustained actual damages. *Id.* at 18-24.The court considers each of these alleged deficiencies.

**A. Intentional and Willful**

"An agency acts in an intentional or willful manner

'either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.' " *Deters v. United States Parole Comm'n,* 85 F.3d 655, 660 (D.C.Cir.1996) (quoting *Albright v. United States,* 732 F.2d 181, 189 (D.C.Cir.1984)). To rise to this level, " '[t]he violation must be so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful.' " *Id.* (quoting *Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987)).

*6 Defendants contend that the factual allegations in plaintiffs' complaint provide no basis for an inference of intentional or willful conduct. Plaintiffs' complaint acknowledges that TSA notified employees of the incident "out of an abundance of caution," apologized that employees' information may be subject to unauthorized access, and stated that they "deeply regret" the incident. These facts, defendants argue, provide no basis of an intentional or willful violation. Plaintiffs further allege that "[d]efendants have been repeatedly informed of recurring, systemic, and fundamental deficiencies in its information security," citing an Office of Inspector General, Department of Homeland Security report titled "Improved Security Required for Transportation Security Administration Networks."Compl ¶ 35. Defendants claim this allegation is not credible because the report notes that while TSA could further improve its network security, it had already strengthened the security of its servers and workstations, and OIG had detected significantly fewer security vulnerabilities. *Id.* at 20-21.Finally, plaintiffs allege that "[d]efendants demonstrated reckless disregard for privacy rights when it failed to effectively secure the external hard drive that maintained the personal information of its personnel workforce."Compl. ¶ 36.

To survive a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."*Bell Atlantic*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)

**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

Page 8

*Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1965 (2007) (citations omitted). Plaintiffs' allegations, if proven, would support a finding that defendants were warned of the deficiencies in their information security but failed to establish proper safeguards. *See In re Dep't of Veterans Affairs Data Theft Litig.,* Misc. No. 06-5606, Dkt. # 30 at 11 (D.D.C. Nov. 11, 2007) (Robertson, J.) (holding that plaintiffs' allegations were sufficient because, if proven, they would support a finding that VA's conduct was "intentional and willful"). At this point, the Court may not conclude that plaintiff cannot establish "any set of facts consistent with the allegations in the complaint" regarding this statutory violation. *Bell Atlantic Corp.,* 127 S.Ct. at 1969 (citations omitted). Indeed, "the issue presented by a motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."*Rochon v. Gonzales,* 438 F.3d 1211, 1216 (D.C.Cir.2006) (citation omitted). The court finds that the plaintiffs have adequately alleged that defendants' conduct was "intentional and willful."

**B. Adverse Effect**

Defendants claim plaintiffs fail to allege sufficient facts to allow the court to infer plaintiffs have suffered an adverse affect. Plaintiffs allege they "experienced adverse effects due to Defendants' failure to safeguard the Personnel Data and/or disclosure, including but not limited to, embarrassment, inconvenience, mental distress, concern for identity theft, concern for damage to credit report, concern for damage to financial suitability requirements in employment, and future substantial financial harm."Compl. ¶ 41. In addition, plaintiffs "who are members of the traveling public experienced adverse effects due to Defendants' disclosure, including but not limited to, mental distress due to the possibility of security breach at airports."Compl. ¶ 42. As a result, plaintiffs claim they "must take affirmative steps to recover peace of mind, emotional stability, and personal security, including but not limited to, frequently obtaining and reviewing cred-

it reports, bank statements, and other similar information."Compl. ¶ 43.

*7 Defendants fault plaintiffs for not "describ[ing] a single occasion on which they were embarrassed and inconvenienced or identified the nature and occasion of any affirmative step taken to recover peace of mind," arguing that plaintiffs cannot rely on such "conclusory assertions" or "sweeping averments" unsupported by factual allegations. Mot. Dismiss at 21-22. The court disagrees with defendants. "At the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice,' and the court 'presum[es] that general allegations embrace the specific facts that are necessary to support the claim.' " *Sierra Club,* 292 F.3d at 898-99 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)). Plaintiffs have adequately plead "adverse effect."

**C. Actual Damages**

Finally, defendants assert that plaintiffs have failed to state a claim because they have not sufficiently plead actual damages. In *Doe v. Chao,* 540 U.S. 614 (2004), the Supreme Court held that a plaintiff must prove actual damages to recover under 552a(g)(4) of the Privacy Act. 540 U.S. at 624-25 (explaining that "an individual subjected to an adverse effect has injury enough to open the courthouse door, but without more has no cause of action for damages under the Privacy Act"). The Court, however, left open the question of what constitutes "actual damages," noting that the courts of appeals "are divided as to whether actual damages are limited to pecuniary loss or can be awarded for emotional damages without any out-of-pocket loss."*Id.* at 627 n. 12.The definition of "actual damages" is also unresolved in this Circuit. *See Albright,* 732 F.2d at 186 (declining to consider "whether non-economic injuries or damages other than out-of-pocket expenses could qualify as 'actual damages' under Section 552a(g)(4)).

Defendants argue that the court should interpret

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

Page 9

"actual damages" narrowly, as is required in construing a waiver of sovereign immunity, to mean only out of pocket expenses, not emotional damages. Plaintiffs claim is therefore insufficient, defendants contend, as "[e]ven the most favorable reading of Plaintiffs' Complaint makes plain that they are not seeking recovery for any alleged out-of-pocket expenses."Mot. Dismiss 23-24. Indeed, plaintiffs concede that they "have not pled current, actual, financial loss."Opp'n at 12. Nevertheless, the court finds that plaintiffs have adequately alleged actual damages at this stage. *See Montemayor v. Federal Bureau of Prisons,* 2005 WL 3274508, at *5 (D.D.C. Aug. 25, 2005) (citing cases) (rejecting argument to narrowly interpret "actual damages" to mean only pecuniary losses and following instead the "recent trend at the District Court level ... to allow Privacy Act suits seeking general compensatory damages, such as pain and suffering and non-pecuniary losses, to proceed" past the motion to dismiss stage.).

### 4. Injunctive and Declaratory Relief are not Remedies for Plaintiffs' claim.

**\*8** In addition to actual damages, plaintiffs' prayer for relief seeks ten other remedies, including six types of injunctive relief (Compl. Demand ¶¶ 5-9, 12), three types of declaratory judgment (Compl. Demand ¶¶ 2-4), and a demand for *in camera* review of defendants' security procedures (Compl. Demand ¶ 1).[FN13] Defendants correctly assert that these declaratory and injunctive remedies are not available to plaintiffs.

> FN13. Although plaintiffs acknowledge that " 'actual damages' must be proven in order for a court to award monetary relief," Opp'n at 12, Plaintiffs' opposition appears to indicate that they seek only equitable and declaratory relief, and it is unclear to the court whether they intend to prove their claim for actual damages. *See id.* at 1-2 ("The malfeasance lies in the release of the information itself and not on what financial damage is wrought by the release."); *id.* at 12 ("while the Plaintiffs have not pled current, actual financial loss, this does not foreclose standing as equitable relief remains available."); *id.*("The Plaintiffs seek equitable relief as meaningful redress from the injury caused them."); *id.* at 16 ("Defendants' err in their failure to recognize that the Defendants' earlier failure to secure the hard-drive so that such a loss of personnel data could occur is the harm and injury already sustained. Plaintiffs are not waiting for additional harm and injury albeit cognizant that future, additional harm may occur from the loss of personnel data."); *id.* at 17 ("Delaying litigation on this issue, therefore, will impede the declarative, equitable, and injunctive remedies sought by the Plaintiffs."); *id.* at 19 ("while 'actual damages' must be proven in order for a court to award monetary relief, the Supreme Court left open the question of whether equitable relief is available without a showing of actual monetary damages.").

The Privacy Act's civil remedies provision authorizes two specific forms of injunctive relief: (1) for § 552a(g)(1)(A) claims, "the court may order the agency to amend the individual's record in accordance with his request or in such other way as the court may direct;"§ 552a(g)(2)(A), and (2) for § 552a(g)(1)(B) claims, "the court may enjoin the agency from withholding the records and order the production to the complainant of any agency records improperly withheld from him,"§ 552a(g)(3)(A). Plaintiffs do not bring their claim under either of these sections, but rather under § 552a(g)(1)(D).[FN14] As the D.C. Circuit has held "only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs."*Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1122 (D.C.Cir.2007) (citing *Doe v. Stephens,* 851 F.2d 1457, 1463 (D.C.Cir.1988)).FN15 The court therefore dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 835856)**

Page 10

misses Plaintiffs' demands for injunctive and declaratory relief.[FN16]

FN14.Section 552a(g)(4) governs relief for claims under (g)(1)(D):

In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of-

(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(4).

FN15.*See Doe v. Chao,* 540 U.S. at 635 (Ginsburg, J., dissenting) ("It bears emphasis that the Privacy Act does not authorize injunctive relief when suit is maintained under § 552a(g)(1)(C) or (D). Injunctive relief, and attendant counsel fees and costs, are available under the Act in two categories of cases: suits to amend a record, § 552a(g)(2), and suits for access to a record, § 552a(g)(3). But for cases like Doe's, brought under § 552a(g)(1)(C) or (D), ... only monetary relief is available.").

FN16. Plaintiffs contend that in *Doe v. Chao,* the Supreme Court "left open the question of whether equitable relief is available" by stating that "[t]he Privacy Act says nothing about standards of proof governing equitable relief that may be open to victims of adverse determinations or effects...." Opp'n at 12, 19 (quoting *Doe*

*v. Chao,* 540 U.S. at 619, n. 1). Plaintiffs fail to note, however, that the Court went on to explain that "it may be that this inattention is explained by the general provisions for equitable relief within the Administrative Procedure Act ..."540 U.S. at 619, n. 1. As the court already stated, plaintiffs have not brought any claims under the Administrative Procedure Act.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. An appropriate order accompanies this memorandum opinion.

D.D.C.,2008.
American Federation of Government Employees v. Hawley
--- F.Supp.2d ----, 2008 WL 835856 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT B

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 65592 (Conn.Super.)
**(Cite as: 2001 WL 65592 (Conn.Super.))**

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.
FOX RUN MALL ASSOCIATES LTD. Partnership
v.
George V. LAWLER, et al
**No. CVH-5842.**

Jan. 15, 2001.

MEMORANDUM OF DECISION
TANZER, J.

*PROCEDURAL BACKGROUND AND FACTS*
**\*1** The plaintiff, Fox Run Mall Associates, Limited Partnership (Fox Run), filed a ten count complaint on April 22, 1997 against the defendants, George V. Lawler ("Lawler"), Frances C. Lawler [FN1] and Colonial Lantern Card & Gift Shop, Inc., d/b/a Village Card & Gift Shop (Colonial Lantern). Fox Run alleges against Colonial Lantern claims for breach of its lease agreement with Fox Run (count one), unjust enrichment (count five) and use and occupancy (count eight). As to Lawler, Fox Run alleges breach of his guaranty (count two). In addition, Fox Run sues Lawler to hold him personally liable, as proprietor of Colonial Lantern or as one who derives benefit from Colonial Lantern, for breach of the lease (count three), unjust enrichment (count six) and use and occupancy (count nine).

> FN1. The action was dismissed as to Frances C. Lawler for plaintiff's failure to make a prima facie case as to her on claims for breach of lease, unjust enrichment and use and occupancy as set forth in Counts four, seven and ten of the complaint.

By way of Special Defense the defendants argue constructive eviction, claiming that Fox Run did not maintain the premises, that Fox Run detracted from and interfered with their business by allowing organizations to conduct fund-raising activities in the mini-mall, and that Fox Run favored a large grocery store tenant at the mall with increased parking thereby limiting available parking for Colonial Lantern's customers. They also allege in their special defense that Fox Run failed to mitigate damages. Lawler, by way of special defense, alleges that his personal guarantee on the lease was only for two years.

The defendants filed two counterclaims and a claim for setoff. The first counterclaim alleges that Fox Run breached the lease agreement by failing to make reasonable repairs to the roof and sidewalk gutters, thus rendering the premises unfit for its purpose as a card shop, and affecting a constructive eviction. In their second counterclaim, the defendants allege that Fox Run violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., by inducing Colonial Lantern, a long-term tenant, to enter a contract of adhesion to continue as a tenant. The defendants also claim a setoff on the basis of the allegations of the two counterclaims.

Colonial Lantern was incorporated in 1979. Lawler was the sole stockholder. The corporation conducted a gift and card shop business at the Premises under a series of five year commercial leases signed by Lawler as President. Colonial Lantern lost its corporate status when it was dissolved by forfeiture on or about May 30, 1989. On January 1, 1994, Colonial Lantern and Fox Run entered into a commercial lease agreement pursuant to which Colonial Lantern rented from Fox Run 3000 square feet of retail space in Fox Run Mall (the "Premises"). The lease provides for annual basic rent of $30,000 in monthly installments of $2500. In addition, the lease provides for the tenant's payment of a pro rata (3.226 percent) share of taxes and operating costs. The lease was to run from January 1, 1994 to December 31, 1998. For the final three years of the lease term, the tenant was to pay additional rent in

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

accordance with the rent adjustments outlined in paragraph thirteen of the lease. Pursuant to the lease, the landlord retained control of common areas, including parking areas, and the landlord retained responsibility for repair and maintenance of the roof.

**\*2** The lease provides that Colonial Lantern will pay attorney's fees and costs of collection in the event of default. The lease was signed by Lawler, as President, and was personally guaranteed by him. Lawler guaranteed to make full, faithful and timely payment and performance of the lease agreement. The guaranty also provides for collection costs and attorney's fees in the event of default. Both the lease and the guaranty provide for interest at the rate of 12%.

Because of a dispute with Colonial Lantern over the erection of an unapproved sign in violation of the lease provisions, Fox Run opted to terminate the tenancy on April 14, 1995, by service of notice to quit. The notice to Quit states as a reason for the termination, "The violation of Colonial Lantern Card and Gift Shop Inc., d/b/a Village Card & Gift Shop, of Section 19 [FN2] of that certain Lease agreement dated January 1, 1994, .... which violation results from the wrongful erection of a sign by you on or before February 16, 1995." The notice to quit further provides that "[a]ny and all payments received after the date of service/delivery of this Notice will be accepted as use and occupancy, attorneys fees and/or costs and not as rent."

> FN2. Paragraph 19 provides "[t]he tenant will not place or suffer to be placed or maintained on any exterior door, wall or window of the Lease Premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Leased Premises without first obtaining the Landlord's written approval and consent...."

Colonial Lantern continued in possession and continued to make payments to Fox Run in an amount equivalent to its monthly basic rent of $2500 for another year through April 1996. During that time, the ledger of Fox Run indicates that Colonial Lantern's payments were received and accounted for as "rent." Lawler considered the payments made after service of the notice to quit as "use and occupancy." Colonial Lantern did not make the additional pro-rata payments called for in the Lease. Colonial Lantern remained in possession until July 10, 1996. Fox Run sold the shopping mall on January 8, 1998.

*FOX RUN'S COMPLAINT*
THE BREACH OF LEASE (COUNTS ONE AND THREE) AND THE GUARANTY (COUNT TWO):

The defendants argue that because the plaintiff opted to terminate the tenancy, the obligations under the lease were discharged. [FN3] "Although the termination of the tenancy releases a tenant from his obligations under the lease, such release does not leave the landlord without legal recourse to recover damages. Where a landlord, as in this case, elects to terminate the tenancy and to regain possession of the premises, although he cannot institute an action for rent due under the lease, he may sue for a breach of the lease. Where the action is one for breach of the lease, basic contract principles apply." *Rokalor v. Connecticut Eating Enterprises,* 18 Conn.App. 384, 389 (1989).

> FN3. The defendants argued also that Fox Run unreasonably refused permission to erect an illuminated exterior sign. That claim does not appear in either the special defense or the counterclaims. It is axiomatic that a party is held to the allegations of the [pleadings]. In any event, the defendants did not present sufficient evidence to support a claim or defense that consent to erect and maintain a sign was unreasonably withheld.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 3
Not Reported in A.2d, 2001 WL 65592 (Conn.Super.)
**(Cite as: 2001 WL 65592 (Conn.Super.))**

Colonial Lantern is liable for damages to Fox Run for breach of lease. Fox Run also seeks to hold Lawler individually liable for breach of the Lease Agreement which he executed as President of the corporation. The parties do not dispute that Colonial Lantern was dissolved by forfeiture in May of 1989, prior to the execution of the lease agreement. See General Statutes § 33-890. Following such dissolution, "[a] corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs under section 33-884 [FN4] and notify claimants under sections 33-886 [FN5] and 33-887." [FN6] General Statutes § 33-891(a). Within three years after dissolution, the dissolved corporation may apply for reinstatement pursuant to General Statutes § 33-892; if the reinstatement is effective, it relates back to the date of dissolution. General Statutes § 33-892(c). It is undisputed that since its dissolution by forfeiture, Colonial Lantern has not reinstated its corporate status.

> FN4. General Statutes § 33-884 provides, in pertinent part, that "[a] dissolved corporation continues its corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs...."

> FN5. General Statutes § 33-886 provides the method of notifying known claimants of the dissolution. "The written notice shall: (1) Describe information that must be included in a claim; (2) provide a mailing address where a claim may be sent; (3) state the deadline, which may not be fewer than one hundred twenty days from the effective date of the written notice, by which the dissolved corporation must receive the claim; and (4) state that the claim will be barred if not received by the deadline." General Statutes § 33-886(a).

> FN6. Section 33-887 of the General Statutes provides the method for publication of notice to unknown claimants of the dissolved corporation.

**\*3** "[A]lthough there is a diversity of opinion among courts ..., the majority rule is that officers may be held personally responsible for contracts made when a dissolved corporation continues to conduct business, regardless of subsequent statutory reinstatement.... Such a construction accords with the rule at common law...." (Citations omitted.) *J.M. Lynne Co. v. Geraghty,* 204 Conn. 361, 367, 528 A.2d 786 (1987). "It has been held in other jurisdictions that a *de jure* corporation which has forfeited its charter and has had its powers suspended, cannot continue to function as a *de facto* corporation.... Connecticut has not yet ruled on this precise issue." *Clark-Franklin-Kingston Press, Inc. v. Romano,* 12 Conn.App. 121, 126, 529 A.2d 240, cert. denied, 205 Conn. 803, 531 A.2d 935 (1987). "Some courts have also held that when a corporation continues to carry on as a corporation after dissolution, and does business beyond that necessary to wind up its affairs, those operating the corporation become individually liable for corporate obligations." Id.

In *Clark-Franklin-Kingston Press, Inc. v. Romano,* the court upheld the trial court's determination that the officers and directors of the dissolved corporation could not be held personally liable for the corporation's obligations. See id., 126. The court reasoned that "the plaintiff did not by reason of the defect in the reincorporation process, acquire any rights against the individual defendants," because it was clear that the defendants "intended to function as a corporation," and because the facts showed that the defendants had "made an immediate good faith attempt at reincorporation upon learning of their dissolution." Id., 125-26. (The corporation was dissolved by the secretary of the state in May 1980, for failure to file two successive annual reports. In June 1980, the defendants attempted to reinstate the corporation. The defendants incorrectly assumed that this attempt had been successful. In May 1982, upon realizing that corporate status had not been re-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 65592 (Conn.Super.)
**(Cite as: 2001 WL 65592 (Conn.Super.))**

Page 4

conferred, the defendants again attempted to rein-
state the corporation and were successful in August
1982.) Here, however, the court lacks such evid-
ence. There was some evidence that Lawler, an at-
torney, made initial efforts to reincorporate;
however, more than three years lapsed after the
1989 dissolution without reinstatement. The lease
commenced on January 1, 1994, after which rein-
corporation never took place. Under these circum-
stances, Lawler is personally liable for the breach
of lease claim.

Lawler is also liable pursuant to the guaranty ex-
ecuted him. The Guaranty Agreement executed by
Lawler provides, in part, that "[i]f Tenant shall de-
fault at any time in the payment of any rent or any
other sums, costs or charges whatsoever, or in the
performance of any of the other covenants and ob-
ligations of Tenant, pursuant to the Lease, then the
undersigned, at his expense, shall on demand of the
Landlord, fully and promptly pay all rent, sums,
costs and charges to be paid by Tenant, and per-
form all the other covenants and obligations to be
performed by Tenant, under or pursuant to the
Lease, and in addition shall on Landlord's demand
pay to Landlord any and all sums due to Landlord,
including (without limitation) all interest on past
due obligations of Tenant, costs advanced by Land-
lord, and damages and all expenses (including at-
torney's fees and litigation costs), that may arise in
consequence of Tenant's default."

### DAMAGES

*4 "A lease is nothing more than a contract. *Robin-
son v. Weitz,* 171 Conn. 545, 551, [370 A.2d 1066
(1976) ]. Thus, as in any other contract action the
measure of damages is that the award would place
the injured party in the same position as he would
have been in had the contract been fully performed.
As a consequence, the unpaid rent, while not recov-
erable as such, may be used by the court in comput-
ing the losses suffered by the plaintiff by reason of
the defendant's breach of contract or lease. The
plaintiff would be entitled to recover the damages
which would naturally follow from such a breach....

*Rokalor, Inc. v. Connecticut Eating Enterprises,
Inc.,* supra, 389." *K & R Realty Associates v.
Gagnon,* 33 Conn.App. 815, 821, 639 A.2d 524
(1994)

The appropriate measure of damages is one that
would put the plaintiff in the same position it would
have been in had the defendant not breached the
lease. In this case, the plaintiff is entitled to rent
due in the amount of $50,000.00 [FN7] plus interest
in the amount of $27,000.00; advertising costs in
the amount of $4665.60 and attorneys fees and
costs in the amount of $27,024.14. [FN8]

> FN7. No amount is awarded for pro rata
> operating expenses or taxes. There is insuf-
> ficient evidence upon which to base a find-
> ing as to the amount due for the years in
> question. The ledger in evidence indicates
> an amount debited monthly for "PARK/
> LOT INC", and the lease sets out the per-
> centage to be applied in order to calculate
> Colonial Lantern's pro rata share of operat-
> ing expenses and taxes. There is no evid-
> ence, however, as to what the operating ex-
> penses were or whether or when the tax
> bill in evidence or any other taxes were
> paid by Fox Run. "Damages are an essen-
> tial element of a plaintiff's proof and must
> be proved with reasonable certainty. *Bi-
> anco v. Floatex, Inc.,* 145 Conn. 523, 525,
> 144 A.2d 310 (1958) ." *Simone Corpora-
> tion v. Connecticut Light & Power Co.,*
> 187 Conn. 487, 495, 446 A.2d 1071 (1982).

> FN8. The lease provides that "[i]n case suit
> shall be brought for recovery of possession
> of the Leased Premises, for the recovery of
> rent or any other amount due under the
> provisions of the Lease, or because of the
> breach of any other covenant herein con-
> tained on the part of the Tenant to be kept
> or performed, and a breach shall be estab-
> lished, the Tenant shall pay to the Land-
> lord all expenses incurred therefor, includ-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ing a reasonable attorney's fee." The guaranty also provides that Lawler agrees to be held liable for "costs advanced by Landlord, and damages and all expenses (including attorney's fees and litigation costs), that may arise in consequence of Tenant's default."

## UNJUST ENRICHMENT (COUNTS FIVE AND SIX)

Because Fox Run may recover on the contract, the equitable remedy afforded by a claim of unjust enrichment is not available. "Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to contract. 5 S. Williston, Contracts (Rev. Ed.) § 1479." *Ayotte Bros. Construction Co. v. Finney,* 42 Conn.App. 578, 581, 680 A.2d 330 (1996).

## USE AND OCCUPANCY(COUNTS EIGHT AND NINE)

Fox Run claims it is entitled to recover use and occupancy or the fair rental value of the Premises from Lawler for the period during which Colonial Lantern occupied the Premises following receipt of the notice to quit, that is from April 1995 through June 1997. *O'Brien Properties, Inc. v. Rodriguez,* 215 Conn. 367, 372, 576 A .2d 469 (1990). That is so. Inasmuch, however, as the court has assessed contract damages for breach of lease and in so doing credited the $2500.00 monthly use and occupancy payments, an award under this count is duplicative and unnecessary.

### SPECIAL DEFENSES

Lawler argues, by way of special defense, that the Guaranty was effective only for the first two years of the lease. The guaranty is limited in duration by rider K, which provides that the guaranty "shall not apply to any options or extensions or renewals *of the five year term* ending December 31, 1998." (Emphasis added.) Thus, the guarantee endured for five years, not two.

In another special defense, the defendants claim that Fox Run failed to mitigate damages. The duty to mitigate damages did not require the plaintiff to sacrifice any substantial right of its own; *Eastern Sportswear Co. v. S. Augstein & Co.,* 141 Conn. 420, 425, 106 A.2d 476 (1954); or to exalt the interests of the tenant above its own. Id.; *Raff Co. v. Murphy,* 110 Conn. 234, 243, 147 A. 709 (1929). It was required to make reasonable efforts to minimize damages. *Danpar Associates v. Somersville Mills Sales Room,* 182 Conn. 444, 446, 438 A.2d 708 (1980). As soon as Fox Run learned that Colonial Lantern had vacated the Premises in July 1996, Fox Run listed the Premises with real estate brokers. From September 1, 1996, through June of 1997, the Premises were advertised in the Hartford Courant over 200 times. These were the "worst years" for real estate; and the Premises were sold in January 1998. Fox Run's account statements for advertising in the Hartford Courant total $4,665.60. The evidence adequately demonstrates Fox Run's reasonable attempts to mitigate damages.

**\*5** Finally, the defendants failed to prove that the condition of the premises was such that the business was constructively evicted from the premises. "[A] constructive eviction arises where a landlord, while not actually depriving the tenant of possession of any part of the premises leased, has done or suffered some act by which the premises are rendered untenantable, and has thereby caused a failure of consideration for the tenant's promise to pay rent." (Internal quotation marks omitted.) *Baretta v. T & T Structural, Inc.,* 42 Conn.App. 522, 526, 681 A.2d 359 (1996)." *Heritage Square, LLC v.. Eoanou,* 61 Conn.App. 329, 333; __ A.2d __ (2001). The defendants failed to sustain their burden that the premises were untenantable for any of the reasons they advance. Specifically, although Lawler complained of water damage, no evidence was offered that Colonial Lantern was required to vacate the premises at any time because of Fox Run's failure to maintain the premises. Likewise, there was no credible or adequate evidence that Colonial Lantern lost customers or had to go out of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 65592 (Conn.Super.)
(Cite as: 2001 WL 65592 (Conn.Super.))

Page 6

business because Fox Run allowed organizations to fund-raise in the mall once or twice a year or because Fox Run leased to a large tenant supermarket in the mall thereby limiting parking. The more credible evidence which came from an employee of another mall store called Roger's Hideaway supports a finding that there were no problems with parking, traffic or maintenance at the mall. The defendants' business was declining and losing customers in 1994 and 1995, they ceased making any payments to Fox Run after April 1997, and they vacated the Premises in July 1997. Colonial Lantern, however, failed to prove that the business declined, that customers were lost, that they stopped paying Fox Run, or that they vacated the Premises because of anything Fox Run did or failed to do. "It is axiomatic that causation must be removed from the realm of speculation and conjecture." *Samose v. Hammer-Passero Norwalk Chiropractic Group, P.C.,* 24 Conn.App. 99, 103, 586 A.2d 614, cert. denied, 218 Conn. 903, 588 A.2d 1079 (1991) ." *PAR Painting, Inc. v. Greenhorne & O'Mara, Inc.* 61 Conn.App. 317, 326, 763 A.2d. 1078 (2001).

In sum, the defendants cannot prevail on their special defenses.

### DEFENDANTS' COUNTER-CLAIMS AND REQUEST FOR SETOFF
### FAILURE TO REPAIR

The defendants' first counterclaim alleges that Fox Run breached the lease agreement and constructively evicted the tenant by failing properly to maintain the roof thereby causing leaks into the premises with resulting damage to inventory; by failing to maintain the gutter system causing decreased pedestrian traffic and decreased business; and by catering to the needs of a large anchor tenant, a grocery store, with increased parking, thereby limiting the available parking for Colonial Lantern's customers and causing it to suffer a dramatic decline in store traffic and a resultant loss of business. There was scant evidence to support any of these allegations and no evidence to show either the amount of business loss or the cause of that loss. Lawler did

present evidence that the card shop had sustained damage to inventory because of water damage, but there was no evidence that water leaks or water damage caused the business to vacate the Premises. "It is axiomatic that causation must be removed from the realm of speculation and conjecture." *Samose v. Hammer-Passero Norwalk Chiropractic Group, P.C.,* 24 Conn.App. 99, 103, 586 A.2d 614, cert. denied, 218 Conn. 903, 588 A.2d 1079 (1991)." *PAR Painting, Inc. v. Greenhorne & O'Mara, Inc.* 61 Conn.App. 317, 326, 763 A.2d. 1078 (2001). There was no constructive eviction.

### CUTPA

*6 The defendants allege that Fox Run was unwilling to negotiate the terms of the January 1994 Lease Agreement with Colonial Lantern and forced it to enter into a contract of adhesion because Fox Run knew that Colonial Lantern would find it difficult to move its operations to another location after twelve years of conducting business at the subject mall. Colonial Lantern alleges the plaintiff took advantage of its superior bargaining position.

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons].... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Hartford Electric Supply Co. v. Allen-Bradley Co.,* 250 Conn. 334, 367-68, 736 A.2d 824 (1999). "Moreover, [the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                    Page 7
Not Reported in A.2d, 2001 WL 65592 (Conn.Super.)
**(Cite as: 2001 WL 65592 (Conn.Super.))**

Supreme Court] has set forth a three part test for satisfying the substantial injury criterion: [1] [the injury] must be substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury that consumers themselves could not reasonably have avoided." (Internal quotation marks omitted.) Id., 368. The evidence before the court does not satisfy the test for CUTPA. In fact, it is more reasonable to find that Lawler was in the better bargaining position for negotiating the new lease. The real estate market was at its 'worst" which would explain why the ledger for the prior lease indicates monthly payments of $3000.00 and why Fox Run overlooked and forgave part of a substantial balance due for rent on the prior lease.

"In determining whether a practice violates CUTPA we use the criteria of whether [it] offends public policy or comes within some established concept of unfairness, whether [it] is immoral, unethical, oppressive or unscrupulous or whether it causes substantial injury to consumers, competitors or other businessmen." *PAR Painting, Inc. v. Greenhorne & O'Mara,* Inc., supra 328. There was no showing that CUTPA was violated or that the plaintiff's alleged damages were established. See Id.

### CONCLUSION

Judgment may enter in favor of the plaintiff on Counts One, Two, Three Eight and Nine. Damages are awarded in the amount of $81,665.60 and attorneys fees and costs in the amount of $27,024.14.

*7 Judgment may enter in favor of the defendants on Counts Five and Six.

Judgment may enter in favor of the plaintiff on the Counterclaims.

Not Reported in A.2d, 2001 WL 65592 (Conn.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**Westlaw Delivery Summary Report for MEHLER,CHARLES V 2500350**

Date/Time of Request:          Wednesday, April 9, 2008 14:16 Central
Client Identifier:             026450.0000.MEHLER
Database:                      CT-CS
Citation Text:                 Not Reported in A.2d
Lines:                         70
Documents:                     1
Images:                        0

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

EXHIBIT C

Westlaw.

Not Reported in A.2d                                                     Page 1
Not Reported in A.2d, 2000 WL 1391739 (Conn.Super.), 28 Conn. L. Rptr. 132
**(Cite as: 2000 WL 1391739 (Conn.Super.))**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.
The CONNECTICUT LIGHT and POWER COM-
PANY,
v.
Joshvant PATEL, et al., dba Pujan Associates, Inc.,
et al.
**No. CV990429899.**

Sept. 12, 2000.

MEMORANDUM OF DECISION
MEADOW.

**\*1** The case was tried after various defaults had
been reopened all as appear of record.

The plaintiff, hereinafter "CL & P" instituted a
three-count complaint seeking money damages for
electrical service provided to the defendants,
Joshvant and Usha Patel d/b/a/ Pujan Associates
Inc. hereinafter "Patels" as individuals and Pujan
Associates Inc. as a corporation hereinafter the "Cor-
poration."

*The First Count* alleges that the Corporation was
dissolved by forfeiture by the Secretary of State on
October 1, 1993 (Paragraph 4). CL & P further al-
leges that from October 20, 1994 to June 25, 1998,
they provided electric services to Patels d/b/a as Pu-
jan Associates Inc. at 30 Lansing Street, Southing-
ton. CL & P alleges that as of July 30, 1999, Patels
owed CL & P $62,802 for the utility service
provided.

*The First Count* sounds in Implied Contract. *The
Second Count* sounds in Express Contract alleging
that as of July 30, 1999, Patels owe CL & P the
same amount as alleged in the First Count for the
utility service. The complaint alleges in *the Third
Count* unjust enrichment for the claimed amount in
the First and Second Counts.

Patels allege in the Special Defense (Pleading #
109) that at all times the services were provided
that the Patels were acting as a corporation either
de jure or de facto in nature and that "there was no
contract, agreement or expectation in the plaintiff
that the named defendants would be liable for any
of the alleged services."

The Second Special Defense essentially states that
the business for which the utility service was
provided was sold about June 12, 1998 and all or a
portion of the amounts claimed is not the responsib-
ility of either the named defendants (Patels), or the
Corporation. The Third Special Defense asserts that
some or all of the charges claimed were part of a
prior lawsuit which was settled and paid.

The principal issue in this case is for the court to
decide whether the Patels are individually liable for
the debt of the Corporation or whether they were
acting as a de facto corporation and therefore incur
no personal liability. Essentially the Patels assert
that CL & P is estopped from treating the Patels
other than in their corporate capacity.

The Patels rely on the holding in *Clark-Frank-
lin-Kingston Inc. v. Romano,* 12 Conn.App. 121,
529 A.2d 240 (1987). CL & P argues that the Patels
woefully misplace the holding in *Romano* because
in *Romano* the defendant, an officer of a dissolved
corporation, made an immediate good faith effort to
reinstate the corporation after learning of its dissol-
ution. In *Romano,* the court held it would be in-
equitable to deny the corporation's existence during
a brief interval between its dissolution and its rein-
statement.

In this case the court finds that the defendants never
undertook to effect reinstatement and the interval of
time for a claim of corporate protection by the of-
ficers and directors is more than four years later.
Accordingly, the holding in *Romano* is inapplicable
in this case.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2000 WL 1391739 (Conn.Super.), 28 Conn. L. Rptr. 132
(Cite as: 2000 WL 1391739 (Conn.Super.))

In *Romano, supra,* at page 126, 529 A.2d 240 the court stated:

*2 Some courts have also held that when a corporation continues to carry on as a corporation after dissolution, and does business beyond that necessary to wind up its affairs, those operating the corporation become individually liable for corporate obligations. 19 Am.Jur.2d, Corporations § 2887; See *In re Hare,* 205 F.Supp. 881, 883 (D.Md.1962); *Trubowitch v. Riverbank Canning Co.,* 30 Cal.2d 335, 345, 182 P.2d 182 (1947); *In re Estate of Plepel,* 115 Ill.App.3d 803, 806, 71 Ill.Dec. 365, 450 N.E.2d 1244 (1983); *Borbein, Young & Company v. Cirese,* 401 S.2d 940, 944 (Mo.App.1966); *Seavy v. I.X.L. Laundry Co.,* 60 Nev. 324, 331, 108 P.2d 853 (1941); *Chatman v. Day,* 7 Ohio App.3d 281, 284, 455 N.E.2d 672 (1982); *Bulova Watch Co. v. Roberts Jewelers,* 240 S.C. 280, 285, 125 S.E.2d 643 (1962); *First National Bank of Boston v. Silberstein,* 398 S.W.2d 914, 916 (Tex.1966). The precise question here, however, is whether there is an exception to this general rule where all parties involved believed there was corporate existence. [FN1]

> FN1. Our Supreme Court has recently upheld a trial court decision which imposed individual liability for a debt on the theory that the defendant, a corporate officer and the sole stockholder of a corporation, continued to conduct corporate business after the corporation had been dissolved but before its reinstatement. *J.M. Lynne Co. v. Geraghty,* 204 Conn. 361, 528 A.2d 786 (1987). In contrast to the present case, there is no indication in *J.M. Lynne Co. v. Geraghty, supra,* that the individual defendant made an immediate, good faith attempt to reinstate the corporation upon learning of its dissolution, or that he believed he was operating as a corporation. Thus, there was no basis upon which the dissolved corporation could have been deemed a de facto corporation during the

period of dissolution. In addition, *J.M. Lynne Co. v. Geraghty,* was decided not on the law of this jurisdiction but on the basis of New York law, pursuant to stipulation by the parties.

CL & P urges the court to adopt the holding in *J.M. Lynne Co. v. Geraghty,* 204 Conn. 361, 528 A.2d 786 (1987).

Accordingly, from all the evidence adduced at trial this court finds that the Patels cannot escape personal liability in accordance with the precedents discussed in *Geraghty.* Further, although there is no specific time for winding up the affairs of a corporation pursuant to the relevant statute, (see C.G.S. § 33-89), failure to do so for more than two years since the sale of the business is unreasonable.

The Court finds there is no exception to make it inequitable to hold the parties personally liable as well as the Corporation.

The next issue to be decided by the court is as to the amount due. The defendants claim in their special defenses that some or all of the charges claimed were part of a prior lawsuit which was settled and paid.

Mary Goffen, Customer Service Representative for CL & P testified that utilities service to the defendants continued to be provided from October 1994 until June 1998 and that the balance owed is $62,782.70. (See Exhibit 1 final bill for $62,782.70.)

Susan Cote of the Revenue Protection Department of CL & P testified that the Pujan, the Corporation, account had unauthorized use of electricity and those charges had ultimately been settled with a credit upon payment by Patels of $35,000 for the unmetered service. Exhibit 4 demonstrated the unmetered claims and credits leaving a balance of $62,782.70 for unpaid utility service. The defendants have failed to meet their burden of proof that the sums due for the metered service amounts to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1391739 (Conn.Super.), 28 Conn. L. Rptr. 132
**(Cite as: 2000 WL 1391739 (Conn.Super.))**

Page 3

$62,782.70.

Accordingly, for the above reasons the court finds in favor of the plaintiff to recover the sum of $62,782.70 plus court costs as to all defendants.

Not Reported in A.2d, 2000 WL 1391739 (Conn.Super.), 28 Conn. L. Rptr. 132

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT D

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 43713 (Conn.Super.), 13 Conn. L. Rptr. 446
**(Cite as: 1995 WL 43713 (Conn.Super.))**

Page 1

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of Ansonia/Milford, at
Milford.
Dawn PERRI
v.
Thatcher DUNI, D/B/A Life Design Systems, et al.
**No. CV94 04 59 81S.**

Jan. 31, 1995.

*MEMORANDUM OF DECISION*
*RE: MOTION FOR SUMMARY JUDGMENT # 110*
THOMPSON, Judge.

**\*1** The plaintiff brings this action against Thatcher Duni and Joanne Duni, d/b/a Life Design Systems. This action arises from a claim that the plaintiff was injured by using a batting cage allegedly operated by the defendants.

The defendants have moved for summary judgment on the ground that, on the day of the alleged occurrence, February 22, 1992, they were doing business, not as individuals, but as a corporation, Life Design Systems, Inc., and cannot therefore be personally liable.

From the documents submitted by both sides, it appears that the corporation was dissolved on or about March 30, 1990 for failure to file a biennial report. At an annual meeting on June 30, 1992, a resolution to reinstate the corporation was adopted and the necessary steps were thereafter taken to accomplish that result. During the interval, on February 22, 1992, the plaintiff claims the occurrence giving rise to her injuries took place.

It is the claim of the defendants that Life Design Systems, Inc. was a de facto corporation at the time of the plaintiff's injuries and, thus, they cannot be held personally liable. In support of their position, the defendants rely on *Clark-Franklin-Kingston*

*Press, Inc. v. Romano,* 12 Conn.App. 121 (1987). The plaintiff, discussing *J.M. Lynne Co. v. Geraghty,* 204 Conn. 361 (1987), argues that the *Clark* case is not controlling as it is distinguishable on its facts.

The court believes that the circumstances in *Clark* distinguish it from the case at bar. In reading both *Clark* and *Lynne,* it appears that the majority rule is that officers that continue to conduct business after dissolution may be held personally liable regardless of subsequent reinstatement.

The court in *Clark* noted that the defendants made a good faith effort to reincorporate after learning of the dissolution and then dealt with the plaintiff as a corporation and the plaintiff dealt with them as a corporation, relying on the corporate status *and corporate assets.* After stating that some courts hold individuals liable in circumstances similar to those at hand, the *Clark* court stated at page 127: "The precise question here, however, is whether there is an exception to the general rule where all parties involved believed there was a corporate existence."

In this case, it is not at all clear that there was a good faith effort to reinstate the corporation in a timely fashion. Unlike the situation in *Clark,* this is not a case where the plaintiff relied upon the corporate existence or its assets, by simply, at least according to the complaint, decided to use a batting cage.

The motion for summary judgment is therefore denied.

Not Reported in A.2d, 1995 WL 43713 (Conn.Super.), 13 Conn. L. Rptr. 446

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN FLYNN, et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No. 1:08-CV-00222** |
| **v.** ) | |
| ) | **Judge Henry H. Kennedy** |
| **ANGELO MONARCA, INC.,** ) | |
| **d/b/a ANGELO MONARCA CONTRACTING, LLC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>ORDER</u>

Upon consideration of the Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and For Failure to State a Claim Upon Which Relief May Be Granted, Plaintiffs' opposition, and any reply, the Court finds that the Defendants' motion should be denied. **ACCORDINGLY**, it is hereby

**ORDERED**, that Defendants' motion to dismiss be, and it hereby is, **DENIED**.

**SO ORDERED**, this _____ day of _____, 2008.

_____
Henry H. Kennedy
United States District Judge

2425546

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN FLYNN, et al.,** | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **Case No. 1:08-CV-00222** |
| **v.** | ) |
| | ) **Judge Henry H. Kennedy** |
| **ANGELO MONARCA, INC.,** | ) |
| **d/b/a ANGELO MONARCA CONTRACTING, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## LOCAL RULE 7(K) STATEMENT

Pursuant to Local Rule 7(k), the following persons are entitled to be served with

orders, judgments and stipulations:

Ira R. Mitzner, Esquire
Dickstein Shapiro LLP
1825 Eye Street, N.W.
Washington, D.C.  20006-5403

Juan Chardiet, Esquire
Gipple & Hale
6665-A Old Dominion Drive
McLean, VA 22101-4518